EXHIBIT H

**PROCEEDINGS PURSUANT TO THE JUDICIAL ARBITRATION AND MEDIATION SERVICES (JAMS) COMPREHENSIVE ARBITRATION RULES & PROCEDURES**

**CONFIDENTIAL**

HOLISTIC SOLUTIONS LLC,

Claimant,

v.

EASTBOUND COLLECTIVE LLC, PATRIK JONSSON and ROBERT SCIARRONE,

Respondents.

EASTBOUND COLLECTIVE LLC,

Counterclaimant,

v.

HOLISTIC SOLUTIONS LLC,

Counterclaim-Respondent,

and SUZAN NICKELSON, individually and as Manager of Holistic Solutions LLC,

Third-party Respondent.

**JAMS Ref. No. 5425002519**

**Stephen M. Orlofsky, Arbitrator**

Counsel for Holistic Solutions LLC:
Robert J. Donaher, Esq.
Alexa E. Sjolund, Esq.
A.Y. STRAUSS LLC
290 West Mount Pleasant Avenue
Suite 3260
Livingston, New Jersey 07039

Counsel for Suzan Nickelson:
Ethan Hougah, Esq.
Grace Wagner, Esq.
MONTGOMERY, MCCRACKEN, WALKER & RHOADS LLP
457 Haddonfield Road, Ste. 600
Cherry Hill, New Jersey 08002

Counsel for Eastbound Collective LLC, Patrik Jonsson and Robert Sciarrone:
Jeffrey J. Greenbaum, Esq.
Joseph B. Shumofsky, Esq.
Morgan H. Durr, Esq.
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102

## TABLE OF CONTENTS

**Page(s)**

I. BACKGROUND ....1
A. Procedural History ....1
B. Arbitrator's Jurisdiction and Instructions in the Operating Agreement ....3
II. FACTUAL FINDINGS ....4
A. The Parties and Other Relevant Individuals and Entities ....4
B. The Regulation and Use of Cannabis in New Jersey ....9
C. The Lead Up To The Holistic-Eastbound Transaction ....11
D. Execution of the Holistic Deal Documents ....12
1. The Holistic OA .... 13
2. The Holistic UPA .... 13
3. The Option Agreement .... 15
4. The License Agreement .... 16
E. The Lead Up To The Eastbound-Cliffside Transaction ....19
F. The Cliffside Deal and Its Funding ....20
G. The Notice Provision and Disclosure Obligations in the Eastbound OA ....22
H. The NJ-CRC's Investigation Into Eastbound and Jonsson's Suitability ....24
I. Eastbound's Funding Sources and Respondents' Understanding of Their Regulatory Obligations ....27
J. Holistic's Expanded ATC License, Opening of the Store, and Sciarrone's May 2023 Visit ....28
K. Eastbound's Disputes With Nickelson ....30
1. Nickelson Employment Agreement .... 30
2. Budget Delays .... 32
3. Refusal to Work With Eastbound Representatives .... 36
4. Eastbound's Demand for Inspection .... 36
L. Holistic's 2024 License Renewal Application and the Revelation of Cliffside as Eastbound's Controlling Member ....38
M. The Removal of Eastbound, Notification to the NJ-CRC, and Holistic's 2024 License Renewal ....42
N. The NJ-CRC's Deferral To The Outcome Of This Arbitration ....44
O. Eastbound's Attempted Exercise of its Option ....45
III. CAUSES OF ACTION ASSERTED BY THE PARTIES ....46
A. Holistic's Claims Against Respondents ....46
B. Eastbound's Claims Against Holistic and Nickelson ....46

# TABLE OF CONTENTS

**Page(s)**

C. Nickelson's Counterclaim Against Eastbound ....................47

IV. CONCLUSIONS OF LAW ....................47

A. New Jersey Law Governs. ....................47

B. The Operation of Limited Liability Companies Under New Jersey Law. ....................48

C. Respondents Violated the NJ Marijuana Laws By Failing To Disclose the Cliffside Deal. ....................51

1. Statutory Requirements For A "Significantly Involved Person" .................... 51

2. The NJ Cannabis Rules .................... 54

D. Eastbound Breached the Holistic OA By Entering Into The Cliffside Deal Without The Consent of Holistic or the NJ-CRC. ....................56

1. The Eastbound-Cliffside Transaction in December 2022 Constituted A "Transfer" of Eastbound's Membership Interest in Holistic. .................... 56

2. Eastbound Breached The Manager Consent Provision of the Holistic OA, As Well As Representations and Warranties in the Holistic UPA. .................... 58

3. The Cliffside Deal Triggered Statutory Notification and Contractual Disclosure Obligations For Respondents. .................... 60

4. Consequences of Respondents' Failure to Notify the NJ-CRC .................... 62

5. Respondents' Failure to Disclose the Cliffside Deal Created a "Regulatory Problem" Under the Holistic OA. .................... 63

6. Pursuant to the Holistic OA, Eastbound's Unauthorized Transfer Of Membership Interests in Holistic Is Null & Void. .................... 65

E. Holistic Is Entitled To A Declaratory Judgment Confirming The Forfeiture Without Consideration of Eastbound's Interests and Eastbound's Removal as a Member. ....................65

F. Holistic Failed To Provide Sufficient Evidence to Support Its Fraud Claims. ....................69

G. Holistic Failed To Prove Its Breach of Fiduciary Duty and Piercing the Corporate Veil Claims. ....................70

H. Eastbound's Breach of Contract Claim Relating To The Option Agreement Fails As A Matter of Law; Its Related Request for a Declaratory Judgment is Denied. ....................72

I. Eastbound Failed To Present Evidence Sufficient To Sustain Any Claim Against Nickelson Individually; However, Its Conduct In Pursuit of The Fraud Claim Did Not Constitute Malicious Abuse of Legal Process. ....................74

J. Eastbound Failed To Prove Its Breach of Contract and Statutory Violation Claims Against Holistic. ....................80

1. Holistic's Removal of Eastbound Did Not Constitute a Breach of the Holistic OA .................... 80

TABLE OF CONTENTS

Page(s)


2. Eastbound Failed To Prove That Nickelson's Failure to Sign An Employment Agreement Constituted A Breach of the Holistic UPA. ................................ 80

3. Eastbound Failed To Prove Nickelson's Delay in Preparing The First Annual Budget Was Unreasonable or That Any Harm Resulted to It or to Holistic. .. 82

4. Eastbound Failed To Prove Breach of Contract or a Statutory Violation Resulting From The Alleged Lack of Sufficient Financial Information. ........ 82

5. Eastbound Failed to Produce Sufficient Evidence of Manager Mismanagement to Support a Breach of the Holistic OA. ........................................................ 86

K. Eastbound's "Oppression" Claim Fails As A Matter of Law. ..................................89

L. The License Agreement Is Unenforceable and All Parties' Breach Claims Fail As A Matter of Law. ..........................................................................................90

M. As Prevailing Parties, Holistic and Nickelson Are Entitled To Reasonable Attorneys' Fees and Certain Expenses. ....................................................................91

1. The Holistic OA and JAMS Rules ................................................................ 91

2. "Prevailing Party" Determination Under New Jersey Law ............................ 92

3. New Jersey Law Governing Fee Awards ...................................................... 96

4. Holistic and Nickelson Are Entitled to a Monetary Award Under the Holistic OA. ................................................................................................................ 97

5. Assessment of the Requested Amounts. ........................................................ 97

6. Interest on the Monetary Awards. ............................................................... 106

**CONFIDENTIAL**

**ORLOFSKY, ARBITRATOR**

**MEMORANDUM OPINION**

# I. BACKGROUND

## A. Procedural History

This matter was initiated in July 2024 with a demand for arbitration filed by Holistic Solutions LLC ("Holistic") against Eastbound Collective LLC ("Eastbound"), Patrik Jonsson ("Jonsson"), and Robert Sciarrone ("Sciarrone"). Eastbound, Jonsson and Sciarrone are referred to collectively herein as "Respondents." Respondents filed their Answer, Defenses, and Counterclaim to Holistic's initial demand, as well as a third-party complaint against Suzan Nickelson ("Nickelson"), individually and as manager of Holistic, on or about August 20, 2024.[1] Holistic answered Respondents' counterclaim on or about September 24, 2024. Nickelson answered Respondents' third-party complaint on or about September 24, 2024, and asserted counterclaims of her own against Eastbound.

On or about September 24, 2024, Holistic filed an Amended Demand for Arbitration ("Holistic Demand"). Respondents answered the Holistic Demand on or about October 8, 2024, and again asserted counterclaims against Holistic and third-party claims against Nickelson. I conducted an initial case management conference on or about October 28, 2024, and entered an initial scheduling order on October 31, 2024, which was subsequently amended several times. The parties conducted discovery pursuant to a Confidentiality Order for approximately one year. On or about June 17, 2025, Eastbound filed its Amended and Supplemental Counterclaims against Holistic and its Amended Third-Party Complaint against Nickelson (collectively herein,

[1] The parties agreed by email to retain me as the Arbitrator in this matter on or about September 11, 2024. Engagement letters confirming my retention were executed by counsel for all parties by mid-October 2024.

"Eastbound Counterclaims"). Holistic and Nickelson answered the Eastbound Counterclaims on or about October 30, 2025.

The arbitration hearing in this matter commenced on December 8, 2025, in Newark, New Jersey. In-person testimony was taken from the parties and other witnesses for 14 days, and certain deposition designations were moved and accepted into the record in accordance with JAMS Rule 22(e). The parties conferred and agreed upon the exhibits admitted into evidence and they submitted copies of the same for the record.[2] All parties submitted proposed findings of fact and conclusions of law on February 20, 2026, and they presented closing oral arguments on February 25, 2026.

On February 23, 2026, I entered an Order ("February 23 Costs Order") requiring each party to file for the record, no later than March 11, 2026, an affidavit consistent with New Jersey Rule of Court 4:42-9(b) and an itemized accounting of his/her/its pre-arbitration-award fees and expenses arising from this arbitration, from the date first incurred through and including March 11, 2026 ("Costs"). *See* 2/23/2026 Order. For the reasons set forth in the Memorandum Opinion and Order of February 28, 2026, I denied Respondents' motion for reconsideration of the February 23 Costs Order. *See* 2/28/2026 Mem. Op. & Order. Each party was also given an opportunity to file objections by March 18, 2026 to any costs being sought by any other party. On March 18, 2026, upon my receipt and consideration of these submissions, the record was closed.[3]

---

[2] The Parties did not agree prior to the hearing to use a consecutively numbered, consolidated set of exhibits. As a result, there was overlap in the exhibit numbering. I will use the following convention to identify documents that were admitted into evidence at the arbitration hearing: "Ex. C[#]" for exhibits from Claimant's Exhibit List and "Ex. R[#]" for exhibits from Respondents' Exhibit List, regardless of which party moved the admission of the document. Citations to the hearing transcript record will be denoted with "Tr." and the page numbers.

[3] JAMS Rule 22(h) requires me to close the record once I have determined that all relevant and material evidence and arguments have been presented. *See id.*

### B. Arbitrator's Jurisdiction and Instructions in the Operating Agreement

Holistic and Eastbound entered into a Second Amended and Restated Operating Agreement for Holistic Solutions LLC (the "Holistic OA," Ex. C22), on or about September 16, 2022, which forms the basis of my jurisdiction over these matters. Pursuant to the Holistic OA, the parties agreed that "any dispute or controversy between any of the parties involving the interpretation, construction or application of any terms of this Agreement, or transactions under it, must be solely and finally settled by arbitration in accordance with the commercial rules then in effect of the Judicial Arbitration and Mediation Services Comprehensive Arbitration Rules and Procedures" (the "JAMS Rules"). Ex. C22, §14.12(a). The arbitration hearing was conducted in accordance with the JAMS Rules.

Under the Holistic OA, except with respect to provisional remedies, I have "the authority to award any remedy or reward (sic) that a court in the United States of America could order or grant, including specific performance of any obligation created under this Agreement, the issuance of an injunction or other provisional relief, or the imposition of sanctions for abuse or frustration of the arbitration process." *See* Ex. C22, §14.12(d)(i). The arbitration award is required to be in writing and specify the factual and legal basis for the award. *See* Ex. C22, §14.12(d)(ii). Section 14.12(b) states: "The decision of the arbitrator must be in accordance with the provisions of this Section 14.12 and must be final, binding, conclusive, and non-appealable." *See* Ex. C22, §14.12(b).

The parties and the arbitrator "must treat all aspects of the arbitration proceedings, including discovery, testimony and other evidence, briefs, and the award, as strictly confidential." *See* Ex. C22, §14.12(c)(ii). Judgment on the arbitration award may be entered in any court that has jurisdiction over the parties or their assets. *See* Ex. C22, §14.12(d)(vi). "The award of the arbitrator is final and is not subject to appeals by either party." *See* Ex. C22, §14.12(d)(v). With

these principles in mind, I have carefully considered all of the evidence admitted and made the following findings.

## II. FACTUAL FINDINGS

### A. The Parties and Other Relevant Individuals and Entities

Holistic is a New Jersey limited liability company with its principal office at 451 White Horse Pike, Waterford, NJ 08004. *See* Holistic Demand at ¶ 8; Ex. C1, C19. It is certified as a diversely owned New Jersey business. Tr. 1045-47. Holistic was established by Nickelson in July 2019 as a minority- and women-owned entity with the initial goal of obtaining a license to dispense medical cannabis.[4] Tr. at 19-20, 25, 29; Ex. C1. In 2019, Holistic submitted its application to the New Jersey Department of Health ("NJ-DOH") to open and operate an ATC. Tr. 20. This

[4] "Medical cannabis dispensary" means "an organization issued a permit by the commission that authorizes the organization to: purchase or obtain medical cannabis and related supplies from medical cannabis cultivators; purchase or obtain medical cannabis products and related supplies from medical cannabis manufacturers; purchase or obtain medical cannabis, medical cannabis products, and related supplies and paraphernalia from other medical cannabis dispensaries and from clinical registrants; deliver, transfer, transport, distribute, supply, and sell medical cannabis and medical cannabis products to other medical cannabis dispensaries; furnish medical cannabis, including medical cannabis products, to a medical cannabis handler for delivery to a registered qualifying patient, designated caregiver, or institutional caregiver consistent with the requirements of subsection i. of section 27 of P.L.2019, c.153 (C.24:6I-20); and possess, display, deliver, transfer, transport, distribute, supply, sell, and dispense medical cannabis, medical cannabis products, paraphernalia, and related supplies to qualifying patients, designated caregivers, and institutional caregivers. A medical cannabis dispensary permit shall not authorize the permit holder to cultivate medical cannabis, to produce, manufacture, or otherwise create medical cannabis products." N.J.S.A. §24:6I-3

"Alternative treatment center" or "ATC" is defined in the New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act ("CREAMM Act"), N.J.S.A. §24:6I-31, *et seq.*, to mean "an organization issued a permit pursuant to the "Jake Honig Compassionate Use Medical Cannabis Act," P.L.2009, c.307 (C.24:6I-1 et al.) to operate as a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant, as well as any alternative treatment center deemed pursuant to section 7 of that act (C.24:6I-7) to concurrently hold a medical cannabis cultivator permit, a medical cannabis manufacturer permit, and a medical cannabis dispensary permit." N.J.S.A. §24:6I-33.

application was approved in December 2021 by the New Jersey Cannabis Regulatory Commission ("NJ-CRC").[5] Tr. 227, 1043, 1079.

Nickelson is an adult individual and the founding and managing member of Holistic. Tr. at 19-20. She received her undergraduate degrees in history and Africana studies from Rutgers University. Tr. 20. Prior to her involvement in the cannabis industry, she worked for the New Jersey State Police for approximately twenty years. Tr. 29, 35. When Holistic was awarded its medical cannabis license in December 2021, Nickelson became the first minority woman in New Jersey to hold a majority interest in an ATC-licensed entity. Tr. 33-34.

Jennifer Cabrera Cammarota ("Cabrera") is a licensed attorney admitted to practice in New Jersey, New York, and Massachusetts. Tr. 1040-42. She specializes in advising cannabis companies regarding regulatory compliance and licensing. Tr. 1041. She is currently a partner in the A.Y. Strauss law firm. Tr. 1041. During the relevant time period, she was a partner in the law firm Vicente LLP and Holistic was its client. Tr. 1041-42. As Holistic's manager, Nickelson regularly sought advice from Vicente LLP on legal matters related to Holistic. Tr. 967, 1080, 1134-39; Exs. C9, C41, C47, C176, C224, C224A.

Eastbound is a Delaware limited liability company formed in February 2022, with its principal place of business at 29 Hathaway Road, Osterville, MA 02655. *See* Exs. C19, at §4.01; C224A. Eastbound was formed by Jonsson as a vehicle to invest in social equity, minority- and veteran-owned cannabis businesses and to provide consulting and management services. Tr. 1589-98; Ex. C224A. Jonsson partnered with Curaleaf Holdings, Inc. ("Curaleaf"), his former employer,

---

5 The authority to regulate and enforce activities related to medical cannabis was initially vested in the NJ-DOH. This authority now resides with the NJ-CRC pursuant to the CREAMM Act, N.J.S.A. §24:6I-31, *et seq*. *See Matter of Cannabis Regul. Commission's Disqualification of Bloom Medicinals of PA, LLC*, No. A-0569-21, 2023 WL 3237339, at *1 (N.J. Super. Ct. App. Div. May 4, 2023); *Matter of GuadCo2 LLC*, No. A-1472-21, 2023 WL 8753528, at *5 (N.J. Super. Ct. App. Div. Dec. 19, 2023).

on several such ventures involving cannabis dispensaries in Connecticut. Tr. 1595-1600, 2320. However, Curaleaf was not an investor in either Eastbound or Holistic. Tr. 59, 102-104.

Jonsson is an adult individual and the sole founding member of Eastbound. *See* Eastbound Counterclaims at ¶ 9. He received his undergraduate degree from Loyola Marymount University in Los Angeles and his MBA from Boston College. Ex. C46. Jonsson has more than a decade of experience in the cannabis industry, having worked to open several medical cannabis dispensaries in Massachusetts in partnership with Joseph Lusardi ("Lusardi"), Jonsson's graduate school classmate.[6] Tr. 1580-1590; Ex. C46. Jonsson also worked at Curaleaf as an executive regional manager from October 2018 to March 2022. *Id.;* Ex. C46. He founded Higher Collective in April 2022, which he has used to invest in, and/or provide consulting services to and branding for, cannabis businesses including several dispensaries in New England. Tr. 1593-94, 1597, 1601, 1973; Ex. C46.

Jane Freedman ("Freedman") is a licensed attorney with a law office in Wellesley, Massachusetts. Tr. 1833; *see* Ex. R160. Michael McQueeny ("McQueeny") is a licensed attorney who specializes in cannabis matters and is employed by the Foley Hoag law firm. Tr. 1876. Freedman and McQueeny served as outside counsel to Jonsson and Eastbound during the relevant time period. Tr. 1833, 1876-77.

Cliffside I LLC ("Cliffside") is a Delaware limited liability company, Ex. C59, with its business address c/o Waldman Hirsch, 3 Second Street, Suite 204, Jersey City, NJ 07311. Ex.

---

6 Jonsson testified that, in 2009, Lusardi opened one of the first medical cannabis dispensaries in the eastern United States, located in Maine. Tr. 1580-82. Jonsson then partnered with Lusardi in Massachusetts in a company known as Mass Organic Therapy. This entity and its dispensaries were later sold to Palliatech/Curaleaf. Tr. 1582; Ex. C46. Jonsson and Lusardi then both worked for Curaleaf. Tr. 1584-87. For a time, Lusardi was the chief executive officer of Curaleaf, and, in 2020, he stepped down and joined its board of directors. Tr. 1588, 2267. Jonsson described Lusardi as his mentor in the cannabis industry. Tr. 1588. Jonsson stated that Lusardi also manages Jonsson's personal finances and the finances for Eastbound. Tr. 1589.

C224A at Eastbound EDF Form, Item 3, and Schedule K-1. Cliffside is owned by Robert Sciarrone and his wife, Marina Sciarrone (together, the "Sciarrones"), in equal membership interests. Exs. C59, R343. Cliffside was formed in November 2022 as a vehicle to invest in certain financial opportunities. Tr. 2562-63; Ex. C59. Neither of the Sciarrones contributed capital to Cliffside at the time of its formation. Ex. C59, at §7.

Robert Sciarrone ("Sciarrone")[7] is an adult individual with an undergraduate degree from Elon University in finance and relevant work experience in finance and business investments. Tr. 2489-2500. He is the managing member of Cliffside. Tr. 2770-71. He is currently employed as an executive vice president and regional leader with Curaleaf. Tr. 2512-13. Sciarrone is responsible for oversight of Curaleaf's operations in the eastern region in the United States, including New Jersey. *Id.* Sciarrone holds less than one-tenth of one percent of the outstanding shares of Curaleaf. Tr. 2518. Immediately prior to his employment with Curaleaf, he worked for venture capital firm Measure 8 Venture Partners ("Measure 8") as a financial analyst and principal. Tr. 2504. Measure 8 is focused solely on investing in companies in the cannabis industry. Tr. 2499. Although he is no longer employed by Measure 8, Sciarrone continues to hold an interest in certain funds managed by Measure 8 that invest in cannabis businesses. Tr. 2500.

---

[7] Sciarrone is named as a Respondent in this Arbitration. While Respondents in their Answer "expressly reserve[d] the right to challenge the jurisdiction of this tribunal over Mr. Sciarrone," Respondents' 10/8/24 Answer at ¶21, no such challenge was made by Sciarrone prior to the record being closed. Sciarrone was represented by the same counsel as the other Respondents and appeared voluntarily and participated in the arbitration hearing as a party. He testified in support of Eastbound's counterclaims. He was also personally involved in the factual matters surrounding the claims and counterclaims in this arbitration. Sciarrone is the managing member and 50 percent owner of Cliffside. Ex. C59. In December 2022, Cliffside acquired a controlling membership interest in Eastbound. Eastbound is a party to the Holistic OA, where it agreed to arbitrate all disputes arising out of or relating to the agreement. For these reasons, as well as other factual findings relating to Sciarrone set forth in this opinion, I find that I have personal and subject matter jurisdiction over Sciarrone.

Sciarrone's wife, Marina Sciarrone, is an adult individual employed as a marketing manager with Curaleaf, and she is co-owner of Cliffside. Tr. 2756-57. She holds less than one-tenth of one percent of the outstanding shares of Curaleaf. Tr. 2534.

Boris Jordan ("Jordan") is the founder, chief executive officer, and executive chairman of Curaleaf. Tr. 2506. He is also the founding partner, owner, and chairman of Measure 8. Tr. 2506-10. Jordan is the father of Marina Sciarrone and father-in-law of Robert Sciarrone. Tr. 2519. Jordan was aware of Cliffside's investment in Eastbound and Holistic, as Sciarrone had discussed it with him. Tr. 2683-85.

Curaleaf is an international cannabis company based in the United States and publicly traded on the Canadian Securities Exchange. Tr. 2507-2510, 2517-2527. The company is headquartered in Stamford, Connecticut. Tr. 2515. It produces and distributes cannabis products and operates dispensaries in multiple states throughout the U.S, including in New Jersey. Tr. 2510-12.

Mary Lou Ferrier ("Ferrier") is an adult individual and resident of Monaco. Tr. 2590. She is a limited partner in certain investment vehicles managed by Measure 8. Tr. 2583-88. Sciarrone had previously met Ferrier through his management of investments at Measure 8. *Id.* She is independently wealthy and loaned Sciarrone and Cliffside the capital to fund Cliffside through an entity that she controlled known as Tangela Holdings. *Id.*

Jason Gross ("Gross") is a licensed attorney and partner with the Sills Cummis law firm, with expertise in New Jersey regulatory matters. Tr. 1506. Gross was retained by Eastbound to represent it before the NJ-CRC in connection with the dispute between Holistic and Eastbound. Tr. 1507.

Joseph Genova ("Genova") is an adult individual and investigator employed by the NJ-CRC. He was the lead investigator in charge of the NJ-CRC's suitability investigation into Jonsson and Eastbound's investment in Holistic. Ex. C64.

Megan Tagliaferri ("Tagliaferri") is an adult individual employed by the NJ-CRC. Ex. C154. She was the Director of the Office of Licensing for the NJ-CRC and communicated with Cabrera regarding Holistic's license renewal application in early 2024. Ex. C154.

Paul Urbish ("Urbish") is an adult individual and attorney employed by the NJ-CRC. Ex. C222. He was the Director of the Office of Compliance and Investigations for the NJ-CRC during the relevant time period and communicated with the parties in 2024 regarding Holistic's request for investigation of Respondents. Ex. C222.

Dave Tuason ("Tuason") is an adult individual and attorney employed by the NJ-CRC. Ex. C222. He was Deputy Counsel – Regulatory Affairs for the NJ-CRC during the relevant time period and communicated with the parties regarding Holistic's request for investigation of Respondents. Ex. C222.

Shawn Keyes ("Keyes") is an adult individual employed by the NJ-CRC. Ex. C244. During the relevant time period, he was an Investigator for the NJ-CRC and communicated with the parties regarding Holistic's request for investigation of Respondents. Ex. C224, C244.

### B. The Regulation and Use of Cannabis in New Jersey

Medical cannabis in New Jersey is governed by the New Jersey Compassionate Use Medical Marijuana Act (the "CUMMA") and the Jake Honig Compassionate Use Medical Cannabis Act (the "Jake Honig Act"), N.J.S.A. §24:6I-1, *et seq.* The New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (the "CREAMM Act"), P.L. 2021 c. 016, N.J.S.A. §24:6I-31, *et seq.*, sets forth the laws governing regulation and use of cannabis for personal (recreational) use in New Jersey. *Id.* The CREAMM Act was approved by

the New Jersey Legislature on February 22, 2021, and it created the NJ-CRC to establish and enforce the rules and regulations governing the licensing, cultivation, testing, selling, and purchasing of both medical and recreational cannabis in the state. *See* N.J.S.A. §24:6I-24.

The NJ-CRC is responsible for writing and enforcing the regulations that direct the sales, purchases, and business activities related to cannabis in New Jersey. *Id.*; *see also* N.J.S.A. §24:6I-34. It reviews license applications, awards business licenses, and ensures legislative mandates on social equity awards are met. *Id.* To protect the safety of cannabis consumers and to assure patient access, the NJ-CRC is empowered to impose fines or other sanctions on licensed cannabis business that violate applicable regulations. *Id.* The NJ-CRC adopted its initial regulations on August 19, 2021 ("NJ Cannabis Rules," N.J.A.C. §17:30-1.1, *et seq*.), which established the licensure process for cannabis businesses and testing laboratories. *See* 53 N.J.R. 1583(a), 2021 NJ REG TEXT 594026 (NS).[8] The NJ Cannabis Rules were amended and readopted, effective February 8, 2023, and March 6, 2023. *See* 54 N.J.R. 1470(a), 55 N.J.R. 402(a). Except where additional specificity

---

[8] Respondents argue that the NJ Cannabis Rules were not applicable to Holistic in 2022 because they: 1) only applied to personal use cannabis and Holistic did not seek to convert its medical license to an expanded ATC until January 2023, or 2) that the Rules "were not formally adopted until February 8, 2023, which came after Holistic opened its dispensary for medical sales." *See* Respondents' Pre-Hearing Submission at p.18, n.10; *see also* Respondents' Post-Trial Brief at 29, n.16. Respondents' argument is inaccurate both in terms of when the NJ Cannabis Rules were first adopted and what they regulated. Furthermore, a number of regulations applicable to medical cannabis and ATCs predated the NJ Cannabis Rules adopted by the NJ-CRC. *See Matter of Cannabis Regul. Commission's Disqualification of Bloom Medicinals of PA, LLC*, No. A-0569-21, 2023 WL 3237339, at *14 (N.J. Super. Ct. App. Div. May 4, 2023).

The CREAMM Act, approved on February 22, 2021, created the NJ-CRC to establish and enforce the rules and regulations governing the licensing, cultivation, testing, selling, and purchasing of both medical and recreational cannabis in the state. *See* N.J.S.A. §§24:6I-24(a)(1) and 24:6I-24(a)(2). The initial regulations adopted by the NJ-CRC were effective on August 19, 2021, not February 8, 2023 as Respondents contend. *See* 2021 NJ REG TEXT 594026 (NS), 53 N.J.R. 1583(a), effective: August 19, 2021. Further, when adopted, the NJ Cannabis Rules applied to "any person, entity, organization, or business possessing, buying, selling, cultivating, producing, manufacturing, transporting, or delivering <u>any cannabis or cannabis items within this State</u>, or engages in any other activity associated with the personal use of cannabis pursuant to the Act." *Id.*, at N.J.A.C. 17:30-1.1(c)(emphasis added). Indeed, the NJ Cannabis Rules regulate both medical and personal use cannabis businesses. *See id.*, at N.J.A.C. §17:30-1.2, §17:30-3.6, §17:30-6.1, §17:30-7.1.

is warranted, I will refer to the CUMMA, the Jake Honig Act, the CREAMM Act, and the NJ Cannabis Rules collectively herein as the "NJ Marijuana Laws."

### C. The Lead Up To The Holistic-Eastbound Transaction

On December 7, 2021, Holistic was awarded a Dispensary Permit Endorsement to operate an Alternative Treatment Center ("ATC") by the NJ-CRC and it began seeking investors to raise funds to support the launch of its dispensary store planned for Waterford, New Jersey. Tr. 58-59, 1043, 1079, 1955-57; Ex. C224A. In the Spring of 2022, Jonsson left his position with Curaleaf. Tr. 1601. He was looking to develop a multi-state organization ("MSO") under the moniker "Higher Collective" or "The Collective" and invest in and/or consult with social equity, women, minority and/or veteran-owned businesses in the cannabis industry, as he had done at Curaleaf. Tr. 56-59, 61-62, 1591-96; 1601-02, 1615, 1956-58; Ex. C46.

Nickelson and Jonsson met in mid-April 2022 after being connected by a mutual acquaintance in the cannabis industry. Tr. 1613-14. Jonsson made it clear to Nickelson that working with women- and minority-owned businesses was important to him and he emphasized his strong ties to Curaleaf. Tr. 1615. Jonsson admitted that Nickelson was hesitant from the outset to work with "larger operators" and she was instead looking to work with smaller investors, like Jonsson. Tr. 1616. They continued discussions throughout May 2022, during which time Jonsson expressed his eagerness to invest in a minority- and women-owned cannabis dispensary like Holistic. Tr. 1955. On May 30, 2022, Jonsson sent Nickelson an initial draft letter of intent ("LOI") outlining the principal terms for Eastbound to acquire certain membership interests in Holistic. Ex. C6. Jonsson sent a revised, executed LOI in mid-June 2022. Ex. C9.

From June to mid-September 2022, Nickelson, Jonsson, and their respective counsel, Cabrera and Freedman, negotiated the deal documents for Eastbound's investment in Holistic (hereinafter, the "Holistic Deal"). *See* Exs. C11, C12, C15, C19, C22, C23, C24, R42, R45, R56.

As part of this process, Cabrera requested certain information from Jonsson and Freedman required for Holistic's change of ownership application and regulatory disclosures to the NJ-CRC. Tr. 1082-83; Ex. C11. Jonsson was advised by Cabrera on July 18, 2022 of his obligation to provide Holistic with a completed personal history disclosure form ("PHD"). *See* Ex. C11. Jonsson was also advised that any other individuals holding a membership interest in Eastbound would need to do the same. *See* Ex. C11 ("Please note that, if there are other owners of Eastbound Collective, they must complete this [personal history disclosure] form as soon as possible."). Jonsson only provided Holistic with a completed PHD for himself. Ex. C46.

### D. Execution of the Holistic Deal Documents

Effective as of September 16, 2022, Holistic and Eastbound executed the Holistic OA (Ex. C22), as well as a Unit Purchase Agreement ("Holistic UPA," Ex. C19), an Intellectual Property License Agreement ("License Agreement," Ex. C23), and an Option Agreement, Ex. R56, collectively referred to herein as the "Holistic Deal Documents." Nickelson signed the Holistic Deal Documents as "President" or "Manager" for Holistic.[9] *See* Exs. C19, C22, C23, R56 at signature pages. While Jonsson certainly made references to other "investors" or his "investment team" at times during the negotiations (*see, e.g.*, Ex. C15), he subsequently signed the Holistic Deal Documents as the "sole member" of Eastbound. *See* Exs. C19, C22, C23, at signature pages. He also provided a separate certification representing that he was the sole member of Eastbound. *See* Ex. C24 ("Sole Member Certificate").

---

[9] At this time, the persons holding membership interests in Holistic included Nickelson, as Manager and majority member, as well as Marisa Edmund, Jenice Baker, and Rafiq Baker. *See* Ex. C22 at Schedule A.

### 1. The Holistic OA

The Holistic OA defines, *inter alia*, the company's purposes and powers, its membership and management, the parties' respective representations and warranties, their liabilities and any limitations thereon, member rights and powers, capital contributions, allocations, distributions, covenants, and regulatory obligations. *See* Exs. C22. It was negotiated by the parties with assistance of their counsel. *Id.* The Holistic OA was executed subsequent to Eastbound's LOI and it does not incorporate or otherwise reference the LOI. *See* Ex. C22. The Holistic OA contains an integration clause stating that it is the sole and entire agreement between the parties and that it supersedes any prior and contemporaneous understandings with respect to its subject matters. *See* Ex. C22, §14.06. Accordingly, with respect to Eastbound's LOI or other negotiations between the parties preceding the execution of the Holistic OA,[10] to the extent there is any conflict with an express term of the Holistic OA, the Holistic OA controls.

### 2. The Holistic UPA

Under the Holistic UPA, for a Purchase Price of $1.7 million, Eastbound obtained the right to acquire up to 35% of the issued and outstanding Units of Holistic, excluding the Units contemplated by the Option Agreement. *See* Ex. C19 at Recitals. The Holistic UPA set forth a Funding Schedule for the Holistic Deal as follows:

---

[10] *See, e.g.*, Tr. 1637-39 and Exs. C9, R25, R27, R31, R34, R36, R37, R38, R39.

**EXHIBIT I**

**UNIT ISSUANCES; FUNDING SCHEDULE**

| Applicable Closing | Funding Amount | Unit Issuance | Date |
|---|---|---|---|
| First Closing | $170,000 | 363 Units | September 16, 2022 |
| Subsequent Closing #1 | $170,000 | 390 Units | October 14, 2022 |
| Subsequent Closing #2 | $170,000 | 420 Units | October 28, 2022 |
| Subsequent Closing #3 | $170,000 | 455 Units | November 11, 2022 |
| Subsequent Closing #4 | $170,000 | 493 Units | November 25, 2022 |
| Subsequent Closing #5 | $850,000 | 4.926 Units* | Concurrently with the commencement of operations of the Business |
| **TOTAL** | $1,700,000 | 7,047 Units | |

*Contemporaneous with this issuance, additional Units may be issued to Suzan Nickelson if required by applicable CRC or other regulations in order for Ms. Nickelson to maintain a majority ownership of the Company.

Ex. C19, at Exhibit I.[11] Eastbound was scheduled to make installment payments to acquire half of its membership interests (*i.e.*, 17.5% of the total outstanding interests) by November 25, 2022, and make a final payment for the other 17.5% share upon commencement of operations of the Holistic store. *Id.* The final payment of $850,000 at Subsequent Closing #5 would bring Eastbound's share of the total membership interests in Holistic to approximately 35%. *Id.*

No later than 30 days following the First Closing, Eastbound was also required to reimburse Holistic 35% of specific pre-closing expenses incurred between June 14, 2022 (the date of the LOI) and the First Closing. *See* Ex. C19, §1.03. Eastbound was also obligated to reimburse Holistic 35% of reasonable operating expenses incurred by Holistic from the date of the Holistic UPA through and including the date of the opening of the Holistic store. *See* Ex. C19, §7.03.

At the time the Holistic Deal Documents were executed, Holistic had been granted the rights to pursue an ATC license but the license issued had not yet been issued by the NJ-CRC. Tr.

---

[11] In addition to the dilution restrictions identified by the asterisk in Exhibit I of the Holistic UPA, the Holistic OA contained other percentage dilution restrictions with respect to the membership interests held by Jenice Baker, Rafiq Baker, and Marisa Edmund. *See* Ex. C22, §4.01(c).

44, 48-50. In the Regulatory Approvals section of the Holistic UPA, each party committed to cooperating fully with the other in promptly seeking to obtain all consents, authorizations, orders, and approvals from the NJ-CRC. Ex. C19, §5.01(a). The parties also committed to not taking "any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals." Ex. C19, §5.01(a). Holistic and Eastbound also committed to the following conditions to their obligations which were subject to fulfillment, "at or prior to the First Closing and each Subsequent Closing":

> [Holistic] and [Eastbound] shall have received all consents, authorizations, orders and approvals from all Governmental Authorities and other Persons necessary for the transactions contemplated by this Agreement, including, without limitation, those required by applicable Law, in each case, in form and substance reasonably satisfactory to [Eastbound] and [Holistic], and no such consent, authorization, order and approval shall have been revoked, provided, however, that for avoidance of doubt, [Eastbound] and [Holistic] agree that the approval of the CRC shall be sought subsequent to the First Closing.

*See* Ex. C19, §6.01(c) (emphasis added). Additionally, in Section 4.02 of the UPA, Eastbound agreed to the following:

> Section 4.02 No Conflicts; Consents. The execution, delivery, and performance by [Eastbound] of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the governing documents of [Eastbound]; (b) violate or conflict with any provision of any Law or Governmental Order applicable to [Eastbound]; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any Permit, license, or Governmental Order.

*See* Ex. C19, §4.02 (emphasis added).

### 3. The Option Agreement

The Option Agreement provided Eastbound with a right to purchase additional Units of Holistic, such that Eastbound, if certain vesting and exercisability conditions were met, could acquire 51% of the total outstanding Units of Holistic. *See* Option Agreement, Ex. R56.

Eastbound's Option vested and became exercisable only after the following had occurred (the "Vesting Date"): "(i) the final Subsequent Closing under the UPA, and (ii) the earlier of (A) the date on which the issuance of the Units underlying the Option to [Eastbound] is permissible under, or not otherwise in violation of, the applicable regulations, or (B) the date on which the CRC approves, consents to or determines that a majority interest in the Company may be held by [Eastbound]." Ex. R56, §1(a) (emphasis added). The Option Agreement contains an integration clause stating that it, together with the Holistic UPA, constitute the sole and entire agreement between the parties with respect to the Option. Ex. R56, §14.

Eastbound is identified in the Option Agreement as the Optionholder. Ex. R56, at p.1. The Optionholder is prohibited from assigning or transferring the Option or any other rights under the Option Agreement without the written consent of Holistic, except where the assignment or transfer is to an entity under the common control with the Optionholder or to a wholly owned subsidiary, each defined as an "Affiliate." *See* Ex. R56, §5. Upon transfer to an Affiliate, the Affiliate was required to enter into a Joinder Agreement to the Holistic OA. *Id.* Cliffside is not an entity under common control with Eastbound, nor is it a wholly owned subsidiary of Eastbound. Cliffside does not meet the definition of "Affiliate" of Eastbound. Cliffside did not execute a Joinder Agreement to the Holistic OA and it is not a party to the Option Agreement.

**4. The License Agreement**

In the License Agreement, Eastbound is referred to as the Licensor and Holistic as the Licensee. *See* Ex. C23 (R48), §B. The "Licensed Property" is defined in the License Agreement in relevant part to mean: "(a) [Eastbound's] Standard Operating Procedures as set forth in Exhibit A attached hereto and made a part hereof ("SOPs"); (b) [Eastbound's] intellectual property related to the Licensee's business set forth on Exhibit B attached hereto and made a part hereof;…" Ex. C23, §C. However, both parties admit that no SOPs were either set forth in or attached to the

License Agreement, nor was any other intellectual property of Eastbound identified or attached as Exhibit B. *See* Exs. C23, R48; Tr. 72; Respondents' Post-Hearing Brief at 11.[12]

The License Agreement contains an integration clause in two places, one in the Standard Conditions at Section 9.11, *see* Ex. C23, §9.11, and one in the License Agreement body stating that the "Basic Terms" set forth therein, "together with the Standard Conditions and all Exhibits and Schedules attached hereto and thereto, all of which are incorporated herein by reference, are referred to collectively as this "***Agreement***" and constitute the complete and entire agreement between the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, negotiations, communications and understandings (both written and oral) regarding such subject matter. In the event of a conflict between the terms or conditions of the Standard Conditions and those of these Basic Terms, the terms and conditions of these Basic Terms shall prevail. This Agreement may only be modified, or any rights under it waived, by a written document executed by both parties." *See* Ex. C23 (emphasis original). The relevant exhibits were not included with the License Agreement, and it is entirely unclear what either party intended Eastbound's "Licensed Property" to mean at the time the License Agreement was executed.

The parties vigorously contested at the hearing whether the SOPs subsequently provided by Eastbound were what the parties intended as the SOPs for purposes of their agreement. All parties were permitted to present their evidence regarding the SOPs in question. However, the testimony and exhibits regarding what occurred after the signing of the License Agreement was not probative of the parties' intent at the time the License Agreement was signed. A contract must be interpreted considering the surrounding circumstances and the relationships of the parties <u>at the</u>

---

12 Indeed, Respondents proposed the following factual finding: "Yet, no SOPs, list of SOPs, or other licensed intellectual property was attached (Exhibit A was blank). Tr. Vol VIII (1680:1-19)." Respondents' Post-Hearing Brief at 11.

time it was entered into, in order to understand their intent and to give effect to the nature of the agreement as expressed by them. *See Graziano v. Grant*, 326 N.J. Super. 328, 342, 741 A.2d 156, 163 (App. Div. 1999). After it was executed, the License Agreement could only be modified by a written document executed by both parties and that did not occur.

Due to the parties' failure to include the proper attachments to their agreement when it was executed and the integration clause in the License Agreement, on the factual record before me, it is impossible to determine what the parties intended "Licensed Property" to mean.[13] As explained below in the Conclusions of Law, the contract is missing an essential term and it fails for indefiniteness. The License Agreement was void from its inception and it is unenforceable by either party.

---

[13] For completeness of the record, I have summarized some of the evidence presented below. However, given the integration clause and the contractual requirement of a written amendment signed by both parties, I found the hearing testimony and exhibits regarding communications occurring after the execution of the License Agreement unhelpful and irrelevant.

Holistic contended that Eastbound failed to provide SOPs consistent with the requirements of the License Agreement. Eastbound contended that the SOPs that it obtained from Sciarrone and Curaleaf satisfied its obligations under the License Agreement and that it is entitled to unpaid Royalty Fees associated with the License Agreement. Jonsson also claimed that a fourth quarter payment was due but did not identify the amount unpaid. *See* Respondents' Post-Hearing Proposed Findings of Fact; Tr. 436, 1696, 1802-03.

Eastbound presented certain SOPs it had obtained from Sciarrone and Curaleaf in October 2022, after the License Agreement was signed. Jonsson scrubbed these SOPs to remove any Curaleaf logos or other references. Tr. 1622-23. Exs. R68, R71, R74. Eastbound provided the scrubbed SOPs to Holistic after the execution of the License Agreement. Tr. 1622-23; Exs. R75, R76. Jonsson and Sciarrone contended that the SOPs that Eastbound provided to Holistic were SOPs that had been used by Curaleaf's New Jersey dispensaries. Jonsson testified that he believed that the SOPs had previously been approved by the NJ-CRC, Tr. 1623-24; however, Respondents produced no evidence of any such approvals from the NJ-CRC.

The SOPs sent by Eastbound to Holistic in the Autumn of 2022 were reviewed by regulatory counsel for Holistic at Vincente LLP, who concluded that they did not meet the regulatory standards or cover the topics required by the NJ Cannabis Rules. Tr. 1693; Ex. R75, R79, R84. Counsel for Holistic thereafter revised the SOPs provided by Eastbound in order to make them complaint with the NJ Cannabis Rules before they could be submitted by Holistic to the NJ-CRC. Tr. 1693-95; Ex. C47.

### E. The Lead Up To The Eastbound-Cliffside Transaction

After Jonsson left Curaleaf in the Spring of 2022, he was seeking capital to support the consulting opportunities, investments, and multi-state network he was looking to create. Tr. 2528-33, 2535-39. Jonsson made a presentation to Measure 8 and Sciarrone attended the pitch. *Id.* Sciarrone had previously met Jonsson through Measure 8's engagements with Curaleaf. *Id.* Although Measure 8 decided to pass on investing with Jonsson, Sciarrone found the opportunity to be of interest to him personally and he went through the Measure 8 waiver process, including discussing with matter with Jordan, so that he could continue discussions with Jonsson in a personal capacity. *Id.*

Throughout the summer of 2022, Jonsson provided Sciarrone and Lusardi with information regarding a number of cannabis-related opportunities that he was pursuing in New Jersey, including Holistic. Tr. 1958-64, 2267-71, 2314-15, 2537, 2546. Lusardi ultimately decided not to invest in these opportunities. Tr. 1828, 1958-64, 2022. Sciarrone stated that he first learned about Holistic in September 2022, at or around the time that the Holistic Deal Documents were being negotiated. Tr. 2546-47. Jonsson and Sciarrone met on or about September 21, 2022, after the Holistic Deal Documents had been signed, to discuss a possible investment by Cliffside in Eastbound. *See* Eastbound Counterclaims at ¶ 21. Sciarrone conducted a "considerable amount of due diligence" in the form of financial modeling, market analysis, and validation of Jonsson's opportunities before deciding to invest in Eastbound. Tr. 2537-46. He concluded that investing in Eastbound was a "great opportunity" with growth potential in New Jersey. Tr. 2544.

In October and November 2022, Jonsson admittedly had difficulty securing the funds required to make the installment payments required by the Holistic UPA. *See* Tr. 2015-25 and Exs. C49, C51, C53, C54, C62, C63. He obtained advancements from Lusardi in order to make some of these installment payments, as well as to make the payments for Eastbound's percentage

of the Holistic operating expenses. Tr. 2020-22, 2030, 2035-36, 2048-49; Exs. C85, R168. Jonsson was also encouraging Sciarrone to invest in Eastbound to help fund Eastbound's interests in Holistic. Tr. 2562-66; Exs. C61, C65.

Despite Jonsson's difficulties, each of the payments required by the Holistic UPA was eventually made by Eastbound to Holistic within the permitted grace period. Tr. 2013; Exs. C19, C71, C221. By November 30, 2022, Jonsson had paid Holistic $850,000 for Eastbound's membership interests and Eastbound held 17.5% of the total outstanding membership interests of Holistic. Tr. 1781-82, 2013; Exs. C19, C71, C221, R159 at Item 3.

**F. The Cliffside Deal and Its Funding**

Sciarrone and his wife formed Cliffside in early November 2022. Ex. C59. On November 21, 2022, in an effort to obtain monies required to fund Cliffside and its eventual investment in Eastbound, Sciarrone reached out to Ferrier to discuss a loan arrangement or line of credit from Tangela Holdings. Ex. C73. A call was scheduled between them on November 22, 2022 to discuss a loan agreement, and proposed loan terms were outlined in an email between Sciarrone and Ferrier. Exs. C74, C75.

By November 29, 2022, Sciarrone, Jonsson, and their respective counsel,[14] were exchanging redlines of an operating agreement, pursuant to which Cliffside would acquire 70% of the membership interests of Eastbound (hereinafter, the "Cliffside Deal"). Exs. C77, R394. Negotiations regarding the terms of the operating agreement continued into the morning of December 8, 2022, and execution pages were exchanged and signed that afternoon. Exs. C77, R394; Tr. 2573-79. The Eastbound Operating Agreement between Eastbound and Cliffside

[14] Sciarrone and Cliffside were represented by Jeremy Cohen of Gesmer Updegrove in connection with the Cliffside Deal. Tr. 2567-68. Eastbound and Jonsson were represented by Freedman. *See* Exs. C77, R394, R160.

("Eastbound OA," Ex. R160) was fully executed late in the afternoon on December 8, 2022. Ex. R160, R394.

At the time of Cliffside's acquisition of 70% of Eastbound, Eastbound's sole asset was its membership interest in Holistic. Tr. 2666. At no point did Jonsson seek authorization from Holistic's Manager, Nickelson, to transfer 70% of Eastbound's interests in Holistic to another entity. Tr. 2011. Jonsson stated that he chose not to mention the Cliffside Deal to Nickelson or seek her consent as Manager of Holistic because she was "combative" and she would have objected. Tr. 2011.

Pursuant to the Eastbound OA, Cliffside acquired the rights to a controlling voting membership interest in Eastbound, represented by 70% of the voting Class A Units of Eastbound. Ex. R160, §4.06 and Schedule A. Jonsson continued to hold the other 30% of the Class A voting Units. Ex. R160, Schedule A. Jonsson and Sciarrone agreed that Jonsson would serve as the Manager of Eastbound. Tr. 2599. However, Cliffside had the power to remove Jonsson at any time, with or without cause. *See* Ex. R160, §8.04; Tr. 2599-2600, 2769-72. Jonsson's powers as manager were also limited by Section 8.02 of the Eastbound OA. *See* Ex. R160, §8.02. As such, Respondents' arguments that Jonsson maintained complete control over Eastbound's affairs after the Cliffside Deal or that Sciarrone's investment in Eastbound was purely financial are simply not credible. Cliffside has voting control of Eastbound and it holds all rights incident to being the majority owner of its interests. *See* Ex. R160. By order of operation of the Holistic and Eastbound operating agreements, Cliffside controlled Eastbound's voting membership interests in Holistic. Tr. 2599; Exs. C22, at §4.06 and Schedule A and R160, at §4.06 and Schedule A.

At the time of the signing of the Eastbound OA, Sciarrone had not yet finalized the funding Cliffside needed for acquisition of its Eastbound interests. Tr. 2582. He received these monies on

or around December 29, 2022. Ex. C89, C94. Sciarrone took a $100,000 personal loan from Tangela Holdings and he acquired a credit facility of $5 million from Tangela Holdings for Cliffside. Tr. 2591-93; Exs. C133, R179. Cliffside's first drawdown against this credit facility was for $1,226,667. Tr. 2591-93; Ex. C133.

Cliffside transmitted funds to Eastbound for its 70% interest on December 30, 2022. Tr. 1740-43, 2595; Ex. C221; Eastbound Counterclaims at ¶ 25. At this time, Sciarrone, and his wife, the 50/50 owners of Cliffside, became the ultimate beneficial owners and controlling voting members of Eastbound. This change in control of Eastbound and the effect on the membership interests it held in Holistic was not disclosed to Holistic for more than fourteen months. Tr. 1872-74; Ex. R297A. Holistic, and not any of the Respondents, was the first to report the Cliffside Deal to the NJ-CRC on or about February 21, 2024. Tr. 1144-48; Ex. C186.

### G. The Notice Provision and Disclosure Obligations in the Eastbound OA

Section 2.03 of the Eastbound OA contained the following notice regarding members' investments in the Units of Eastbound:

> (c) Marijuana Investments. **INVESTMENTS IN THE UNITS INVOLVE DIRECT AND/OR INDIRECT INVESTMENT IN COMMERCIAL MARIJUANA ACTIVITIES. THE POSSESSION, CULTIVATION, MANUFACTURE, PRODUCTION, STORAGE, TESTING, DISTRIBUTION, AND SALE OF MARIJUANA IS ILLEGAL UNDER U.S. FEDERAL LAW. NO PARTY, NOR ANY ATTORNEYS FOR THE PARTIES, HAVE MADE ANY REPRESENTATION TO THE CONTRARY. EACH MEMBER, MANAGER, AND OFFICER ASSUMES ALL RISKS ASSOCIATED WITH INVESTMENT IN THE UNITS AND ACTIVITIES OF THE COMPANY, INCLUDING THE RISK OF CRIMINAL PROSECUTION, AND HEREBY REPRESENTS AND WARRANTS THAT IT UNDERSTANDS SUCH RISKS.**

Ex. R160, §2.03(c) (boldface and capitalization original). Importantly, Eastbound itself was not engaged in commercial marijuana activities. Its only such association came as a result of the membership interests it held in Holistic. Tr. 2274. Eastbound had no other cannabis establishment holdings. Tr. 2274.

The Eastbound OA also contained the following provision regarding the "Disclosure Requirements" under the NJ Marijuana Laws:

> Each Member, Manager and Officer acknowledges and is aware that the Company or a Company Subsidiary may be, or may be an owner of, a commercial marijuana business and/or may enter into contractual arrangements with commercial marijuana businesses. Each Member, Manager, and Officer further acknowledges that as a result of the Company or Company Subsidiary engaging in any commercial marijuana business or business with commercial marijuana businesses, such Member, Manager or Officer (and/or its or their respective direct or indirect owners, directors, officers and managers (collectively, the "Member Parties")) may be required to be listed as owners or in another capacity of the Company, a Company Subsidiary or other commercial marijuana business under the Marijuana Laws. The Company and each Member, Manager, and Officer shall promptly and without delay work in good faith to include the Member Parties as an owner or other applicable designation, as applicable (as may be required by the Marijuana Laws as determined in good faith by the Company) on the Company's or Company Subsidiary's licenses and, if applicable as determined in good faith by the Company, on any other licenses of any entity with which the Company or any Company Subsidiary has contracted. Each Member, Manager, and Officer agrees to promptly provide the Company all information regarding the Member Parties as may be required by the Marijuana Laws. The Members, the Managers, the Officers, and the Company further agree and acknowledge that any required disclosure of the Member Parties for purposes of the Marijuana Laws shall not alter the respective liabilities and indemnifications of the Members, the Managers, or the Officers as set forth in this Agreement.

Ex. R160, §2.03(d). Eastbound, Jonsson, Cliffside and Sciarrone were all therefore on notice that any information required to be disclosed by the NJ Marijuana Laws would need to be provided to Eastbound and any other entity whose license was affected by a contract with Eastbound. *Id.* This

included Holistic, as Eastbound had a related disclosure obligation to Holistic in Section 2.03(d) of the Holistic OA. *See* Ex. C22, §2.03(d) ("Each Member, Manager, and Officer agrees to promptly provide the Company all information regarding the Member Parties as may be required by the Marijuana Laws.").

### H. The NJ-CRC's Investigation Into Eastbound and Jonsson's Suitability

In connection with the Holistic Deal agreed in September 2022, Holistic had filed the required change of ownership notification with the NJ-CRC.[15] Tr. 1082-83. Jonsson had represented to Holistic that Eastbound's investment would be funded entirely with his own money. Tr. 58-59. He later made the same representation to the NJ-CRC. Tr. 1772-75; Ex. R156. Jonsson also stated that he was the sole member of Eastbound and confirmed this for Holistic by providing a Sole Member Certificate with the Holistic Deal Documents. Tr. 58; Ex. C24. Holistic's counsel, Cabrera, communicated with Jonsson regarding information needed for the change of ownership application and Holistic's license application that were required to be submitted to the NJ-CRC. Jonsson also spoke with Cabrera in preparation for his interviews with the NJ-CRC. Tr. 1083-84, 1087-91. Jonsson provided no indication to either Holistic or the NJ-CRC that Eastbound would have other owners or funding sources. Tr. 57, 59, 1772-75, 2123.

Investigator Genova was assigned to investigate and assess Eastbound's and Jonsson's suitability for its investment in Holistic. Tr. 1064-67, 1088-89. This included investigating the sources of Jonsson's funding for the investment in Holistic. Tr. 1779, 2095; Exs. C64, C78, C79, C81. Throughout November and December 2022, Jonsson was in communication with Genova

---

[15] Several of the NJ Marijuana Laws prohibit the sale or transfer of any interest in a cannabis establishment without first seeking approval from the NJ-CRC, undergoing a background check and suitability determination, and paying fees, as applicable. *See, e.g.,* N.J.S.A. §24:6I-7(d)(1) and N.J.A.C. §17:30-9.2. This includes the "[a]ddition or removal of owners or passive investors," N.J.A.C. §17:30-9.2(a)(1)(i), as well as "[a]ny other changes to the ownership and financial information provided to the Commission pursuant to N.J.A.C. 17:30-7.10 and 7.13." N.J.A.C. §17:30-9.2(a)(1)(iv).

and was providing Genova with requested documents. Tr. 1064-67, 1088-89; Exs. C78, C79, C81, R151, R155, R156, R164A. Jonsson was asked by Genova to provide detailed financial information and documentation to substantiate the sources of funding for his investment in Holistic. Tr. 1088-89; Exs. C46, C78, C79, C224A, R155, R156, R164A. Jonsson represented both orally and in writing to Genova that the source of his funds came from the sale of interests in his first cannabis company, Mass Organic Therapy, and by redeeming corporate bonds that he held in Baldwin Holdings LLC. *See* Tr. 1265-67, 1774-76; Exs. C79, R156. He provided bank statements and statements of account to support the representations he made to Genova. *See* Ex. R164A.

Genova also interviewed Jonsson by phone at least twice in connection with the suitability determination. Tr. 1091-94, 1268-72, 2043-44; Exs. C78, C81, R164A. One such interview was scheduled for December 6, 2022. Tr. 1774-75, 1920, 2045; Ex. C78. Jonsson was certainly aware at this time that the Eastbound OA was nearly in final execution form, as he executed the Eastbound OA on December 8, 2022. Tr. 1776, 2131, 2136; Ex. C77, R158, R160. However, he made no mention to Genova of the impending Cliffside Deal.

Nor did Jonsson mention it in a follow-up email to Genova on December 7. Instead, in the email Jonsson stated: "As it stands today, Eastbound Collective LLC, the investor in Holistic, is 100% owned by me." Ex. C79. In the email, he again represented that Eastbound's investment in Holistic came solely from his personal funds. Ex. C79. While he may have been technically correct at the time he sent the December 7 email, Jonsson was certainly not forthcoming with the NJ-CRC about the Cliffside Deal or the Cliffside Deal Documents that he would sign the next day. And by the time of his next telephone interview with Genova, Jonsson had already executed a contract to transfer control of Eastbound to Cliffside. Ex. R160.

On December 13, 2022, Jonsson participated in a second telephone interview with Genova. Exs. C81, R164A; Tr. 1777-81, 2045, 2140. Cabrera participated in this call as counsel for Holistic. Ex. C81, Ex. C224A; Tr. 1092-93, 1249. Jonsson did not disclose to Genova or Cabrera that he had signed the Cliffside Deal Documents on December 8. Ex. C81; Tr. 1777-81, 2045-46. He also failed to amend or correct the representation he made just days earlier regarding his 100% ownership of Eastbound. *Id.* Jonsson also knew by this time that Cliffside would be supplying the majority of the funds for Eastbound's interests in Holistic, yet he said nothing to Genova about the source of those funds. Jonsson attempted to excuse his lack of transparency by stating that Genova did not ask him a direct question about Eastbound's ownership on the call and/or by suggesting that he did not yet need to disclose the transaction because Cliffside had not yet sent him the funds. Tr. 1740-41.

I find that Jonsson lacked credibility when explaining why he failed to disclose the Cliffside Deal to Genova. His conduct was not consistent with his disclosure obligations under the NJ Marijuana Laws and the Holistic OA. First, Genova would have no reason to ask about a transaction of which he had no knowledge, and the NJ Marijuana Laws require full transparency from any applicant or entity seeking to invest in a cannabis establishment. *See* N.J.A.C. §17:30-7.11(b). Second, when the Cliffside funds were received just a few weeks later, Jonsson still did not inform Nickelson, Cabrera, or Genova of the change in control of Eastbound or the funds coming from Cliffside. Jonsson did not supplement Eastbound's ownership and funding disclosures to the NJ-CRC or ask Holistic to do so. Tr. 2152-53. Third, it is clear from the emails following the December 13 call that Genova did in fact again inquire about Jonsson's funding sources and he requested additional documentation to validate the sources of Jonsson's funds. *See* Ex. C224A (12/13/2022 emails between Jonsson, Genova and Cabrera regarding bank statements).

Clearly, Jonsson knew or should have known that the source of Eastbound's funds was a significant topic of concern for Genova. By the end of December 2022, Cliffside had provided the majority of the funds for Eastbound's interests in Holistic, yet Jonsson chose not to disclose these facts to Genova. The NJ-CRC's suitability determination was ongoing, yet Jonsson (and Cliffside/Sciarrone) said nothing about the Cliffside Deal to the regulators. Tr. 2045, 2140.

### I. Eastbound's Funding Sources and Respondents' Understanding of Their Regulatory Obligations

Unbeknownst to Holistic and the NJ-CRC, in January 2023, Jonsson used the Cliffside funds that Eastbound just received to pay himself back $340,000, part of the monies he had previously invested in Holistic. Tr. 2013-14. On or about January 26, 2023, Eastbound also made its final $850,000 closing payment to Holistic ("Subsequent Closing #5" in the UPA, Ex. C19, Exhibit I), using funds that had been provided by Cliffside. Tr. 362-63; Ex. C221.

Eastbound's 35% membership interest in Holistic was ultimately funded by the following sources: 30% or $510,000 from Jonsson, and 70% or $1.19 million from Cliffside (with those monies actually originating from Tangela Holdings and Ferrier). Tr. 2013-14. Cliffside had become the largest single investor in Holistic, yet neither the NJ-CRC nor Holistic were made aware of the ultimate sources of those funds. At no time did Jonsson himself attempt to clarify or correct any of the information he previously provided to Genova regarding the source Eastbound's funds. Nor did he inform Holistic or its counsel so that they could do so.

At the time of Cliffside's investment in Eastbound, Jonsson recalled having discussions with Sciarrone about whether Jonsson needed to tell Nickelson about Sciarrone and Cliffside's investment in Eastbound. Tr. 1744. Jonsson believed that since he was not directly transferring shares of Holistic and was only "bringing on an investor into Eastbound" that it did not "trigger" anything. Tr. 1744-46. Jonsson could not recall whether he sought legal counsel in December

2022 about the regulatory requirements applicable to himself or to Eastbound. *Id.* However, Freedman retained the Foley Hoag firm on behalf of Eastbound on December 8, 2022. *See* Foley Hoag 12/8/2022 engagement letter.

Sciarrone recalled having discussions with Jonsson, sometime prior to February 2024 but he could not say exactly when, about the need to disclose Cliffside's interest in Eastbound to the NJ-CRC. Tr. 2631. Sciarrone stated that Jonsson told him that, at some point, Cliffside would need to fill out documentation and work with the NJ-CRC to abide by the disclosure requirements. Tr. 2631, 2810-11. Sciarrone indicated that he was "always willing and able to" disclose Cliffside's involvement to the NJ-CRC, but stated that he was relying upon Jonsson, as manager of Eastbound, to let Sciarrone and Cliffside know if and when those disclosures to the NJ-CRC were necessary. Tr. 2631-32, 2810-13. However, Cliffside had its own legal counsel in connection with the Cliffside Deal. Tr. 2567-68. Sciarrone does not recall whether he consulted counsel prior to February 2024 about the regulatory requirements applicable to Cliffside or its owners, the Sciarrones. Tr. 2685-87.

### J. Holistic's Expanded ATC License, Opening of the Store, and Sciarrone's May 2023 Visit

After the sale of personal use (recreational) cannabis was authorized by the CREAMM Act, Holistic applied to the NJ-CRC to convert from an ATC license to an Expanded ATC license so that it was authorized to sell recreational cannabis. Tr. 1048-49. In early February 2023, the NJ-CRC granted Holistic a permit to commence medical cannabis sales. Tr. 1783; *see also* Eastbound Counterclaims at ¶ 37. On April 13, 2023, Holistic received final approvals from the NJ-CRC to operate as an expanded ATC. *See* Eastbound Counterclaims at ¶ 39. The Expanded ATC annual operating license issued to Holistic was valid from April 25, 2023, to April 24, 2024. *See* Ex. C154

(referencing 90 days prior as 1/25/24). This license was renewed for the period April 25, 2024 through April 24, 2025 by action of the NJ-CRC on March 13, 2024. *See* Ex. R430 at pp. 5, 8.

In May 2023, Holistic began recreational cannabis sales as an Expanded ATC. *See* Eastbound Counterclaims at ¶ 40; Tr. 543-46, 1634, 1783. Even though Nickelson had expressed concerns about certain statements Jordan, Curaleaf's chairman, had made, which she viewed as derogatory toward minorities, when the Holistic store opened it was carrying Curaleaf products. Tr. 1631-34. Jonsson stated that he had used his contacts with Curaleaf to obtain a 20 percent discount on Curaleaf products for Holistic, Tr. 1634, which Nickelson disputed. Tr. 535-36. Holistic continues to carry Curaleaf medical products but not its recreational products. Tr. 535.

In late May 2023, Sciarrone desired to visit the Holistic store because he "wanted to confirm that Patrik [Jonsson] had deployed the [Cliffside] capital appropriately and what he was telling me about the store's operation was true." Tr. 2610. This visit was arranged by a text message between Jonsson and Nickelson. Tr. 157; Ex. C123. However, instead of disclosing Sciarrone as the managing member of Cliffside and majority owner of Eastbound, Jonsson identified Sciarrone to Nickelson only as "Bobby," "a friend of mine who is interested in potentially getting into the NJ cannabis space as maybe an investor." Exs. C123, R208. Sciarrone was also instructed by Jonsson to not disclose his investment in Eastbound to Nickelson. Tr. 2611-13, 2619. Not only did Jonsson fail to inform Holistic of Cliffside's investment at the time of the Cliffside Deal, six months later, he instructed Sciarrone to hide his ownership in Eastbound from Nickelson. Tr. 2611-13, 2619. When combined with his lack of transparency with Genova, Jonsson's conduct here makes it clear that he did not want Nickelson or the NJ-CRC to know about the Sciarrones' investment in Eastbound.

Sciarrone testified that, during the visit on May 25, he spoke with Nickelson about her strategy for the store, how the store was performing, what systems Holistic was using, how many customers it was serving, and other New Jersey-specific questions. Tr. 2620. Sciarrone's visit lasted about an hour. He described it as very cordial and stated that he congratulated Nickelson on the opening of the store. Tr. 2621. On his way home, Sciarrone called Jonsson and reported positively on the visit and shared some feedback for improvements with Jonsson. Tr. 2621-22.

Sciarrone also sent an email to Jordan (his father-in-law and chairman of Curaleaf) and Lusardi (vice-chair of Curaleaf), as well as brother-in-law Peter Jordan, reporting on his key takeaways from the Holistic visit. Tr. 2622-26; Exs. C125, R211. Curaleaf operated its own retail dispensaries in New Jersey in competition with Holistic and it was also a supplier to Holistic. Tr. 533-35, 2510-12, 2626. Sciarrone opined to Jordan and Lusardi that "assuming Patrik and Bridget can really push" Nickelson, "we should be able to increase volume significantly in short order." Ex. C125. Sciarrone was employed by Measure 8 at the time. Tr. 2610. Cliffside controlled 70% of Eastbound's 30% interest in Holistic, yet Sciarrone's email to Curaleaf's chair and vice-chair reveals that his shared goal with Curaleaf was to increase in the volume of Curaleaf sales at Holistic by having Jonsson "push" Nickelson. Ex. C125. Lusardi responded to the report with "Thx Bobby!" *Id.* Five months later, in October 2023, Curaleaf employed Sciarrone as its senior vice president for the east region, which included responsibility for distribution of Curaleaf products in New Jersey. Tr. 2502-03, 2510-12. Sciarrone's indirect ownership of membership interests in Holistic was not disclosed to Holistic or to the NJ-CRC.

### K. Eastbound's Disputes With Nickelson

#### 1. Nickelson Employment Agreement

Eastbound asserts that Nickelson's refusal to enter into an employment agreement with Holistic constituted a breach of the Holistic OA. *See* Respondents' Post-Hearing Brief at 19.

Respondents cite to Section 8.03(a)(xi) of the Holistic OA for the proposition that "[t]he OA also required Nickelson to execute an employment agreement subject to Eastbound's approval." *Id.* at 14. However, Section 8.03(a)(xi) does not require Nickelson to sign an employment agreement with Holistic. *See* Ex. C22, §8.03(a)(xi). That subsection actually *prohibits* Holistic from entering into any commitment that would set Nickelson's compensation, or make "adjustments outside the ordinary annual salary increase cycle or as otherwise set forth in an employment agreement entered into between the Company and Ms. Nickelson," without the approval of a super majority of the members. *Id.* It does not *require* Nickelson to execute an employment agreement. Further, Section 8.06(b) of the Holistic OA states that the operating agreement "does not, and is not intended to, confer upon the Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with the Manager." *See* Ex. C22, §8.06(b). Therefore, it is clear that there is no requirement in the Holistic OA for Nickelson to enter into an employment agreement with Holistic and the lack of any such agreement cannot constitute a breach of the Holistic OA as Respondents contend.

However, a conflicting requirement regarding an employment agreement appears in the Holistic UPA at Article VI, Closing Conditions. Section 6.01(d) of the Holistic UPA states:

> (d) As soon as reasonably practicable after the date hereof, [Holistic] and Suzan Nickelson shall enter into an Employment Agreement for the employment of Ms. Nickelson as the President of the Company, commencing at the Closing, in a form mutually acceptable to [Eastbound] and [Holistic]. The Employment Agreement will provide, among other things, that the position shall be full time, the President's annual base salary shall start at $130,000 plus any benefits that are routinely provided by [Holistic] or a [Holistic] affiliate to its employees generally, and that compensation shall commence to be paid on a date that is one (1) month prior to the anticipated opening of the Business, which is anticipated to be on November 23, 2022. In addition to base compensation, such Employment Agreement shall provide for the bonus compensation described in Section 5.02. The Employment Agreement will also contain

> other customary terms and provisions including but not limited to a non-compete and a non-solicitation provision. [Eastbound] shall take such actions as necessary to approve such Employment Agreement under the terms of the Operating Agreement.

*See* Ex. C19, §6.01(d) (emphasis added). While Eastbound did not assert a separate breach of the Holistic UPA, I will address this Holistic UPA provision in the conclusions of law section below.

**2. Budget Delays**

Eastbound also alleged that "Nickelson ran the Company without an approved budget for almost a year without any explanation. It was not until October 31, 2023 that Holistic sent Eastbound a draft budget for its approval." *See* Respondents' Pre-Hearing Submission at 10. Jonsson argued that Nickelson's delay in preparing the 2023 budget impeded his supermajority rights. He testified that he was relying upon "Section 8.03(i)" and Section 8.03(a)(ii) of the Holistic OA to support his claims. Tr. 1681-82.

It appears that Jonsson was referring to Section 8.03(a)(i) of the Holistic OA. *See* Ex. C22, §8.03(a)(i). However, that section of the agreement deals with Holistic's approval of a budget without the consent of Eastbound. There is no evidence that Holistic approved any budget without Eastbound's consent. Jonsson's complaint is that Nickelson was delinquent in producing a budget, not that one was approved without his consent. As such, Section 8.03(a)(i) of the Holistic OA is inapplicable. Similarly, Section 8.03(a)(ii) speaks to Holistic taking actions "not in conformity with a Budget." Ex. C22, §8.03(a)(ii). Again, Respondents presented no evidence that actions were taken by Nickelson or Holistic that were inconsistent with an already approved budget. As such, Section 8.03(a)(ii) is inapplicable. The applicable section governing the preparation of budgets appears at Section 8.01(b) of the Holistic OA.

Pursuant to Section 8.04 of the Holistic OA, Nickelson was appointed by the parties to the Holistic OA to be Holistic's Manager. *See* Ex. C22, §8.04. In Section 8.01 of the Holistic OA,

the parties granted the Manager broad powers to manage the Company, subject to Sections 8.02 through 8.05 of the Holistic OA and certain provisions of the New Jersey Revised Uniform Limited Liability Company Act (N.J.S.A. 42:2C-1, *et seq.*) that cannot be abrogated by an operating agreement. *See* Ex. C22, §8.01. The non-managing members had no authority or right to operate the company absent the Manager's specific authorization. *See* Ex. C22, §8.01(a). Eastbound was one of four non-managing members of Holistic. *See* Ex. C22, Schedule A.

With respect to the Manager's budget obligations, Section 8.01(b) of the Holistic OA requires the Manager to prepare:

> an annual operating budget for the Company (the "Budget"), which shall include line items and sufficient detail to guide the expenditures of the Company, and which shall include, without limitation, provision for specific compensation and payroll expenditures. The initial Budget shall be prepared as promptly as reasonably practicable after the Effective Date, and each subsequent Budget shall be prepared at least fifteen (15) days prior to the commencement of the next fiscal year, provided, however, that such deadline may be reasonably extended by consent of the Members in the event that the Manager is in the process of preparing the Budget in good faith.

Ex. C22, §8.01(b).

With regard to the initial operating budget and construction budget for the Holistic dispensary store, those budgets were prepared by Nickelson and reviewed with Jonsson. Tr. 161-64, 227-28; *see* Exs. R186, C30, C31, C49, C51, C53, C62, R191, R194, R197, R198, R207. Nickelson testified that they were also submitted to local planning boards and the wetlands and pinelands commissions for approvals related to the dispensary. Tr. 161-64. Jonsson did not dispute or contradict this testimony. Nickelson also stated that Jonsson was provided with invoices where he gave recommendations on the construction payment schedule and worked with Nickelson on the budgets. Tr. 161-64. Nickelson stated that the other Holistic members were also involved in discussions regarding the initial construction and operating budgeting process. Tr.

164. Respondents offered no evidence to the contrary. Several of the emails exchanged confirm that Jonsson and Nickelson were indeed discussing the monies needed for operating expenses, target revenues, and construction costs related to the launch of the store. *See, e.g.*, Exs. R186, C30, C31, C49, C51, C53, C62, R191, R194, R197, R198, R207.

Holistic opened as a medical only dispensary (ATC) in February 2023. Tr. 50, 143, 1783. Once Holistic began operations as an Expanded ATC in May 2023, Nickelson stated that all members of Holistic received quarterly financial statements. Tr. 168. Indeed, Jonsson and the other members of Holistic were sent the first such statements, Holistic's 2023Q1 Financial Statements, via email on June 9, 2023. *See* Ex. C130. Without approval from Holistic, Jonsson shared this information with Sciarrone and Lusardi on June 13, 2023. *See* Ex. C130.

In mid-June 2023, Jonsson, Nickelson, and Barry Brown (Holistic's accountant) were also engaged in budget discussions for Holistic. *See* Tr. 1713-14; Ex. R213. It was during this time, prompted largely by demands from Sciarrone, that Jonsson became insistent that Holistic provide Eastbound with more detailed financial data than it was making available to the other non-managing members. Tr. 164-65, 2602-04, 2855; Exs. C127, C130, C131, C132, C138, C142. Jonsson began pushing for Nickelson to provide him with direct access to the Company's QuickBooks. Tr. 169-171. Nickelson declined to do so but she did provide Jonsson with a KPI that reported sales on a day-to-day basis, as well as target sales goals. Tr. 169-70. Despite the KPI access, Jonsson continued to press for even more detailed financial information from Nickelson throughout the remainder of 2023. Tr. 169-71, 579-82, 1790-95. With respect to Jonsson's demands for QuickBooks access, Nickelson testified that she became concerned that Jonsson was asking for operational data well beyond that of any other member and that he may have been sharing confidential information of Holistic with unauthorized parties. Tr. 170-72.

Nickelson suspected that Jonsson was sharing the Company's confidential and proprietary information in violation of the Confidentiality provision in the Holistic OA, which only permits disclosures to a Member's Representatives. *See* Ex. C22, §10.01(b). The arbitration record shows that Nickelson's suspicions were well-founded. Throughout 2023, Jonsson shared Holistic's confidential information with Sciarrone. *See* Exs. 130, 131, 132, 142. However, Sciarrone was not a "Member" of Holistic or a "Representative" of either Eastbound or Jonsson under the terms of the Holistic OA.[16]

Nickelson acknowledged that the 2023 Budget was delayed but explained that she believed that preparing the first annual budget without some insight into the store's actual sales was premature and of minimal utility. She and Jonsson had discussions beginning in June 2023 where she requested the opportunity to compile at least 90 days of actual operations data before preparing the annual operating budget. Tr. 161-68. Jonsson disagreed that 90 days of data was necessary to prepare the annual budget. Tr. 1674-75. However, because the recreational cannabis market was in its infancy in New Jersey and an initial operating budget had already been discussed, I do not find it unreasonable for Nickelson to have requested one quarter of actual sales and operational data prior to finalizing the first annual operating budget for the dispensary. Further, as discussed below, Eastbound failed to introduce any evidence that Holistic was harmed by any delay in preparing the first annual budget.

[16] Section 10.01(a) of the Holistic OA sets forth obligations of the Members with respect to treatment of Confidential Information. Ex. C22, §10.01(a). Given that Sciarrone does not meet the definition of a "Member" of Holistic or qualify as a "Representative" of Jonsson or Eastbound under the Holistic OA, Jonsson's sharing of Holistic's financial information with Sciarrone throughout 2023 was not permitted under the Holistic OA. "Representative" means, "with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person." Ex. C22, §1.01. As Eastbound's Manager, only Jonsson was permitted to act on its behalf. Ex. R160, §8.01 ("No other Member of the Company shall have any authority or right to act on behalf of or bind the Company unless otherwise provided herein or unless specifically authorized by the Manager pursuant to a duly adopted resolution expressly authorizing such action.")

### 3. Refusal to Work With Eastbound Representatives

Eastbound next complained that Nickelson refused to hire or consult with former Curaleaf employees that Jonsson recommended, such as Erin O'Keefe. *See* Respondents' Post-Hearing Brief at 19. However, Section 8.01(c) states that "The Manager shall have authority over hiring and termination decisions with respect to employees and consultants working directly with the Company, subject to compliance with the Budget and as expressly set forth in Section 8.03, provided, however, that (i) the Manager and Eastbound Collective LLC shall collaborate in attracting and selecting candidates for employment or independent contractor relationships, and (ii) Eastbound Collective LLC shall participate in job fairs, onboarding of new staff and contractors, and interviews of candidates for employment or independent contractor relationships." Ex. C22, §8.01(c). The parties to the Holistic OA granted Nickelson broad discretion in hiring and consulting decisions, and Eastbound failed to present sufficient evidence that Nickelson exceeded this discretion in deciding who she employed or with whom she consulted. Eastbound also failed to present evidence of harm resulting from Nickelson's refusal to hire or consult with O'Keefe or any other recommended personnel.

### 4. Eastbound's Demand for Inspection

Pursuant to Section 11.01 of the Holistic OA, the Members have the following Inspection Rights:

> Upon reasonable notice from a Member, the Company shall, and shall cause its Managers, Officers, and employees to, afford each Member and its Representatives reasonable access during normal business hours to: (i) the Company's and the Company Subsidiaries' properties, offices, plants, and other facilities; (ii) the corporate, financial, and similar records, reports, and documents of the Company and the Company Subsidiaries, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters, and communications with Members or Managers,

> and to permit each Member and its Representatives to examine such documents and make copies thereof; and (iii) the Company's and the Company Subsidiaries' Officers, senior employees, and public accountants, and to afford each Member and its Representatives the opportunity to discuss and advise on the affairs, finances, and accounts of the Company and the Company Subsidiaries with their Officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member and its Representatives such affairs, finances and accounts).

Ex. C22, §11.01.[17]

On January 24, 2024, Eastbound sent a formal demand for inspection of books and records ("Demand") to Holistic pursuant to Section 11.01 of the Holistic OA and N.J.S.A. §14A:5-28(2)-(3). *See* Exs. C151, C151A; Tr. 172-73. At Sciarrone's request, the Demand was drafted by an in-house attorney employed by Measure 8. Tr. 2607-09. Jonsson signed this Demand by again identifying himself as the "Sole Member" of Eastbound. Ex. C151. However, Jonsson was not the sole member of Eastbound and he had not been for more than a year.

Upon receipt of the Demand, Nickelson repeated her concerns to Jonsson that he was inappropriately sharing the Company's Confidential Information with third parties not authorized by the Holistic OA and asked him to provide engagement letters or signed confidentiality agreements with persons whom he intended to share the information. Tr. 174-83; Ex. C152. Jonsson refused to have his agents sign anything but committed to keeping information confidential consistent with the Holistic OA. *See* Ex. C152; Tr. 174-83.

---

[17] "Member" in the Holistic OA means: "(a) each Person identified on the Schedule of Members as of the date hereof as a Member and who has executed and delivered this Agreement or a counterpart thereof (each, an "Initial Member"); and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" of the Company." *See* Ex. C22, §1.01. "Person" means "an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity." *Id.* "Representative" in the Holistic OA means, "with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person." *Id.*

On February 2, 2024, Jonsson met with Nickelson and Barry Brown, Holistic' s accountant, to review the 2023 financials for Holistic and reported it to be a "good meeting." *See* Ex. C158. Holistic shared with Jonsson the company's balance sheet as of 12/31/2023, Q42023 statement of cash flow, Q42023 income statement, and its December bank statements. *See* Ex. C176; Tr. 172-73. Shortly thereafter, the existence of the Cliffside Deal was revealed and Eastbound was removed as a member of Holistic.

**L. Holistic's 2024 License Renewal Application and the Revelation of Cliffside as Eastbound's Controlling Member**

On January 9, 2024, the NJ-CRC issued guidance for license renewal submissions for Expanded ATCs. *See* Ex. C154. This triggered an obligation for Holistic to file a renewal application for its license by January 25, 2024 (90 days prior to the expiration of its existing license). *Id.* Thereafter, Cabrera was in contact with Tagliaferri regarding Holistic's renewal application, which was to be submitted for the first time through the NJ-CRC portal. Tr. 1101-02; Ex. C154. Due to the volume of information required to be gathered and difficulties Nickelson had in obtaining portal credentials, Cabrera sought a one-week extension from the NJ-CRC to submit the materials. Tr. 1106-07; Ex. C154. A formal extension was not granted but the NJ-CRC advised Holistic to submit its materials through the portal as soon as possible. Ex. C154.

On January 29, 2024, Cabrera informed Jonsson and Freedman via email that Holistic's renewal application was due and she needed an updated Entity Disclosure Form ("EDF") for Holistic's entities of interest (those holding more than 5% of the company). Ex. C156. Cabrera could not locate any prior EDF submitted by Eastbound. Ex. C156. She asked Jonsson if he previously submitted one to the NJ-CRC and, if not, to complete the attached form and have it notarized by January 31, 2024. Ex. C156. On January 30, 2024, Cabrera submitted a license renewal application for Holistic through the NJ-CRC portal. Tr. 1110-11. At the time the

application was submitted, it was incomplete and contained only an EDF for Holistic. *Id.* She had not yet received an EDF for Eastbound or an updated PHD from Jonsson. *Id.* In a notarized letter just six days earlier, however, in connection with Eastbound's Demand, Jonsson had just represented himself as Eastbound's sole owner. *See* Ex. C151, C151A.

Jonsson did not immediately respond to Cabrera, so she reached out again on February 6 asking for a status update. Ex. C156. Freedman responded on February 6 by offering certificates of good standing for Eastbound, however Cabrera replied that she needed the signed and notarized EDF. Ex. C156. Further email exchanges occurred but the EDF was not provided, and by February 9, the NJ-CRC issued a deficiency notice asking that all missing documents be provided for Holistic's renewal application. Ex. C156.

After receiving Cabrera's request on January 29 for the Eastbound EDF, Jonsson was in contact with Sciarrone and Lusardi about the need to disclose Cliffside. Ex. C163. In an email on February 5, Jonsson stated to Sciarrone "[w]e probably have to disclose Cliffside's involvement at this point, for the annual entity disclosure renewal. See section 3 [in the EDF Form]." Ex. C163. Sciarrone replied, "Let's discuss this tomorrow." Ex. C163. On February 8, Jonsson wrote to Sciarrone, "Here is the form we need to submit that will require disclosing Cliffside, we should discuss asap since it was due last week supposedly. Section 2 & 3 is what will be a problem…." Ex. C169. On February 11, Jonsson wrote to Sciarrone, "Here is the form I am submitting on my end, along with a document tracked I shared with Jane. I have my doc notarized and we need to send over first Monday (sic) morning. You and I need to discuss my 'missing' data for Section 3." Ex. C175 (internal quotation marks original).

On February 12, 2024, more than fourteen months after the Eastbound OA had been executed, Jonsson disclosed to Holistic for the first time that Cliffside held 70% of the membership

interests of Eastbound. Ex. C156. Jonsson provided Cabrera with a signed and notarized EDF for Eastbound. Tr. 2627; Ex. C156. However, Jonsson again failed to provide complete and accurate information to Holistic. In response to Item 8 of the Eastbound EDF, which requires identification of "all other personnel associated with the Entity not otherwise listed above" and "all people and entities in any way affiliated with the operation or funding of the Entity," *see* Ex. C156, EDF Form at Item 8 (emphasis original), Jonsson answered "Does Not Apply." There was no mention of Robert or Marina Sciarrone as the owners of Cliffside, or Tangela Holdings' loans to Cliffside, or Ferrier as the source that funding. *See* Ex. C156. Jonsson did not provide an EDF for Cliffside or PHD forms for the Sciarrones with his February 12 email. In this email, Jonsson also incorrectly stated that "Cliffside consists of only one person." Ex. C156. This statement was not true, since from its inception Cliffside was owned 50/50 by Robert and Marina Sciarrone. *See* Ex. C59.[18]

The NJ Cannabis Rules and the instructions to the Entity Disclosure Form require transparency from any Entity requesting to participate in a cannabis business in New Jersey. *See* N.J.S.A §24:6I-7; N.J.A.C. §17:30-9.4(c); N.J.A.C. §17:30-7.11(b); and Ex. C156, EDF Instructions at HOL 0001947. The submitting entity must "make accurate statements and include all material facts. Any misrepresentation, or the failure to provide requested information, may result in the denial of the Entity's request for suitability." Ex. C156, EDF Instructions (HOL 0001947). Jonsson signed a sworn affidavit dated February 10, 2024, affirming that all statements in the EDF were true and that "any misrepresentation or failure to reveal information may be

---

[18] Jonsson stated that he was not made aware of Marina Sciarrone's 50% ownership interest in Cliffside at the time of the Cliffside Deal. Tr. 1873, 1919, 1926-27, 1987, 2080. Sciarrone testified that he did not disclose his wife's ownership in Cliffside to Jonsson in 2022 but could not recall whether he disclosed this fact to Jonsson sometime prior to April 8, 2024. Tr. 2562-63, 2682-83. Jonsson stated that he was also unaware that Cliffside's capital contribution was being funded through a loan from Tangela Holdings and Ferrier. Tr. 1743, 1969. Pursuant to the Eastbound OA, however, the Sciarrones and Cliffside had obligations to Eastbound and to Jonsson, as Eastbound's Manager, to disclose all of this information. *See* Ex. R160, §2.03(d).

deemed sufficient cause for the refusal to issue, or the revocation of, a permit/license." Ex. C156, EDF Form at Affidavit (HOL 0001981).

On February 14, 2024, after Cabrera had raised a number of concerns regarding Eastbound's belated disclosure of the Cliffside Deal, Freedman replied on behalf of Eastbound with the following statement: "Cliffside's investment is purely financial. They do not exercise any voting power or investment discretion over Eastbound's holdings in Holistic…." *See* Ex. C177 at 2/14/24 email from Freedman to Cabrera. This statement by Freedman is also false and directly at odds with the plain language of the Eastbound OA. *See* Ex. R160, definitions of "Class A Units," "Voting Member," "Voting Unit," Schedule A, and §§4.06, 4.07, 4.10, 6.01, 7.02. In connection with the Cliffside Deal, Cliffside acquired 70% of the Class A Voting Shares of Eastbound and 70% of the Membership Interests of Eastbound, which includes the rights to distributive shares of its profits, losses and assets, as well as the right "to vote on, consent to, or otherwise participate in any decision of the Members as provided in this Agreement." *See* Ex. R160, §1.01 "Membership Interest" Definition.

Second, as discussed in detail below, even if the investment was "purely financial" as Freedman contended, as one of its owners, Eastbound was still contractually required to notify Holistic of its new Member Parties for compliance with the NJ Marijuana Laws. *See* Ex. C22 at §2.03(d). The addition or removal of even passive investors in a cannabis business requires license holder notification to and approval from the NJ-CRC. *See* N.J.A.C. §17:30-9.2(a)(1)(i). Holistic could not meet its obligation to notify the NJ-CRC, however, because Respondents concealed the existence of the Cliffside Deal. Moreover, as discussed further below, as "significantly involved persons," the Sciarrones and Cliffside were statutorily obligated themselves to directly notify the

NJ-CRC and seek regulatory approval of Cliffside's investment. *See* N.J.S.A. §24:6I-7(d)(1) and (e).

### M. The Removal of Eastbound, Notification to the NJ-CRC, and Holistic's 2024 License Renewal

On February 16, 2024, a telephonic meeting of all members of Holistic, minus Eastbound, was convened by Nickelson as the Manager. Tr. 201, 1137. The members present and voting constituted a majority of the voting units of Holistic. Tr. 201. Cabrera participated as counsel to Holistic. Tr. 1137. The non-managing participating members were presented with information regarding Eastbound's failure to disclose the Cliffside Deal in December 2022, Jonsson's lack of transparency with the NJ-CRC, and the creation of a "Regulatory Problem" by Eastbound. Tr. 201-02. Cabrera discussed the Cliffside Deal and its regulatory implications with Holistic's members. Tr. 1136. All of Holistic members other than Eastbound voted, unanimously, to remove Eastbound as a member of Holistic. Tr. 201-02.

On February 16, 2024, Eastbound submitted a revised renewal application through the NJ-CRC portal reflecting the removal of Eastbound as a member. Tr. 1145-46. On February 21, 2024, Cabrera wrote to Tagliaferri at the NJ-CRC to report on the removal of Eastbound as a member of Holistic. Ex. C186; Tr. 1144-48. She explained that the Cliffside Deal, which occurred in December 2022, had not been disclosed to Holistic until February 12, 2024 and that, due to concerns related to the nondisclosure and violations of N.J.S.A. §24:6I-7(d)(1), Eastbound had been removed as a member of Holistic. *See* Ex. C186.

On February 21, 2024, Cabrera also wrote to Freedman and advised her that Eastbound had forfeited its interests in Holistic due to its creation of a Regulatory Problem and subsequent failure to timely cure, and that Eastbound had been removed as a member of Holistic. Ex. R305. On February 23, 2024, on behalf of Eastbound, Freedman responded to Cabrera's letter and

disputed the removal of Eastbound. Ex. C190. Freedman asserted that Eastbound was not in breach of any obligations to Holistic and denied that a "Regulatory Problem" had been created. *Id.*

Throughout late February and March 2024, Cabrera had a number of conversations with representatives from the NJ-CRC regarding the removal of Eastbound as a member of Holistic and the license renewal application that was pending. Tr. 1168-69. On behalf of Eastbound, Gross also spoke several times and exchanged emails with the NJ-CRC between February and May 2024 regarding Eastbound's removal and Holistic's license renewal. Tr. 1508-20, 1528-1532; Exs. R323, R326, R329, R340, R346, R351, R364. On March 8, 2024, Gross wrote to Urbish asking that the NJ-CRC not recognize any ownership change with respect to Holistic's Renewal Application because the Holistic OA requires that any dispute among the parties be resolved by mediation and, if not successful, arbitration. Ex. R329. Gross also asked that the NJ-CRC not implement or consider the alleged ownership change reported by Holistic in the Renewal Application. *Id.*

On March 21, 2024, the NJ-CRC approved Holistic's application for renewal of its license to operate as an Expanded ATC. Ex. C200. Under the license, Holistic was "permitted to engage in adult, personal-use cannabis activities in New Jersey" as a Class 5 Cannabis Retailer. Ex. C200 at p.1. The NJ-CRC stated that Holistic had "submitted complete, accurate, and verifiable information, and the NJ-CRC has approved the expanded ATC to operate in the adult personal-use market for an additional year." Ex. C200 at p.1. The approval letter states that the "Commission's approval provided herein is based and conditioned on the information provided in the entity's certification materials." Ex. C200 at p.2. The most recent materials submitted by

Holistic on February 16, 2024 did not include Eastbound as a member. *See* Exs. C186, C224, C226; Tr. 1144-48.

### N. The NJ-CRC's Deferral To The Outcome Of This Arbitration

After communications with counsel for both Holistic and Eastbound, on April 17, 2024, Director Urbish reached out to Cabrera to check on the status of the dispute, as he had heard of a potential mediation between the parties. Ex. C222. Cabrera reported that Holistic was declining to participate in mediation until the NJ-CRC concluded its investigation. Ex. C222. Deputy Counsel Tuason then asked Cabrera for a call to discuss the issue. In that discussion, he stated that the NJ-CRC would prefer to wait to decide on Holistic's change of ownership. Ex. C222.

Cabrera encouraged the NJ-CRC to investigate any potential violations of the NJ Marijuana Laws by Eastbound and its owners, since the NJ-CRC has primary jurisdiction to "investigate and aid in the prosecution of every violation of the statutory laws of this State relating to cannabis and cannabis items," *see* N.J.S.A. §24:6I-34(b)(3), and to "exercise all powers incidental, convenient, or necessary to enable the commission to administer or carry out the provisions of [the CREAMM Act], or any other law of this State that charges the commission with a duty, function, or power related to personal use cannabis." N.J.S.A. §24:6I-34(b)(5). This includes the NJ-CRC's duties to investigate the suitability of any investor in a cannabis establishment, whether direct or indirect, passive or active, as well as any "significantly involved person" investing in a medical cannabis business before issuing such an investor a permit. N.J.S.A. §24:6I-7(d)(1) and (e). Part of this process involves evaluating the completeness and accuracy of any information that an applicant is required to submit to the NJ-CRC. *See* N.J.S.A §24:6I-7(m); N.J.A.C. §17:30-9.4(c); N.J.A.C. §17:30-7.11(b).

Despite her citation to relevant provisions of the CREAMM Act and Holistic's request that the NJ-CRC investigate Eastbound and Cliffside, Deputy Counsel Tuason replied to Cabrera on

April 29, 2024 that Holistic had only two options: (1) submit a formal request to the NJ-CRC's compliance team to proceed with an investigation but warning Holistic that the NJ-CRC's investigation would only determine "whether fraudulent information was submitted to the NJ-CRC by Holistic, the licensee…NJ-CRC's only investigation is whether the NJ-CRC received fraudulent information when Holistic Solutions submitted its application," or (2) "proceed with arbitration and/or mediation" and thereafter "bring the determination to the NJ-CRC, which will be presented to the Board for an ownership change or other requested action." Ex. C222.

Holistic filed its demand for arbitration in July 2024. On November 7, 2024, in an email from Nickelson to Urbish and Wesley McWhite of the NJ-CRC, Holistic also reiterated its request for a formal investigation. Ex. C223. Investigator Keyes thereafter reached out to Gross to notify Eastbound that he had been appointed to investigate the matter. Ex. R377. On March 4, 2025, Keyes reported to Gross and Cabrera that he had completed his report for the ownership change in Eastbound and had submitted it to NJ-CRC legal for review, prior to being presented to the NJ-CRC Commission. Ex. C244. He stated that "No other changes to the license will occur until the arbitration is completed." Ex. C244. On April 1, 2025, Investigator Keyes reported that the NJ-CRC would "hold all transactions effecting (sic) the business changes and will wait for the outcome of the arbitration. At this time the business is not in violation, as it is the NJ CRC's decision to wait for the results [of the arbitration] and [Holistic] can operate as normal." Ex. C244.

### O. Eastbound's Attempted Exercise of its Option

In January 2024, Eastbound began to make inquiries of Holistic about the timing for when it could exercise its Option under the Option Agreement. Exs. R254, R258; Tr. 1470-71, 1836-37; Eastbound Counterclaims, ¶ 114. While this arbitration was pending, Eastbound sent Holistic a letter dated May 15, 2025, with the subject "Notice of Election to Exercise Option," and offered to wire funds for the Option Exercise Price to Holistic. Tr. 388; Ex. R429. On June 11, 2025,

Holistic rejected Eastbound's attempted exercise of the Option because Eastbound had previously breached the Holistic OA and it had been removed as a member of Holistic. Tr. 866; Eastbound Counterclaims, ¶ 120 and attached email Exhibit C.

## III. CAUSES OF ACTION ASSERTED BY THE PARTIES

### A. Holistic's Claims Against Respondents

Holistic asserts the following claims against Eastbound: Count 1 - Breach of the Holistic OA for creation of a Regulatory Problem and for failure to provide information required by the NJ Marijuana Laws; Count 2 - Breach of the License Agreement for failure to deliver usable SOPs; Count 3 - Declaratory Judgment. *See* Holistic Demand, ¶¶ 42-58. Holistic's request for declaratory judgment seeks confirmation that Eastbound created a Regulatory Problem; that Eastbound forfeited its membership interests in Holistic for no consideration as a result; and that Eastbound was lawfully removed as a member of Holistic. *Id.*, ¶¶ 56-57, 71. Holistic also requests a judgment declaring Eastbound's indirect transfer of Holistic membership interests to Cliffside to be null and void. *Id.*; Holistic 11/21/2025 Pre-Hearing Brief at 13. Holistic also asserts the following claims against Eastbound, Jonsson, and Sciarrone: Count 4 - Fraudulent misrepresentation, *see* Holistic Demand ¶¶ 59-64; Count 5 - Breach of fiduciary duty, *see* Holistic Demand ¶¶ 65-66. Holistic asserted the following claim against Jonsson and Sciarrone: Count 6 – Individual liability – piercing the corporate veil. *See* Holistic Demand ¶¶ 67-70.

### B. Eastbound's Claims Against Holistic and Nickelson

Eastbound alleges that it was "harmed by [Holistic's] and Nickelson's fraud, oppression, mismanagement, breach of contract, failure to permit inspection of the Company's books and records, failure to provide the required budget and financial information, failure to pay licensing fees due and owing to Eastbound, and Nickelson's breach of the duty of care, loyalty and good

faith and fair dealing." Eastbound Counterclaims at ¶ 1. It brings its claims "under New Jersey common law and the New Jersey Revised Uniform Limited Liability Company Act ("RULLCA"), N.J.S.A. 42:2C-1, et seq." *Id.*

Eastbound asserts the following causes of action against Holistic: Count 1 - Breach of the Holistic OA for failure to permit inspection of the Company's books and records; Count 2 – Oppression of a minority member under N.J.S.A. 42:1A-23; Count 3 – Breach of the OA for removing Eastbound and divesting it of its interest; Count 5 – Breach of the License Agreement; Count 6 - Fraud; Count 7 – Minority member oppression in violation of N.J.S.A. 42:2C-48; Count 9 – Breach of fiduciary duty of good faith and fair dealing; Count 10 – Breach of the Option Agreement; Count 11 – Declaratory Judgment regarding the Holistic OA; and Count 12 – Declaratory Judgment regarding the Option Agreement. *See* Eastbound 6/17/2025 Counterclaims.

Eastbound asserts Counts 1, 2, 3, 5, 6, 7, 10 and 11 against Nickelson individually. Eastbound adds the following claims against Nickelson: Count 4 - Breach of the Holistic OA for Failing to Create an Annual Budget, and Count 8 - Breach of Fiduciary Duty, Duties of Care, Loyalty, and Good Faith and Fair Dealing. *Id.*

### C. Nickelson's Counterclaim Against Eastbound

Nickelson asserted the following counterclaims against Eastbound: Count 1 – Declaratory Judgment confirming that her actions were lawful, *see* Nickelson 9/24/24 Counterclaims at ¶¶ 41-48; and Count 2 – Malicious Abuse of Legal Process, *see id.* ¶¶ 49-52.

## IV. CONCLUSIONS OF LAW

### A. New Jersey Law Governs.

Holistic is a New Jersey limited liability company. As such, pursuant to New Jersey's Revised Uniform Limited Liability Company Act, N.J.S.A. §42:2C-1, *et seq*., ("RULLCA"), its

internal affairs and the liabilities of any member or manager for its debts, obligations or other liabilities are governed by New Jersey law. *See* N.J.S.A. §42:2C-6. The parties agreed in the Holistic OA that New Jersey law governs all issues and questions concerning its application, construction, validity, interpretation, and enforcement, without effect to any choice or conflict of law provision or rule. *See* Ex. C22, §14.11.

**B. The Operation of Limited Liability Companies Under New Jersey Law.**

The company's operating agreement, here the Holistic OA, governs the relations among the members and between members and the limited liability company, N.J.S.A. §42:2C-11(a)(1), except for subject matters not addressed therein, and in such cases the RULLCA governs. N.J.S.A. §42:2C-11(b). The RULLCA is "to be liberally construed to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements." N.J.S.A. §42:2C-11(i).

Relevant to the claims asserted by the parties here, an operating agreement may not, subject to subsections d. through g. of N.J.S.A. §42:2C-11, eliminate the duty of loyalty, the duty of care, or any other fiduciary duty. N.J.S.A. §42:2C-11(c)(4). However, if not manifestly unreasonable, the operating agreement may "alter the duty of care, except to authorize intentional misconduct or knowing violation of law," N.J.S.A. §42:2C-11(d)(3); "alter any other fiduciary duty, including eliminating particular aspects of that duty," N.J.S.A. §42:2C-11(d)(4); and "prescribe the standards by which to measure the performance of the contractual obligation of good faith and fair dealing under [N.J.S.A. §§42:2C-39(d) and -39(g)(i)]." N.J.S.A. §42:2C-11(d)(5).

"The operating agreement may alter or eliminate the indemnification for a member or manager provided by [N.J.S.A. §42:2C-38] and may eliminate or limit a member's or manager's liability to the limited liability company and members for money damages, except for:

(1) breach of the duty of loyalty;

(2) a financial benefit received by the member or manager to which the member or manager is not entitled;

(3) a breach of a duty under [N.J.S.A. §42:2C-36 – Liability for improper distributions];

(4) intentional infliction of harm on the company or a member; or

(5) an intentional violation of criminal law."

N.J.S.A. §42:2C-11(g).

N.J.S.A. §42:2C-39 sets forth the duties of loyalty and care owed by members of an LLC to one another and to the LLC. A member of a member-managed limited liability company owes to the company and, subject to N.J.S.A. §42:2C-67(b), the other members, the duties of loyalty and care stated in N.J.S.A. §§42:2C-39(b) and (c). *See* N.J.S.A. §42:2C-39(a). "The duty of care of a member of a member-managed limited liability company in the conduct and winding up of the company's activities is to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." N.J.S.A. §42:C-39(c). Members are required to discharge their duties under the RULLCA or under the operating agreement, and exercise any rights, consistently with the contractual obligation of good faith and fair dealing. *See* N.J.S.A. §§42:2C-39(d).[19] However, a member does not violate a duty or obligation under the RULLCA or under the operating agreement merely because the member's conduct furthers the member's own interest. N.J.S.A. §§42:2C-39(e). The obligations of a limited liability company and its members to a person in the person's capacity as a transferee or dissociated member are governed by the company's operating agreement. *See* N.J.S.A. §42:2C-13(b).

---

[19] The New Jersey Supreme Court long ago recognized that every contract contains an implied term of good faith and fair dealing. *See Onderdonk v. Presbyterian Homes,* 85 *N.J.* 171, 182, 425 *A.*2d 1057 (1981); *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.,* 69 *N.J.* 123, 129–30, 351 *A.*2d 349 (1976); *Palisades Properties, Inc. v. Brunetti,* 44 *N.J.* 117, 130, 207 *A.*2d 522 (1965).

"Under New Jersey law, where the terms of a contract are clear and unambiguous, there is no room for interpretation or construction and the courts must enforce those terms as written." *Namerow v. PeditriCare Associates, LLC*, 218 A.3d 839, 843, 461 N.J. Super. 133, 140 (Ch. Div. 2018). "A basic tenet of contract interpretation is that contract terms should be given their plain and ordinary meaning." *Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 236 N.J. 301, 321 (2019). "Contracts should be read 'as a whole in a fair and common sense manner.'" *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (quoting *Hardy by Dowdell v. Abdul-Matin*, 198 N.J. 95, 103 (2009)). "When presented with an unambiguous contract, the court should not look outside the 'four corners' of the contract to determine the parties' intent, and parol evidence should not be used to alter the plain meaning of the contract." *Namerow v. PeditriCare Associates, LLC*, 218 A.3d at 843, 461 N.J. Super. at 140. "The court has no right to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." *Id.* (quoting *Connecticut Gen. Life Ins. Co. v. Punia*, 884 F. Supp. 148, 152 (D.N.J. 1995) (citations omitted)).

With respect to the Holistic OA and the Eastbound OA, I find them to be unambiguous, and I will apply the plain meaning of the terms contained therein.[20] The same is true of the Holistic UPA and the Option Agreement, and I will apply the plain meaning of the terms in those agreements.

With respect to the Holistic License Agreement, however, since the parties failed to attach Exhibits A and B when the agreement was executed, *see* Ex. C23, the License Agreement fails as

---

[20] With regard to its execution and effective date, while Holistic spent considerable time debating the date of Sciarrone's signature on the Eastbound OA (December 7, 2022 versus December 8, 2022), I find little relevance to the one-day distinction. I find that Sciarrone simply misdated his signature page and conclude based upon the evidence presented that the Eastbound OA was fully executed on December 8, 2022. Tr. 1733-38, 2131-32, 2574-79; Ex. C77, R158, R170.

a matter of law for indefiniteness. From its inception, the document lacked an essential material definition for the term "Licensed Property." *See* Ex. C23. No meeting of the minds ever occurred and the agreement is unenforceable. *See Friedman v. Tappan Development Corp.*, 22 N.J. 523, 531, 126 A.2d 646 (1956); *Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank*, 163 N.J. Super. 463, 474, 395 A.2d 222, 227 (App. Div. 1978). No party shall be permitted to recover under the License Agreement, and I will address the claims by all parties related to this document collectively below.

### C. Respondents Violated the NJ Marijuana Laws By Failing To Disclose the Cliffside Deal.

#### 1. Statutory Requirements For A "Significantly Involved Person"

Under the NJ Marijuana Laws, any individual who "secures an investment interest" such that he or she becomes a "significantly involved person" in a medical cannabis dispensary has a duty to notify the NJ-CRC by filing an application for a permit, undergo a criminal history record background check, and provide all information as may be required by the commission no later than 30 days after the date the individual becomes a significantly involved person. *See* N.J.S.A. §24:6I-7(d)(1).[21] Failure to do results in any permit issued to the individual or group of which the significantly involved person is a member being automatically revoked and the individual or group of which the person is a member being deemed ineligible to hold any ownership or investment interest in a cannabis business for a minimum of 24 months. *See* N.J.S.A. §24:6I-7(d)(1). The legislature used "shall" in the statutory language in both instances. *Id.*

---

[21] For the completeness of the record, with regard to the effective date of this section of the statute, the applicable provisions referenced in this section of the opinion were adopted in 2019 as part of amendments to the CUMMA and the Jake Honig Act. *See* 2019 NJ Sess. Law Serv. Ch. 153 (ASSEMBLY 20) (WEST) at amendments to C.24:6I-7(d)(1).

"Significantly involved person" means "a person or entity who holds at least a five percent investment interest in an entity issued, or applying for a permit to operate as, a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant, or who is a decision making member of a group that holds at least a 20 percent investment interest in an entity issued, or applying for a permit to operate as, a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant, in which no member of that group holds more than a five percent interest in the total group investment interest, and the person or entity makes controlling decisions regarding the operations of the entity issued, or applying for a permit to operate as, a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant. N.J.S.A. §24:6I-3 (emphasis added) (last revised 2021, c.16, s.4).

The statutory language chosen by the legislature in Section 6I-7(d) makes clear that the obligation to notify the NJ-CRC rests with the "significantly involved person," by themselves filing a permit application, and not the license holder. *See* N.J.S.A. §24:6I-7(d)(1) and (e). Indeed, the statute states "[f]or purposes of this section, the term "applicant" shall include any owner, director, officer, or employee of, and any significantly involved person in, a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant." N.J.S.A. §24:6I-7(d)(1) (emphasis added). The notification obligation for each such individual is triggered as of the date the person becomes a "significantly involved person," and is not tied in any way to the timing of a license holder's own application or any renewal application. *Id.*

Respondents' tortured reading of the statute, as presented in their closing argument and related PowerPoint slides,[22] completely ignores that the definition of "applicant" includes a "significantly involved person" and applies directly to any "individual who secures an investment interest **or** gains the authority to make controlling decisions in a permitted entity that makes the individual a significantly involved person." N.J.S.A. §24:6I-7(d)(1) (emphasis added). Any such person is required by the statute to "notify the commission, complete a criminal history record background check, and provide all information as may be required by the commission no later than 30 days after the date the individual becomes a significantly involved person…." *Id.* (emphasis added).

In this same section, the statute further makes clear that any significantly involved person must themselves apply for a permit: "An applicant who is required to undergo a criminal history record background check pursuant to this section who refuses to consent to, or cooperate in, the securing of a check of criminal history record background information shall not be considered for a permit to operate, or authorization to be employed at or to be a significantly involved person in, a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant. An applicant shall bear the cost for the criminal history record background check, including all costs of administering and processing the check." N.J.S.A. §24:6I-7(d)(1) (emphasis added). To argue, as Respondents have, that this section of the statute is meant only as an obligation of the license holder, Holistic, is illogical and conflicts with the plain language of the statute.

The notification and application filing obligations quite clearly rest with the "individual" who "secures an investment interest" such that he or she becomes a "significantly involved

[22] *See* Respondents' 2/25/26 email with attached closing summation PowerPoint presentation slides.

person." Each such individual must file an application for a permit to be an investor in a medical cannabis business, undergo a criminal history record background check, and provide all information as may be required by the commission no later than 30 days after the date the individual becomes a significantly involved person. *See* N.J.S.A. §24:6I-7(d)(1); *see also* N.J.A.C. §17:30-7.12. Failure to do so is a disqualifying event for the "the individual or group of which the significantly involved person is a member." N.J.S.A. §24:6I-7(d)(1).

**2. The NJ Cannabis Rules**

The NJ Cannabis Rules separately require that cannabis business license holders apply for an amended license, along with the applicable fee, if any, for changes in ownership, including the "[a]ddition or removal of owners or passive investors," or "any other changes to the ownership and financial information provided to the Commission pursuant to N.J.A.C. 17:30-7.10 and 7.13." *See* N.J.A.C. §17:30-9.2(a). As defined in the NJ Cannabis Rules, "Owner" means:

> 1. Any person or entity that holds at least a five percent aggregate ownership interest in a cannabis business or testing laboratory license applicant or license holder;
> 2. Where an entity, including a parent company, holds at least a five percent ownership interest in a cannabis business or testing laboratory license applicant or license holder, any person or entity that holds at least 10 percent aggregate ownership interest in or is a member of the executive team of such entity; or
> 3. A significantly involved person of a cannabis business license applicant or license holder.

N.J.A.C. §17:30-1.2. "Person" means "a natural person." *Id.* "Cannabis business" means "a cannabis cultivator, a cannabis manufacturer, a cannabis retailer, cannabis wholesaler, cannabis distributor, or cannabis delivery service," and it "includes an 'expanded ATC.'" *Id.* "License applicant" means "a person or entity that is applying for, or has a pending application for, a conditional or annual cannabis business license or a testing laboratory license." *Id.* "License

holder" means "a person or entity registered to do business in New Jersey that holds a conditional or annual cannabis business license or a testing laboratory license." *Id.* "Ownership interest" means "a right to ownership or equity interest in an entity." *Id.* ""Significantly involved person" has the same meaning as at N.J.S.A. 24:6I-33." *Id.*

The NJ Cannabis Rules also address ownership and passive investment and state that "[a]n ownership interest may be held directly or indirectly through an intermediary controlled by the holder, such as a shell company or holding company; the presence of such an intermediary shall not change the determination of the actual holder of the ownership interest." N.J.A.C. §17:30-6.8(j). Further, a license applicant or license holder must disclose to the NJ-CRC any financial source agreements prior to any such agreement taking effect. N.J.A.C. §17:30-6.10(g). Failure to seek approval for such material changes pursuant to §17:30-9.2(a) "may result in sanctions upon the license holder pursuant to N.J.A.C. 17:30-20, including civil penalties, or suspension or revocation of any license issued to the license holder." *Id.* §17:30-9.2(b).

Holistic, as the license holder, could only meet its obligation to inform the NJ-CRC and apply to amend its license if it were told about its new "owners or passive investors." Accordingly, the Holistic OA and the Eastbound OA both mandate that any information Holistic was required to provide to the NJ-CRC under the NJ Marijuana Laws needed to be provided promptly to Holistic by its Members. *See* Ex. C22, §2.03(d) and Ex. R156, §2.03(d) ("Each Member, Manager, and Officer agrees to promptly provide the Company all information regarding the Member Parties as may be required by the Marijuana Laws.").

Eastbound not only had contractual obligations to disclose the Cliffside Deal to Holistic, but it also had its own regulatory obligations to disclose the transaction to the NJ-CRC. The NJ Cannabis Rules require that, as part of the "ongoing material conditions and general requirements

applicable to cannabis business license holders," a "license holder and its owners, principals, employees, management services contractors, financial sources, and vendor-contractors": "1. Maintain qualification to hold a license pursuant to N.J.A.C. 17:30-7.4, as applicable; 2. Comply with the Act and this chapter; and 3. Cooperate with the Commission and its staff." N.J.A.C. §17:30-9.4(c) (emphasis added).

No person or entity can be qualified to hold a license where the license applicant or license holder:

> 1. Does not meet the requirements [of N.J.A.C. §17:30-7.11(a)];
> 2. Fails to provide information, documentation, and assurances as required pursuant to [the CREAMM Act], or this subchapter or as requested by the Commission, including failure to provide a required criminal history record background check or to cooperate with the Commission in its investigation of the license applicant;
> 3. Fails to reveal any material fact pertaining to qualification;
> 4. Supplies information that is untrue or misleading as to a material fact pertaining to the qualification criteria for a license; or
> 5. Has been determined by the Commission to be unsuitable to hold a cannabis business license pursuant to [§17:30-7.11(c)].

N.J.A.C. §17:30-7.11(b).

### D. Eastbound Breached the Holistic OA By Entering Into The Cliffside Deal Without The Consent of Holistic or the NJ-CRC.

#### 1. The Eastbound-Cliffside Transaction in December 2022 Constituted A "Transfer" of Eastbound's Membership Interest in Holistic.

Eastbound first acquired a Membership Interest in Holistic in September 2022. "Membership Interest" is defined in the Holistic OA to be "an interest in the Company owned by a Member, including such Member's right (based on the type, class or series of Unit or Units held by such Member), as applicable: (a) to a distributive share of Profits, Losses, and other items of income, gain, loss and deduction of the Company; (b) to a Distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as

provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement." Ex. C22, § 1.01 (Definitions, "Membership Interest").

A "Transfer," as defined in the Holistic OA, means "to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to, the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units or Unit Equivalents owned by a Person."[23] *See* Ex. C22, § 1.01 (Definitions, "Transfer") (emphasis added); Tr. 2219-20.

On December 8, 2022, Eastbound, a Person then holding a 17.5% interest in Holistic and all of the corresponding membership rights to which it was entitled in the Holistic OA, entered into an agreement to transfer 70% of those interests to Cliffside. *See* Ex. R160, Schedule A. By order of the governing operating agreements, at the time of the consummation of its deal with Eastbound, Cliffside became entitled to a 12.25% (70 percent of the 17.5% share Eastbound then held in Holistic) distributive share of the profits and losses of Holistic. *See* Ex. R297A, Articles VI and VII, and Ex. C22, Articles VI and VII. On December 30, 2022, the Cliffside Deal was consummated and there was a transfer to Cliffside of a beneficial interest in Holistic previously

---

[23] "Unit" is defined in the Holistic OA as "a unit representing a fractional part of the Membership Interests of the Members and shall include all types, classes, and series of Units, including the Common Units; provided, however, that any type, class, and series of Units shall have the privileges, preferences, duties, liabilities, obligations, and rights set forth in this Agreement and the Membership Interests represented by such type, class, or series of Unit shall be determined in accordance with such privileges, preferences, duties, liabilities, obligations, and rights." Holistic OA, § 1.01 (Definitions).

"Unit Equivalents" is defined in the Holistic OA as "any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable or exercisable for Units, and any option, warrant, or other right to subscribe for, purchase, or acquire Units." Holistic OA, § 1.01 (Definitions).

"Person" is defined in the Holistic OA as "an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity." Holistic OA, § 1.01 (Definitions).

held by Eastbound and its sole member, Jonsson. Sciarrone also confirmed that it was his expectation as a result of the Cliffside Deal that Cliffside would receive a distributive share of the profits of Holistic. Tr. 2602-03; Ex. C130. Indeed, by early July 2023, Sciarrone was already asking Jonsson about the issuance of dividends from Holistic. Ex. C130.

Cliffside also became the controlling voting member of Eastbound. *See* Ex. R297A, §§4.06, 4.07, and Schedule A. It had the authority to control Eastbound's voting interests in Holistic. *Id.* Jonsson, the person that had been the face of Eastbound to Holistic and Nickelson and its "sole member," no longer had voting control of Eastbound. While Jonsson was chosen to remain Eastbound's manager, Cliffside had the authority to remove Jonsson at any time, with or without cause. *See* Ex. R297A, §8.04.

The Eastbound OA is a contract which transferred seventy percent (70%) of Jonsson's interests in Holistic, held through Eastbound, to Cliffside and the Sciarrones. *See* Ex. R160. Further, as noted above, the NJ Cannabis Rules state that "[a]n ownership interest may be held directly or indirectly through an intermediary controlled by the holder, such as a shell company or holding company; the presence of such an intermediary shall not change the determination of the actual holder of the ownership interest." N.J.A.C. §17:30-6.8(j). The Cliffside Deal unquestionably effectuated a "Transfer" to Cliffside of Jonsson's membership interests in Holistic that he held through Eastbound. To the extent Respondents seek a declaratory judgment to the contrary, their request is denied.

**2. Eastbound Breached The Manager Consent Provision of the Holistic OA, As Well As Representations and Warranties in the Holistic UPA.**

The Transfer of membership interests in Holistic to Cliffside was not permitted under the Holistic OA without written consent from Nickelson. Section 9.01 of the Holistic OA, General Restrictions on Transfer, states:

> (a) Consent of Manager. Except as permitted pursuant to Section 4.05 and Section 9.02, no Member shall Transfer all or any portion of its Membership Interest in the Company, except with the written consent of the Manager. No Transfer of Membership Interests to a Person not already a Member of the Company shall be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with Section 4.01 hereof.

Holistic OA, §9.01(a). The exceptions set forth in Sections 4.05 (Death) and 9.02 (Permitted Transfers) are inapplicable here. Jonsson, as the sole member and manager of Eastbound, was required to seek the prior written consent of Nickelson prior to any Transfer of any portion of the Membership Interest in Holistic that he held through Eastbound. *See* Holistic OA, §9.01(a).

Respondents argue that Jonsson was not required to seek consent because Eastbound did not directly transfer any Units of Holistic to Cliffside. However, this argument presents a flawed reading of the definition of "Transfer" and it is not persuasive. "Transfer" is defined in the Holistic OA to include not only a direct transfer of Units but also a transfer "<u>of any interest (including a beneficial interest) in</u>" Units or Unit Equivalents owned by a Person. *See* Holistic OA, § 1.01 (Definitions, "Transfer") (emphasis added). Further, as already discussed above, Membership Interest is defined to include more than just the Units of Holistic. *See* Ex. C22, § 1.01 (Definitions, "Membership Interest").

Eastbound is considered a Person under the Holistic OA. As part of the Cliffside Deal, Jonsson (the sole owner of Eastbound) entered into a contract with Cliffside that disposed of seventy percent of his Membership Interests, including his beneficial interests in Holistic. Respondents also clearly knew that they were affecting a transfer of Membership Interests in Holistic. If the Eastbound-Cliffside deal were simply a change in ownership in Eastbound as Respondents now argue, there would have been no need in the Eastbound OA to reference the Marijuana Laws, their disclosure requirements, or licenses and regulations relating to cannabis,

because Eastbound was not a regulated cannabis business. Eastbound's only such connection was through the membership interests it held in Holistic. Tellingly, there are references throughout the Eastbound OA to the Marijuana Laws and the regulation of cannabis. *See* Ex. R160. This is further evidence that Eastbound, Cliffside, and their respective owners were aware that their transaction involved a transfer affecting Eastbound's membership interests in Holistic, which triggered disclosure requirements under the NJ Marijuana Laws.

Eastbound's failure to notify Holistic and obtain its prior consent constitutes a breach of Section 9.01(a) of the Holistic OA. Jonsson's conduct in failing to disclose the Cliffside Deal was also inconsistent with the duty of good faith and fair dealing that he owed his Holistic partners under the Holistic OA. *See* Ex. C22, §2.03(d) and N.J.S.A. §42:2C-39(d). Similarly, Jonsson's dealings with the regulators lacked the candor required of investors by the NJ Marijuana Laws. *See* N.J.S.A §24:6I-7; N.J.A.C. §17:30-7.11(b). Finally, by entering into the Cliffside Deal prior to Subsequent Closing #5, Eastbound also triggered additional required consents and government approvals from the NJ-CRC in violation of the commitments Eastbound made in Sections 4.02 and 6.01(c) of the Holistic UPA. *See* Ex. C19, §§ 4.02 and 6.01(c). This constituted a separate breach of the representations and warranties Eastbound made in the Holistic UPA. *Id.* To the extent Respondents seek a declaratory judgment to the contrary, their request is denied.

### 3. The Cliffside Deal Triggered Statutory Notification and Contractual Disclosure Obligations For Respondents.

The CUMMA, the Jake Honig Act, the CREAMM Act, and the NJ Cannabis Rules all qualify as a "Marijuana Law" under the Holistic OA and Eastbound OA. *See* Exs. C22, §1.01 (Definitions, "Marijuana Laws") and R160, §1.01 (Definitions, "Marijuana Laws"). These laws require transparency from Eastbound and Holistic, and their owners, in relation to the persons and

entities involved in the ownership of cannabis businesses in New Jersey. *See* N.J.S.A §24:6I-7; N.J.A.C. §17:30-9.4(c); N.J.A.C. §17:30-7.11(b).

At the time of the funding of the Cliffside Deal in December 2022, Eastbound (through payments made by Jonsson) held a 17.5% membership interest in Holistic. Tr. 24-26, 2013; Exs. C19, C22.[24] Cliffside acquired 70% of those interests – which amounted to a 12.25% interest in Holistic. Even with the 50/50 split between the co-owners of Cliffside, both Robert and Marina Sciarrone each meet the definition of "significantly involved person" holding an ownership or investment interest in Holistic. The Cliffside Deal triggered a statutory obligation for the Sciarrones to notify the NJ-CRC of their status as "significantly involved persons" within thirty days of its consummation. *See* N.J.S.A. §24:6I-7(d)(1). Cliffside and/or the Sciarrones failed to satisfy this statutory obligation and Eastbound failed to satisfy its contractual obligations to Holistic.

Section 2.03(d) of the Holistic OA also sets forth certain disclosure requirements for "each Member, Manager or Officer (and/or its or their respective direct or indirect owners, directors, officers and managers (collectively, the "Member Parties")." Ex. C22, §2.03(d). A similar provision appears in Section 2.03(d) of the Eastbound OA. Ex. R160, §2.03(d). Eastbound was a Member of Holistic. Upon consummation of the Cliffside Deal, Cliffside and the Sciarrones qualified as "Member Parties" of Holistic. The Respondents collectively had an obligation under the Holistic OA to promptly provide Holistic "all information regarding the Member Parties as may be required by the Marijuana Laws." *Id.*

---

[24] By the end of November 2022, Jonsson made payments of $850,000 to Holistic for Eastbound consistent with the Funding Schedule in Exhibit I of the Holistic UPA. *See* Holistic UPA (Ex. C19); Tr. 24-26, 77-78, 2013.

Freedman's interpretations and statements to Cabrera on February 14, that "[w]e do not view the investment by Cliffside in Eastbound as tripping any disclosure requirements with Holistic," are inconsistent with the plain language of the governing statute, as well as the Holistic OA. *See* Ex. C177. As I explained in Sections IV.C.1. and IV.C.2. above, Respondents had a duty under the NJ Marijuana Laws to notify the NJ-CRC of the Cliffside Deal. Section 2.03(d) of the Holistic OA also clearly required Eastbound to disclose any new Member Parties to Holistic and promptly provide all information required by the NJ Marijuana Laws so that Holistic could satisfy its own obligations. *See* Ex. C22, §2.03(d). To the extent Respondents seek a declaratory judgment to the contrary, their request is denied.

**4. Consequences of Respondents' Failure to Notify the NJ-CRC**

In the case of a "significantly involved person," the filing obligations rest with the "individual" who "secures an investment interest" to notify the NJ-CRC within 30 days of the date that he or she becomes a "significantly involved person." *See* N.J.S.A. §24:6I-7(d)(1); *see also* N.J.A.C. §17:30-7.12. Failure to do so is a disqualifying event for the "the individual or group of which the significantly involved person is a member." N.J.S.A. §24:6I-7(d)(1). Indeed, any failure to notify the commission of an investment interest, failure to complete a criminal history background check, and/or failure to provide all information required by the commission, results in ineligibility for the offending individual or group for a minimum of two years. *See* N.J.S.A. 24:6I-7(d)(1).

The NJ-CRC has jurisdiction to decide on the length of the ineligibility after considering certain factors outlined in the statute. However, as mandated by statute, the period cannot be less than 2 years. *See* N.J.S.A. 24:6I-7(d)(1) ("the individual or group shall be deemed ineligible to hold any ownership or investment interest in a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant for a period of at least two years,

commencing from the date of revocation, and for such additional period of time as the commission deems appropriate, based on the duration of the nondisclosure, the size of the individual's or group's investment interest in the permitted entity, the amount of profits, revenue, or income realized by the individual or group from the permitted entity during the period of nondisclosure, and whether the individual had a disqualifying conviction or would otherwise have been deemed ineligible to be a significantly involved person in a medical cannabis cultivator, medical cannabis manufacturer, medical cannabis dispensary, or clinical registrant.") (emphasis added).

#### 5. Respondents' Failure to Disclose the Cliffside Deal Created a "Regulatory Problem" Under the Holistic OA.

In Section 4.02(i) of the Holistic OA, each Member represented to the other that it would "not create a Regulatory Problem for the Company." Ex. C22, §4.02(i). "Regulatory Problem" is defined in the Holistic OA to include, *inter alia*: "(c) the failure by any Member, Manager or Officer to promptly provide all information required or requested by any Marijuana Enforcement Authority of said Member, Manager or Officer; or (d) circumstances exist such that any Member, Manager or Officer is deemed likely, in the reasonable discretion of Manager (excluding the affected Manager), based on verifiable information received from any Marijuana Enforcement Authority or otherwise, to preclude or materially delay, impede or impair the ability of the Company or any of its Subsidiaries to obtain, retain or renew a Marijuana License, or may result in the imposition of materially burdensome terms and conditions on, or the revocation or suspension of such a Marijuana License." Ex. C22, § 1.01 (Definitions) (emphasis added).

In connection with the Cliffside Deal, Eastbound and Cliffside were being advised by experienced legal counsel, and Jonsson and Sciarrone are sophisticated businessmen active in the cannabis industry. Despite the plain language of the statute and the Holistic OA, Respondents failed to timely notify Holistic or the NJ-CRC of the Cliffside Deal. They did not disclose the

Sciarrones as significantly involved persons, as required by the NJ Marijuana Laws. *See* N.J.S.A. §24:6I-7(d)(1). They did not disclose the change in voting control of Eastbound to either Holistic or the NJ-CRC. They did not disclose to the NJ-CRC the source of the funds Eastbound ultimately used to invest in Holistic. They did not correct prior information provided to the NJ-CRC by Jonsson. I find that Respondents' conduct was likely to mislead the NJ-CRC.

Respondents' conduct also put Holistic's cannabis retailer license at risk. As the license holder, Holistic has its own obligations to the NJ-CRC. *See* N.J.S.A. §24:6I-42. Among other requirements, Holistic is required to have "any owner, other than an owner who holds less than a five percent investment interest in the cannabis retailer" undergo a criminal history record background check. N.J.S.A. §24:6I-42(a)(4). However, Holistic could hardly meet these obligations since Respondents concealed the existence of the Cliffside Deal from Holistic for over fourteen months.

Finally, had Holistic not taken appropriate action to remove Eastbound, Respondents' conduct could have resulted in the revocation of Holistic's license. Holistic could not continue to operate with a member who, due to statutory violations, included persons ineligible to hold any ownership or investment interest in a medical cannabis dispensary. By failing to provide information required or requested by any Marijuana Enforcement Authority, Respondents created a Regulatory Problem under the Holistic OA. *See* Ex. C22, §1.01; N.J.A.C. §17:30-7.11(b).[25] To the extent Respondents seek a declaratory judgment to the contrary, their request is denied.

[25] Respondents' argument that the Cliffside Deal transaction does not constitute a Regulatory Problem under the Holistic OA because the NJ-CRC has thus far refrained from taking regulatory action is entirely unpersuasive. The NJ-CRC has clearly stated that it is waiting for this arbitration to conclude before taking any actions with respect to Holistic's license or its recognized ownership. *See* Ex. C244.

**6. Pursuant to the Holistic OA, Eastbound's Unauthorized Transfer Of Membership Interests in Holistic Is Null & Void.**

Section 9.01(d) of the Holistic OA, entitled "Null and Void Transfers," provides that "[a]ny Transfer of any Membership Interest in violation of [the] Agreement shall be null and void…and the purported Transferee shall not be treated as the owner of such Membership Interests." Ex. C22, §9.01(d). Accordingly, insofar as the Cliffside Deal purported to convey to Cliffside 70% of the membership interests that Jonsson previously held in Holistic through Eastbound, the transfer of such interests is hereby adjudged to be null and void. A judgment reflecting this finding will be entered in favor of Holistic. To the extent Respondents seek a declaratory judgment to the contrary, their request is denied.

**E. Holistic Is Entitled To A Declaratory Judgment Confirming The Forfeiture Without Consideration of Eastbound's Interests and Eastbound's Removal as a Member.**

Holistic seeks a declaratory judgment confirming the forfeiture of Eastbound's membership interests in Holistic and the removal of Eastbound as a member of Holistic. This relief will be granted.

Pursuant to N.J.S.A. §2A:16-52, all courts of record in New Jersey have the "power to declare rights, status and other legal relations, whether or not further relief is or could be claimed; and no action or proceeding shall be open to objection on the ground that a declaratory judgment is demanded." *Id.* Pursuant to the Holistic OA, I have the authority to award "any remedy or reward (sic) that a court in the United States of America could order or grant, including specific performance of any obligation created under this Agreement, the issuance of an injunction or other provisional relief, or the imposition of sanctions for abuse or frustration of the arbitration process." *See* Ex. C22, §14.12(d)(i).

Pursuant to N.J.S.A. §2A:16-53, a "person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." *Id.* A contract may be construed either before or after a breach thereof. N.J.S.A. §2A:16-54. A declaratory judgment may be either affirmative or negative in form and effect and shall have the force and effect of a final judgment. N.J.S.A. §2A:16-59.

Pursuant to N.J.S.A. §42:2C-46, a person may dissociated as a member of an LLC in the following situations: an event stated in the operating agreement as causing the person's dissociation occurs, *see* N.J.S.A. §42:2C-46(b); the person is expelled as a member pursuant to the operating agreement, *see* N.J.S.A. §42:2C-46(c); or the person is expelled by the unanimous consent of the other members if it is unlawful to carry on the company's activities with the person as a member, *see* N.J.S.A. §42:2C-46(d)(1). With regard to expulsion clauses in an operating agreement, the statute imposes no specific procedural requirements, notice provisions, or substantive limitations. Application of any one of these provisions would allow Holistic to remove Eastbound as a member.

Here, an event stated in the operating agreement causing Eastbound's dissociation occurred and Eastbound was removed pursuant to the operating agreement. The Holistic OA provides that "the failure of any Member, Manager or Officer to promptly provide information provide information required or requested by any Marijuana Enforcement Agency of said Member, Manager or Officer" constitutes a "Regulatory Problem." Ex. C22, §§1.01 ("Regulatory Problem" definition at subsection (c)). It further provides that an Affected Member who fails to cure the

Regulatory Problem within the specified cure period of ninety days "shall be deemed" to have forfeited its Units "for no consideration without any action necessary on the part of the Company or the Affected Member." Ex. C22, §10.02(c).[26]

Giving Respondents the benefit of Cliffside's funding date (and not the effective date of the Eastbound OA), Cliffside transmitted its funds for its interest in Eastbound on December 30, 2022. Tr. 1740-43, 2595; Ex. C221; Eastbound Counterclaims at ¶ 25. Respondents therefore had 30 days from December 30, 2022 to disclose the Cliffside Deal to the NJ-CRC but they failed to do so. *See* N.J.S.A. §24:6I-7(d)(1). Once the 30-day period had run, the violation of the statute made Respondents legally ineligible to continue as members of Holistic. *Id.* However, even assuming that Respondents were entitled to the contractual 90-day cure period in Section 10.02(c) of the Holistic OA as they contend, they still failed to notify the NJ-CRC within 90 days of their creation of a Regulatory Problem. Respondents failed to provide the information required under the NJ Marijuana Laws to timely cure the Regulatory Problem. Eastbound also failed to provide information to Holistic so that Holistic could meet its obligations under the NJ Marijuana Laws. Respondents' violations of the NJ Marijuana Laws and Eastbound's breaches of the Holistic OA result in Eastbound forfeiting its interests in Holistic. *See* Ex. C22, §10.02(c). Eastbound created

---

[26] Section 10.2(c) states in full: "Affected Member Cure Period. In the event that a Member shall experience a Regulatory Problem which causes such Member to become an Affected Member, such Affected Member shall promptly take all actions necessary or advisable to eliminate, terminate, discontinue, or otherwise cure the Regulatory Problem within ninety (90) days, including: (i) terminating the activity, relationship, or other circumstances giving rise to the Regulatory Problem; (ii) effecting the Transfer of its Units as permitted hereunder; (iii) immediately providing the applicable Marijuana Enforcement Authority with all information required or requested of the Affected Member; and (iv) taking all other actions as may be necessary or appropriate to remedy the Regulatory Problem. If the foregoing are not able to resolve the Regulatory Problem within ninety (90) days, then the Affected Member shall be deemed to have forfeited its Units for no consideration without any action necessary on the part of the Company or the Affected Member." Ex. C22, §10.2(c).

a Regulatory Problem, which it then failed to timely cure. Pursuant to the Holistic OA, Eastbound has automatically forfeited its interests in Holistic. *Id.*

Separately, the removal of Eastbound and the forfeiture of interests was confirmed by a unanimous vote of the unaffected members of Holistic. As explained above, the offending individual or group of which a "significantly involved person" is a part becomes ineligible to invest in or hold ownership in a medical cannabis retailer of a minimum of two years for violations of the statute. *See* N.J.S.A. §24:6I-7(d)(1). Holistic's unaffected members were well within their rights, after having received advice from Holistic's counsel, to vote unanimously to confirm the removal of Eastbound. *See* N.J.S.A. §42:2C-46. It was a proper exercise of the unaffected members' contractual and statutory powers under the RULLCA to vote unanimously to remove Eastbound. *See* N.J.S.A. §42:2C-46(d)(1).[27]

Jonsson argued that Eastbound was not validly removed and that any action taken at the February 16, 2024 telephonic meeting of the Holistic members was void because he was not given notice of the meeting consistent with Section 4.07(c) of the Holistic OA and Eastbound was not present or invited to participate in the meeting. *See* Ex. C22, §4.07. However, under Section 10.02(c) of the Holistic OA, Holistic was not required to take any action to remove Eastbound. Eastbound's interests were forfeited automatically for no consideration because it had created a Regulatory Problem that it had failed to cure. *See* Ex. C22, §10.02(c) (interests forfeited for no

[27] To be clear, this is not a case of a party seeking court-ordered expulsion like that authorized by N.J.S.A. §42:2C–46(e)(3). Instead, an event stated in the operating agreement – the creation of a Regulatory Problem due to violations of the NJ Marijuana Laws by Respondents and a failure to cure – caused Eastbound's dissociation. Eastbound was expelled pursuant to the terms of the operating agreement. Separately, the other members of Holistic rightly voted by unanimous consent to confirm Eastbound's expulsion because Eastbound was ineligible to continue as a member of Holistic under the NJ Marijuana Laws. *See* subparts (b), (c) and (d) of N.J.S.A. §42:2C-46; compare *IE Test, LLC v. Carroll*, 226 N.J. 166, 183, 140 A.3d 1268, 1279 (2016) (consideration of factors for court-ordered expulsion under N.J.S.A. §42:2C–46(e)(3)).

consideration "without any action necessary on the part of the Company or the Affected Member.").

Section 4.09 of the Holistic OA, Action Without Meeting, also states that any matter that is to be voted on, consented to, or approved by Voting Members may be taken without a meeting, without prior notice, and without a vote, if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of the appropriate Voting Units. *See* Ex. C22, §4.08. On February 22, 2024, the members of Holistic approved a formal Written Consent confirming the forfeiture of Eastbound's membership interests and removing Eastbound as a member of Holistic. *See* Ex. C224A, at Exhibit 1B.

Holistic is entitled to a declaratory judgment confirming Eastbound's removal as a member of Holistic and the forfeiture of Eastbound's membership interests in Holistic. To the extent Eastbound seeks a declaratory judgment or has asserted a counterclaim to the contrary, its request is denied and its claim is dismissed with prejudice.

**F. Holistic Failed To Provide Sufficient Evidence to Support Its Fraud Claims.**

A claim for common law fraud requires proof of five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 610 (1997).[28] Those elements must be proved by clear and convincing evidence. *Simpson v. Widger*, 311 N.J. Super. 379, 392 (App. Div. 1998).

---

[28] Fraudulent concealment requires proof of the following five elements: (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation; (2) That the evidence was material to the litigation; (3) That plaintiff could not reasonably have obtained access to the evidence from another source; (4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation; (5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence

In its Pre-Hearing Statement, Holistic contended that it was asserting claims for fraud, fraudulent inducement, fraudulent concealment, and fraudulent conspiracy. *See* Holistic Pre-Hearing Statement at 22. While each of these claims has its own independent elements, at their core, they all require proof of the elements of fraud by clear and convincing evidence.

In its proposed findings of fact and conclusions of law, Holistic fails to identify any evidence supporting any of the elements necessary for these claims. There was no evidence presented that met the clear and convincing standard. With respect to fraudulent inducement, Holistic never identified any specific pre-contract misrepresentation made by Jonsson that it was induced by, or any damages that resulted from such inducement. Likewise, to the extent Holistic is claiming fraudulent concealment, it failed to satisfy the elements of proof required for such a claim by clear and convincing evidence or articulate how it was harmed by any alleged fraudulent concealment.

Finally, Holistic failed to articulate any specific pre-contract fraud claim that would be distinct or different from its breach of contract claims. Under New Jersey law, "only those pre-contractual misrepresentations that are extraneous to the parties' contract may be brought alongside a breach of contract claim." *See Petric & Assocs., Inc. v. CCA Civ., Inc.*, No. A-3571-17T2, 2020 WL 3041418, at *10 (N.J. Super. Ct. App. Div. June 8, 2020) (unpublished opinion). Accordingly, Holistic's fraud-based claims are dismissed with prejudice.

### G. Holistic Failed To Prove Its Breach of Fiduciary Duty and Piercing the Corporate Veil Claims.

Similarly, Holistic failed to prove its claims against Jonsson and Sciarrone, individually, for breach of fiduciary duty and "individual liability – piercing the corporate veil." In the Holistic

---

defendant concealed. *Novembre v. New Jersey Nets*, No. A-3313-15T3, 2019 WL 3230868, at *2 (N.J. Super. Ct. App. Div. July 18, 2019).

OA, Holistic agreed to waive any and all fiduciary duties of Covered Persons and those fiduciary duties that may be implied by law. *See* Ex. C22, §13.02(a). Eastbound and its members are considered Covered Persons under the terms of the Holistic OA. As such, Holistic's breach of fiduciary duty claims against Eastbound and its members are precluded by the express terms of the Holistic OA. Holistic's breach of fiduciary duty claim, Count 5 in the Holistic Demand against Respondents, is dismissed with prejudice.

Likewise, Holistic failed to produce any evidence that would justify piercing the corporate veil of either Eastbound or Cliffside. Under New Jersey law, in order for a court to "pierce the corporate veil" and hold a member personally liable for the company's liabilities, two conditions must be met: first, "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and second, "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *State Capital Title & Abstract Co. v. Pappas Bus. Servs.,* 646 F.Supp.2d 668, 679 (D.N.J. 2009) (internal quotation marks omitted). In other words, the corporation must be the "alter ego" of the shareholder, such that the corporate form is effectively a legal fiction and enforcing that legal fiction must result in some fundamental unfairness. *Verni ex rel. Burstein v. Harry M. Stevens, Inc.,* 387 N.J. Super. 160, 903 A.2d 475, 497–99 (N.J. Super. Ct. App. Div .2006). The party seeking to pierce the veil bears the burden of proving that those circumstances are present, a burden that "is notoriously difficult for plaintiffs to meet." *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 485 (3d Cir. 2001).

Here, Holistic produced no evidence to satisfy the elements of this claim. Moreover, Section 4.03 of the Holistic OA provides that "no Member will be obligated personally for any debt, obligation, or liability of the Company or of any Company Subsidiaries or other Members,

whether arising in contract, tort, or otherwise, solely by reason of being a Member," except as expressly provided in the Holistic OA. Ex. C22, §4.03.

Given the protections afforded Covered Persons in the Holistic OA, and the fact that Holistic failed to produce any evidence that would justify piercing the corporate veil of either Eastbound or Cliffside, I find there is no basis to impose personal liability on either of the individual Respondents, Jonsson and Sciarrone. Holistic's piercing the corporate veil claim, Count 6 in the Holistic Demand, is dismissed with prejudice.

### H. Eastbound's Breach of Contract Claim Relating To The Option Agreement Fails As A Matter of Law; Its Related Request for a Declaratory Judgment is Denied.

On May 15, 2025, Eastbound sent Holistic a "Notice of Election to Exercise Option" and offered to wire funds for the Option Exercise Price to Holistic. Tr. 388; Ex. R429. On June 11, 2025, Holistic rejected Eastbound's attempted exercise of the Option because Eastbound had previously breached the Holistic OA and it had been removed as a member of Holistic. Tr. 866; Eastbound Counterclaims, ¶ 120.

Pursuant to the Holistic UPA, the conditions precedent to Holistic's obligation to sell additional option units to Eastbound include at least the following: (1) Eastbound's representations and warranties to Holistic being true and correct in all material respects, *see* Ex. C19, §6.03(a); and (2) Eastbound performing and complying in all material respects with all agreements, covenants, and conditions, *see* Ex. C19, §6.03(b). The Option Agreement also required that any adjustments and issuances comply with the NJ Marijuana Laws, *see* Ex. R56, at Recitals, and achievement of the Vesting Date, *see id.*, §1(a).

In the Holistic UPA, Eastbound represented and warranted to Holistic that the transactions contemplated by the agreement did not, "violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, treaty, or other requirement of any Governmental Authority" nor

"violate or conflict with … any contract … license … or any other agreement, commitment, or legally binding arrangement, whether written or oral …, to which [Eastbound] is a party or by which [Eastbound]is bound or to which any of their respective properties and assets are subject." *See* Ex. C19, §3.04. Further, under Section 6.03 of the UPA, Holistic's obligation to consummate a sale of the option units is conditioned upon Eastbound's representations to Holistic being true and correct, including Eastbound's statements that it was not violating New Jersey law and it was not in breach of the Holistic OA. *See* Ex. C19, §6.03.

In February 2024, Eastbound was dissociated as a member of Holistic. It nonetheless attempted an exercise of its Option in the Option Agreement on May 15, 2025. *See* Ex. R429. By this time, however, Eastbound had breached numerous provisions in the Holistic OA, made misrepresentations to Holistic regarding its ownership, violated the NJ Marijuana Laws, and had forfeited its membership interests in Holistic through the creation of a Regulatory Problem that it did not timely cure.

When a person is dissociated as a member of a limited liability company the "person's right to participate as a member in the management and conduct of the company's activities terminates." N.J.S.A. §42:2C-47(a)(1). In addition, due to the various violations of the NJ Marijuana Laws committed by the Respondents collectively, as the offending individual or group of a "significantly involved person" who failed to notify the NJ-CRC, Eastbound and its members are, as a matter of law, statutorily prohibited from investing in or holding ownership in a medical cannabis retailer in New Jersey for a minimum of two years. *See* N.J.S.A. §24:6I-7(d)(1).

As such, any attempted exercise of the Option by Eastbound in May 2025 was invalid. Eastbound failed to establish that any breach of the Option Agreement occurred and its claim at

Count 10 of its Counterclaims is dismissed with prejudice. Its related request for a declaratory judgment in Count 12 of its Counterclaims is dismissed with prejudice.

### I. Eastbound Failed To Present Evidence Sufficient To Sustain Any Claim Against Nickelson Individually; However, Its Conduct In Pursuit of The Fraud Claim Did Not Constitute Malicious Abuse of Legal Process.

Article XIII of the Holistic OA expressly limits the liabilities and duties of "Covered Persons."[29] Ex. C22, Article XIII. Section 13.01(b) states that "No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person." Ex. C22, §13.01(b). Section 13.02(a) further limits potential liability for any Covered Person as follows:

> Limitation of Liability. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, <u>each of the Members and the Company hereby waives any and all fiduciary duties of Covered Persons that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement or which cannot be abrogated by an operating agreement under the Act</u>. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person, except to the extent such duties or liabilities cannot be abrogated by an operating agreement under the Act.

[29] "Covered Person" is defined in Section 13.01(a) of the Holistic OA to include "(i) each Member; (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent, or representative of each Member, and each of their controlling Affiliates; and (iii) each Manager, Officer, Partnership Representative, employee, agent, organizer, or representative of the Company or any Company Subsidiary." Ex. C22, §13.01(a).

Ex. C22, §13.02(a) (emphasis added). Section 8.08 of the Holistic OA also provides:

> **No Personal Liability.** Except as expressly provided in this Agreement or by Applicable Law which cannot be abrogated by the terms of an operating agreement, no Manager will be obligated personally for any debt, obligation, or liability of the Company or of any Company Subsidiaries, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

Ex. C22, §8.08.

Additionally, Section 13.02(b) states that whenever a Covered Person is permitted or required by the Holistic OA "to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, except to the extent such duties or liabilities cannot be abrogated by an operating agreement under the Act. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law." Ex. C22, §13.02.

Notwithstanding the foregoing contractual restrictions, on or about August 20, 2024, Eastbound filed a third-party complaint against Nickelson, individually and as manager of Holistic. Eastbound reasserted these claims on or about October 8, 2024, when it responded to Holistic's amended demand. Eastbound amended and supplemented its third-party claims against Nickelson on June 17, 2025 (hereinafter "Third-Party Claims"). Eastbound's Third-Party Claims against Nickelson included, *inter alia*, allegations of fraud, fraudulent concealment, breach of fiduciary

duty, mismanagement, willful misconduct, and self-dealing. *See, e.g.,* Third-Party Claims at ¶¶ 82, 106, 171, 172, 174, 175, 181, 182, 189, 190. 191.

Given the provisions of the Holistic OA expressly limiting individual personal liability, and those limiting the liability of Covered Persons and the Manager, in addition to the protections afforded managers of limited liability companies in the RULLCA, as well as controlling New Jersey law limiting the duties and liabilities of managers of limited liability companies,[30] all of Eastbound's claims against Nickelson individually fail as a matter of law. Only claims alleging conduct so far from the norm as to constitute fraudulent, self-dealing or unconscionable conduct, *see Seidman v. Clifton Sav. Bank, S.L.A.*, 205 N.J. 150, 176-77 (2011), or "grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law," *see* N.J.S.A. §42:2C-39, are sustainable. Accordingly, Counts 1, 2, 3, 4, 5, 7, 8, 10 and 11 asserted against Nickelson individually are dismissed with prejudice. Only Eastbound's fraud claim asserted in Count 6 of the Third-Party Claims warrants any further discussion.

As to this claim, Nickelson first requested leave to file a motion to dismiss Eastbound's fraud claim during an initial scheduling conference in this matter on or around October 28, 2024. Among other things, Nickelson asserted that Eastbound's fraud claim did not satisfy federal or state pleading standards, was duplicative of Eastbound's breach of contract claims, and it was legally unsustainable. Nickelson argued that a motion to dismiss would simplify the proceedings

---

[30] New Jersey's RULLCA provides substantial protection for managers through its standards of conduct provisions in N.J.S.A. §42:2C-39 and essentially adopts the business judgment rule. For managers in an LLC, the duty of care standard requires only that they "refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." *Id.* The statute also protects self-interested conduct, providing that "a member does not violate a duty or obligation under this act or under the operating agreement merely because the member's conduct furthers the member's own interest." *Id.* "There is no valid claim for breach of fiduciary duty based on members in a member-managed company acting in conformity with the provisions clearly set forth in the Agreement." *Namerow v. PediatriCare Assocs., LLC*, 461 N.J. Super. 133, 147 (Ch. Div. 2018).

and avoid significant unnecessary expense. At several stages throughout this arbitration, Nickelson sought leave to file a dispositive motion as to Eastbound's fraud claim; and each time, Eastbound objected. Eastbound, through its counsel, made assertions to the Arbitrator that Nickelson had misappropriated funds from the Company for her own benefit. Eastbound's counsel claimed that additional discovery would reveal further evidence of Nickelson's alleged fraud and financial malfeasance.

During a status conference near the close of discovery, on July 2, 2025, Nickelson again sought permission to file a motion to dismiss Eastbound's fraud claim. Eastbound again objected and I ordered letter briefs from the parties. In her letter brief of July 16, 2025, Nickelson argued that Eastbound's fraud claim (1) failed to state a claim and was not pleaded with particularity; (2) was barred by the economic loss doctrine; (3) was duplicative of Respondents' claims against Holistic and was barred by the Holistic OA, absent a showing of fraud or willful misconduct; and (4) that, despite extensive discovery, Eastbound had no evidence to support its claims of fraud and financial impropriety. *See* Nickelson 7/16/25 letter brief. On July 23, 2025, Eastbound filed its opposition letter brief, wherein it again claimed that Nickelson had "misappropriate[d] Eastbound's $1.7 million investment." *See* Respondents' 7/23/25 letter brief at pp. 1, 3. On September 16, 2025, due to Eastbound's assertions that Nickelson had personally misappropriated company funds, I denied Nickelson's request to file a dispositive motion, without prejudice.

During the pre-hearing conference, Nickelson again renewed her request, and Eastbound again opposed, contending that it had evidence sufficient to sustain its claims against Nickelson individually. *See* Nickelson's 11/21/2025 Pre-Hearing Submission; Respondents' 11/21/2025 Pre-Hearing Submission at 22-24 ("The duty of care requires Nickelson to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

N.J.S.A. § 42:2C-39…Nickelson breached all of these duties to Eastbound from the time she received Eastbound's first funding payment in September 2022 to the time she improperly removed Eastbound in February 2024."). As a result, I denied Nickelson's request without prejudice.

When it came to the hearing, however, Respondents failed to produce any evidence of fraud, misappropriation, self-dealing, or willful misconduct by Nickelson. Respondents' pre-trial brief and post-hearing proposed findings of fact and conclusions made little attempt to advance any of these claims against Nickelson. *See* Respondents' 11/21/25 Pre-Hearing Submission and Respondents' 2/20/26 Post-Trial Brief. No evidence was presented during the arbitration to substantiate Eastbound's prior representations regarding misappropriation of funds, the purchase of a luxury car, or other alleged financial improprieties. Respondents produced no evidence showing that they had even suspected Nickelson of misappropriating funds for herself.[31] Jonsson did not provide any testimony regarding any alleged fraud, financial impropriety, or misappropriation of funds. Neither did Sciarrone or Gross. Respondents introduced no exhibits into evidence that suggested fraud, misappropriation, or other financial impropriety by Nickelson.

---

[31] Given that the removal of Eastbound was unanimously confirmed by the unaffected members of Holistic, to succeed on their fraud or willful misconduct claims against Nickelson, Eastbound was required to prove that any actions taken by Nickelson in connection with the removal "are so far from the norm of responsible corporate behavior as to be unconscionable or constitute a fraud, impermissible self-dealing or corporate waste." *Seidman v. Clifton Sav. Bank*, 205 N.J. 150, 177 (2011). Eastbound was required to provide clear and convincing evidence showing that: (1) Nickelson materially misrepresented a presently existing or past fact; (2) that she knew or believed that fact to be false; (3) that she intended for Respondents to rely on it; (4) Respondents reasonably relied on that fact; and (5) Respondents were damaged. *See Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 560 (1997); *Fox v. Mercedes–Benz Credit Corp.*, 281 N.J. Super. 476, 484 (App. Div. 1995) (citing *Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J. Super. 388, 395 (App. Div. 1989), *cert. denied,* 121 *N.J.* 607 (1990)). "Willful misconduct" is the "commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden." *Dunlea v. Twp. of Belleville*, 349 N.J. Super. 506, 510, 793 A.2d 888, 890 (App. Div. 2002). Eastbound provided no such evidence.

Finally, no evidence was introduced to show that Nickelson had allegedly lied to the NJ-CRC in order to misappropriate Respondents' investment in Holistic for herself.

Respondents' counsel cross-examined Nickelson for three days. On the subject of Eastbound's removal, Nickelson consistently testified that she and Holistic's non-affected members, after consulting with Cabrera as counsel to the company, determined that Respondents' violations of the NJ Marijuana Laws, non-disclosure of the Cliffside Deal, and Jonsson's misrepresentations to the NJ-CRC concerning Eastbound's ownership and funding, constituted a "Regulatory Problem" under the Holistic OA warranting Eastbound's removal from the Company. Accordingly, Eastbound's fraud claim against Nickelson individually lacks any basis in fact or law and is dismissed with prejudice.

While I find it concerning that Eastbound filed and continued to claim that it had evidence sufficient to support a fraud claim against Nickelson, individually, I cannot conclude that Eastbound's pursuit of its fraud claim constituted malicious abuse of legal process under New Jersey law. *See Baglini v. Lauletta*, 338 N.J. Super. 282, 293 (App. Div. 2001). A plaintiff in a malicious use of process case must prove four elements: that the original action complained of (1) was brought without probable cause; (2) was actuated by malice; (3) was terminated favorably to plaintiff; and (4) that plaintiff suffered a special grievance. *Id.* at 299 (citing *LoBiondo v. Schwartz,* 323 N.J. Super. 391, 423, 733 *A.*2d 516 (App. Div.), *certif. denied,* 162 *N.J.* 488, 744 *A.*2d 1211 (1999)). Nickelson failed to introduce sufficient evidence to prove her counterclaim against Eastbound.

However, Eastbound's fraud claim against Nickelson individually resulted in her having to retain counsel separate from Holistic, due to the potential for a conflict of interest between her and Holistic, which caused Nickelson to personally incur significant legal fees. I find that

Nickelson, sued individually and in her capacity as Manager of Holistic, is a prevailing party under the Holistic OA and she will be entitled to an award of her costs under its terms, which I will address further below.

### J. Eastbound Failed To Prove Its Breach of Contract and Statutory Violation Claims Against Holistic.

#### 1. Holistic's Removal of Eastbound Did Not Constitute a Breach of the Holistic OA

In Count 3 of its Counterclaims, Eastbound alleged a breach of the Holistic OA for Holistic's removal Eastbound as a member and Holistic divesting it of its interest in Holistic. For the reasons set forth above, Holistic's removal of Eastbound as a member of Holistic was proper and it did not constitute a breach of contract. Respondents' breach of contract claims relating to Eastbound's removal are dismissed with prejudice. There is ample evidence in the record demonstrating that Nickelson's actions were taken in good faith based on reasonable business knowledge and advice from legal professionals. Count 3 of the Eastbound Counterclaims is dismissed with prejudice.

#### 2. Eastbound Failed To Prove That Nickelson's Failure to Sign An Employment Agreement Constituted A Breach of the Holistic UPA.

While Eastbound alleged no separate breach claim in its Counterclaims related to the lack of an employment agreement between Nickelson and Holistic, it argued in its Pre-Hearing Brief that Nickelson failed to agree to a job description or an employment agreement. *See* Respondents' Pre-Hearing Brief at 10-11. To prevail on a breach of contract claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustain damages. *EnviroFinance Group, LLC v. Environmental Barrier Co., LLC*, 440 N.J. Super. 325, 345 (App. Div. 2015) (citing *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007)).

Here, as noted in the findings of fact section, the Holistic OA states that it does not and is not intended to provide the Manager with any rights of continued employment with the Company. *See* Ex. C22, §8.06(b). The Holistic OA further states that the Manager "may be removed at any time, with or without cause." *See* Ex. C22, §8.05. By contrast, the Holistic UPA then requires that Nickelson enter into an employment agreement with Holistic, which would, under New Jersey law, provide her with rights to continued employment because an "express employment contract serves to create an other than at-will employment relationship." *Nelson v. Elizabeth Bd. of Educ.*, 466 N.J. Super. 325, 339, 246 A.3d 802, 810–11 (App. Div. 2021).

I need not resolve the conflict between the Holistic OA and the Holistic UPA, however, because even assuming that Nickelson was required to enter into an employment agreement under the UPA, Eastbound has failed to prove that any harm resulted from the lack of an employment agreement between Nickelson and Holistic. Proof of harm is an element of any breach of contract claim under New Jersey law. *EnviroFinance Group, LLC v. Environmental Barrier Co., LLC*, 440 N.J. Super. 325, 345 (App. Div. 2015) (citing *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007)). Eastbound failed to introduce any evidence of harm or damages arising from the lack of an employment agreement between Nickelson and Holistic. Eastbound provided no evidence to show that Nickelson received any greater compensation for her services as the manager of Holistic than what was intended by the parties in the Holistic UPA. Nor did Eastbound produce any evidence that Nickelson violated any intended non-compete or non-solicitation provision outlined in the Holistic UPA. Given the lack of any harm, Eastbound's breach of contract claim for failure to enter into an employment agreement fails.

### 3. Eastbound Failed To Prove Nickelson's Delay in Preparing The First Annual Budget Was Unreasonable or That Any Harm Resulted to It or to Holistic.

Similarly, to the extent Eastbound is asserting a breach based on Nickelson's delay in preparing the company's first annual budget, I do not find that the delay materially affected Holistic's operations or rose to a level of a breach of the Holistic OA. Eastbound failed to present sufficient evidence that the alleged delay from May 2023, when the Holistic store began recreational cannabis sales, to October 2023, when the 2023 budget was distributed to the members, caused Holistic or its members any harm. Further, Nickelson's decisions were based on a reasonable understanding of the business landscape and the state of Holistic's operations at that time. While Jonsson may have had more experience in the cannabis industry, Eastbound chose Nickelson as the Manager of Holistic, and it does not otherwise get to second-guess decisions that she made as manager. Without proof of some harm resulting to Holistic from the delay in preparing the annual budget, Eastbound's breach of contract claim fails and it is dismissed with prejudice.

### 4. Eastbound Failed To Prove Breach of Contract or a Statutory Violation Resulting From The Alleged Lack of Sufficient Financial Information.

In Count 1 of its Counterclaims, Eastbound alleged that Nickelson and Holistic breached the Holistic OA by not providing reasonable access to the Company's financial information. *See* Eastbound Counterclaims, Count 1. In Count 2, Eastbound asserted that this lack of access constituted a violation of N.J.S.A §42:1A-23. *Id.*, Count 2. Eastbound also made vague references to this lack of information as constituting oppression of a minority member and/or a breach of the duties of care and loyalty. *See* Respondents' Pre-Hearing Brief at 23. In Count 5 of its Counterclaims, Eastbound also claimed that Holistic and Nickelson failed to provide it with sufficient financial information so that it could monitor its license fee payments due under the

License Agreement. *See* Eastbound Counterclaims, ¶ 162. For the reasons set forth below, however, I find that the License Agreement was unenforceable from its inception and any breach claims related to payments under the License Agreement lack merit.

With regard to Eastbound's access to and receipt of information, the rights of members, managers, and dissociated members to information of a member-managed limited liability company are governed by N.J.S.A. §42:2C-40, and not N.J.S.A §42:1A-23 as referenced by Eastbound. Subpart (a)(2) of Section 42:2C-40 states:

> (2) The company shall furnish to each member:
>
> (a) without demand, any information concerning the company's activities, financial condition, and other circumstances which the company knows and is material to the proper exercise of the member's rights and duties under the operating agreement or this act, except to the extent the company can establish that it reasonably believes the member already knows the information; and
>
> (b) on demand, any other information concerning the company's activities, financial condition, and other circumstances, except to the extent the demand or information demanded is unreasonable or otherwise improper under the circumstances.

N.J.S.A. §42:2C-40(a)(2)(a) & (b).

With regard to Eastbound's suggestion that the financial information provided to the non-managing members was insufficient for it to monitor the company's activities or to protect its investment, I disagree. Jonsson was provided information regarding operating expenses, target revenues, and construction costs related to the launch of the store. *See, e.g.*, Exs. R186, C30, C31, C49, C51, C53, C62, R191, R194, R197, R198, R207. He and his associates were in regular contact with Nickelson regarding the planning for the launch of the store. *Id.* Nickelson also provided Jonsson with access to financial information that other non-manager members did not

receive. Jonsson received access to a KPI that reported sales on a day-to-day basis, as well as target sales goals. Tr. 169-70.

In addition, the financial reporting given to Eastbound and Jonsson contained sufficient line-level data, and the budget contained similar information, as well as anticipated headcounts and salaries, as follows:

| | |
|---|---|
| 4 | **Retail Revenue** |
| 5 | Flower |
| 6 | Concentrate |
| 7 | Cartridges |
| 8 | Tinctures |
| 9 | CBD Oil |
| 10 | Edibles Capsules, lozenges,etc |
| 11 | Vape Pin Items |
| 12 | Accessories |
| 13 | Miscellaneous foods etc., |
| 14 | **Total Retail Revenue** |
| 15 | |
| 16 | |
| 17 | **Discounts** |
| 18 | Flower |
| 19 | Concentrate |
| 20 | Cartridges |
| 21 | Tinctures |
| 22 | CBD Oil |
| 23 | Edibles Capsules, lozenges,etc |
| 24 | Vape Pin Items |
| 25 | Accessories |
| 26 | Miscellaneous foods etc., |
| 27 | **Total Discounts** |
| 28 | % of Gross |

| | |
|---|---|
| 29 | |
| 30 | **Net Revenue** |
| 31 | Flower |
| 32 | Concentrate |
| 33 | Cartridges |
| 34 | Tinctures |
| 35 | CBD Oil |
| 36 | Edibles Capsules, lozenges,etc |
| 37 | Vape Pin Items |
| 38 | Accessories |
| 39 | Miscellaneous foods etc., |
| 40 | **Net Revenue** |
| 41 | % of Gross |
| 42 | Actual Net Revenue |
| 43 | **Cogs** |
| 44 | Flower |
| 45 | Concentrate |
| 46 | Cartridges |

| | |
|---|---|
| 47 | Tinctures |
| 48 | CBD Oil |
| 49 | Edibles Capsules, lozenges,etc |
| 50 | Vape Pin Items |
| 51 | Accessories |
| 52 | Miscellaneous foods etc., |
| 53 | **Cogs** |
| 54 | % of Gross |
| 55 | |
| 56 | **Profit** |
| 57 | Flower |
| 58 | Concentrate |
| 59 | Cartridges |
| 60 | Tinctures |
| 61 | CBD Oil |
| 62 | Edibles Capsules, lozenges,etc |
| 63 | Vape Pin Items |
| 64 | Accessories |
| 65 | Miscellaneous foods etc., |
| 66 | **Gross Profit** |
| 67 | % of Gross |
| 68 | % of Net |
| 69 | |
| 70 | |

| | |
|---|---|
| 71 | **Operating Expenses** |
| 72 | Salaries & Wages & Related |
| 73 | Overtime |
| 74 | Payroll Taxes |
| 75 | Employee Benefits |
| 76 | Workers Comp |
| 77 | Bonus |
| 78 | Temporary Employee Wages |
| 79 | **401(K) Match** |
| 80 | Payroll Processing Fees |
| 81 | Employee Badging & Background |
| 82 | Employee Appreciation |
| 83 | Employee Training |
| 84 | **SG&A Salaries and Benefits** |
| 85 | |
| 86 | Events and Tradeshows |
| 87 | Marketing, Media & Advertising |
| 88 | Customer Appreciation |
| 89 | Promotional Items |
| 90 | Web Design |
| 91 | Brand Initiatives and Collaborations |
| 92 | **Branding, Marketing, and Product** |

| | |
|---|---|
| 93 | |
| 94 | Rent |
| 95 | CAM - Common Area Maint |
| 96 | Utilities |
| 97 | Cleaning & Landscapeng |
| 98 | Security |
| 99 | Property Tax |
| 100 | Repairs & Maintenance |
| 101 | **Rent and other Facility Costs** |
| 102 | |
| 103 | Property and Liability Insurance& W |
| 104 | Director and Officer Insurance |
| 105 | **Insurance and Risk Management** |
| 106 | |
| 107 | Consulting & Professional Fees |
| 108 | Licensing Fee (16%) |
| 109 | Legal Fees |
| 110 | Recruiting |
| 111 | **Accounting, Legal and Profession** |
| 112 | |

| | |
|---|---|
| 113 | Office Supplies |
| 114 | Retail Supplies |
| 115 | Postage & Shipping |
| 116 | Dues & Subscriptions |
| 117 | Software Applications |
| 118 | Network/IT Services |
| 119 | Cash Pick Up Fee |
| 120 | Bank Fees / Services Charges |
| 121 | Transaction Fees |
| 122 | Cash Over/Under |
| 123 | **Monthly Services and Other Oper** |
| 124 | |
| 125 | Local & Excise Tax |
| 126 | Annual License Fees |
| 127 | Filing Fees |
| 128 | **License Fee and Excise Tax** |
| 129 | |
| 130 | **Total Operating Costs** |
| 131 | Opex % of Revenue |
| 132 | **EBITDA** |
| 133 | EBITDA % of Revenue |
| 134 | Licensing Fee (16%) |
| 135 | Depreciation |
| 136 | Amortization |
| 137 | **EBIT** |
| 138 | **Income tax** |

| | |
|---|---|
| 7 | **2023 Budget** |
| 8 | **Medical - Revenue** |
| 9 | **Adult Use - Revenue** |
| 10 | **Gross Revenue** |
| 11 | Flower |
| 12 | Concentrate |
| 13 | Cartridges |
| 14 | Tinctures |
| 15 | CBD Oil |
| 16 | Edibles Capsules, lo |
| 17 | Vape Pin Items |
| 18 | Accessories |
| 19 | Miscellaneous foods |
| 20 | **Total Gross Revenue** |
| 21 | **Discounts** |
| 22 | Flower |
| 23 | Concentrate |
| 24 | Cartridges |
| 25 | Tinctures |
| 26 | CBD Oil |
| 27 | Edibles Capsules, lo |
| 28 | Vape Pin Items |
| 29 | Accessories |
| 30 | Miscellaneous foods |
| 31 | **Total Discounts** |

| | |
|---|---|
| 32 | **Net Revenue** |
| 33 | Flower |
| 34 | Concentrate |
| 35 | Cartridges |
| 36 | Tinctures |
| 37 | CBD Oil |
| 38 | Edibles Capsules, lo |
| 39 | Vape Pin Items |
| 40 | Accessories |
| 41 | Miscellaneous foods |
| 42 | **Net Revenue** |
| 43 | |
| 44 | **Inc per mo (Input)** |
| 45 | **# of Customers** |
| 46 | Visits per month |

| | |
|---|---|
| 47 | UPT |
| 48 | AUR |
| 49 | AOV |
| 50 | **$/Customer** |
| 51 | |
| 52 | Transactions |
| 53 | Quantity |
| 54 | |
| 55 | **Quantity - Units Mix %** |
| 56 | Flower |
| 57 | Concentrate |
| 58 | Cartridges |
| 59 | Tinctures |
| 60 | CBD Oil |
| 61 | Edibles Capsules, lo |
| 62 | Vape Pin Items |
| 63 | Accessories |
| 64 | Miscellaneous foods |
| 65 | **Subtotal** |

| | |
|---|---|
| 66 | |
| 67 | **Quantity - Units** |
| 68 | Flower |
| 69 | Concentrate |
| 70 | Cartridges |
| 71 | Tinctures |
| 72 | CBD Oil |
| 73 | Edibles Capsules, lo |
| 74 | Vape Pin Items |
| 75 | Accessories |
| 76 | Miscellaneous foods |
| 77 | **Subtotal** |
| 78 | |

| 6 | Job Title | | Annual Salary/Wage | Pay Type |
|---|---|---|---|---|
| 7 | Consultant | $ | - | Hourly |
| 8 | CEO/Director of Operati | $ | 130,000 | Salary |
| 9 | General Manager | $ | 75,000 | Salary |
| 10 | Inventory | $ | 39,520 | Salary |
| 11 | Inventory | $ | 37,440 | Hourly |
| 12 | Sales Associates | $ | 37,440 | Hourly |
| 13 | Sales Associates | $ | 37,440 | Hourly |
| 14 | Sales Associates | $ | 37,440 | Hourly |
| 15 | Sales Associates | $ | 37,440 | Salary |
| 16 | Sales Associates | $ | 37,440 | Hourly |
| 17 | Sales Associates | $ | 37,440 | Hourly |
| 18 | Sales Associates | $ | 37,440 | Hourly |
| 19 | Sales Associates | $ | 37,440 | Hourly |
| 20 | Receptionist | $ | 33,290 | Hourly |
| 21 | Supervisor | $ | 47,850 | Hourly |
| 22 | Team Lead | $ | 41,600 | Hourly |
| 23 | Team Lead | $ | 41,600 | Hourly |
| 24 | Add Description & Annualized Salary | | | |
| 25 | Add Description & Annualized Salary | | | |
| 26 | Add Description & Annualized Salary | | | |
| 27 | Add Description & Annualized Salary | | | |
| 28 | | | | |
| 29 | **Totals** | | | |

*See* Ex. C142.

Holistic began limited operations in February 2023 and opened as an Expanded ATC in May 2023. Jonsson and the other members of Holistic were sent the first quarterly financial statements, for 2023Q1, via email on June 9, 2023. *See* Ex. C130. Holistic's members were provided with Holistic's 3rd Quarter 2023 Financial Information and the 2023 Budget on October 31, 2023. *See* Ex. C142. Holistic's profit and loss statement for July-September 2023 was provided. *See* Ex. C142. Eastbound received the same financial reporting at the same time as the other members. No other member of Holistic complained about insufficiency of financial information. Tr. 953.

With respect to Jonsson's demands for QuickBooks access, Nickelson testified that she became concerned that Jonsson was asking for operational data well beyond that of any other member and that he may have been sharing confidential information of Holistic with unauthorized parties. Tr. 170-72. Nickelson provided Eastbound with the same financial information the Company provided to other members. Tr. 953. Nickelson had reservations about providing Eastbound with additional financial information or permitting access to the Company's QuickBooks because she correctly suspected, correctly, that Jonsson was sharing confidential Company information with undisclosed third parties. Tr. 176, 180; Ex. C152. Eastbound presented no evidence that Nickelson's reluctance to share the Company's QuickBooks or certain other financial records was to "hide" alleged financial improprieties or for any other improper purpose.

I find that Holistic provided Eastbound with sufficient information concerning the company's activities, financial condition, and other circumstances material to the proper exercise of Eastbound's rights and duties under the operating agreement and the RULLCA. Given the

detail that Jonsson was already receiving through access to the KPI, it was reasonable for Nickelson to deny further access to the Company's QuickBooks or refuse to provide additional reporting that no other member requested. *See* N.J.S.A. §42:2C-40(a)(2)(a). Further, given her concerns regarding Jonsson sharing the Company's Confidential Information with unauthorized persons, which are confirmed by emails exchanged at the time of Jonsson's requests, Nickelson fairly exercised her business judgment in finding that Eastbound's demands for additional detail and access were unreasonable or otherwise improper under the circumstances. *See* N.J.S.A. §42:2C-40(a)(2)(b).

Eastbound failed to prove that Holistic and/or Nickelson breached the Holistic OA or violated N.J.S.A. §42:2C-40 by failing to provide sufficient financial information to enable it to protect its membership interests. Counts 1 and 2 of the Eastbound Counterclaims are dismissed with prejudice. Eastbound's claim for breach of contract or for alleged statutory violations related to insufficient financial information is dismissed with prejudice.

**5. Eastbound Failed to Produce Sufficient Evidence of Manager Mismanagement to Support a Breach of the Holistic OA.**

Eastbound also claimed that Nickelson mismanaged Holistic. *See* Respondents' Pre-Hearing Brief at 25. New Jersey courts have long held that it is improper to interfere with the internal government of businesses where there are "honest differences of opinion concerning management between different factions in interest." *Sarner v. Sarner*, 62 N.J. Super. 41, 60 (App. Div. 1960). The business judgment rule protects directors for a business "from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct." *In re PSE&G Shareholder Litig.*, 173 N.J. 258, 277 (2002) (superseded by statute as to derivative suit burdens of proof). "Under the rule, when business judgments are made in good faith based on reasonable business knowledge, the decision makers are immune from

liability from actions brought by others who have an interest in the business entity." *Green Party of N.J. v. Hartz Mountain Indus., Inc.*, 164 N.J. 127, 147 (2000) (citing *Sarner*, 62 N.J. Super at 60). Even if a decision is "unwise from a business standpoint, it is not the place for courts to question the efficacy of such decisions," as New Jersey courts have found that "bad judgment, without bad faith, does not ordinarily make officers individually liable." *Lamme v. Client Instant Access, LLC*, Case No. A-2689-20, 2022 WL 1276123 at *3 (N.J. Super. Ct. App. Div. April 29, 2022). Thus, even actions that were ill-advised or caused financial damage to a business are alone insufficient to overcome the presumption created by the business judgment rule, and parties must factually demonstrate that members acted in bad faith to prevail on their claims. *See Lamme*, 2022 WL 1276123 at *4; *Ruccolo v. Ardsley W. Community Ass'n, Inc.*, Case No. A-1563-21, 2024 WL 1316094, at *7 (N.J. Super. Ct. App. Div. Mar. 28, 2024).

The New Jersey Supreme Court highlighted the following principles articulated by the American Law Institute when discussing the corporate governance duties relevant to the business judgment rule:

> (a) A director or officer has a duty to the corporation to perform the director's or officer's functions in good faith, *in a manner that he or she reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person would reasonably be expected to exercise in a like position and under similar circumstances*. […]
>
> (c) A director or officer who makes a business judgment in good faith fulfills the duty under this Section if the director or officer:
>
>> (1) is not interested […] in the subject of the business judgment;
>>
>> (2) is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances; and
>>
>> (3) rationally believes that the business judgment is in the best interests of the corporation.

*Seidman v. Clifton Sav. Bank, S.L.A.*, 205 N.J. 150, 176 (2011) (emphasis added). Further, "when corporate actions either have been approved or ratified by the stockholders, the propriety of those actions is to be gauged by the business judgment rule." *Id.* at 177. Where the business judgment rule applies, ratified corporate actions are presumed to be correct and that "presumption may be rebutted only if the challenged corporate actions are so far from the norm of responsible corporate behavior as to be unconscionable or constitute a fraud, impermissible self-dealing or corporate waste." *Id*.

The testimony from Nickelson, Cabrera, and Ms. Edmund established that Nickelson acted in a considered manner as Manager of Holistic that she believed, after quite regularly consulting with legal counsel, was: (1) authorized by the Holistic OA; (2) reasonably appropriate under the circumstances; (3) in the best interests of the business; and (4) sufficiently informed. *See Green Party,* 164 N.J. at 147; *Seidman,* 205 N.J. at 177. The removal of Eastbound was ratified by the other non-affected members of Holistic after receiving the advice of Holistic's legal counsel. Eastbound has failed to present credible evidence to rebut the presumption afforded by the business judgment rule.

Eastbound presented no evidence that Nickelson's decision as Manager to operate for a period before creating an annual operating budget constituted fraud or willful misconduct or otherwise harmed Eastbound and/or the Company. Respondents pointed only to Holistic's declining sales since Eastbound's removal as evidence of Nickelson's mismanagement. However, a company's sales can decline for any number of reasons and the anecdotal evidence presented was certainly insufficient to establish bad faith mismanagement. Respondents' breach of contract claim alleging mismanagement of Holistic by Nickelson is dismissed with prejudice.

### K. Eastbound's "Oppression" Claim Fails As A Matter of Law.

Eastbound claimed that Nickelson oppressed Eastbound and violated the RULLCA by frustrating Eastbound's reasonable expectations under the Holistic Deal Documents. *See* Respondents' Pre-Hearing Brief at 23-24. In Count 7 of its Counterclaims, Eastbound asserted a claim for oppression. *See* Eastbound Counterclaim, Count 7. "Illegality and fraud may frustrate a shareholder's reasonable expectations for a company but nonetheless not qualify as oppression. That is so because oppression is usually directed at a minority shareholder personally, whereas fraudulent or illegal conduct can instead be directed at solely the shareholder's investment in the corporation." *Brenner v. Berkowitz*, 134 N.J. 488, 506, 634 A.2d 1019, 1028 (1993).

Unlike the Business Corporations Act, however, the RULLCA has no equivalent oppressed shareholder provision. *See Tutunikov v. Markov*, No. A-1827-10T3, 2013 WL 3940889, at *8 (N.J. Super. Ct. App. Div. Aug. 1, 2013). Instead, the RULLCA contains a provision at N.J.S.A. §42:2C–48a(5)(b) permitting a member to apply to the Superior Court for "an order dissolving the company on the grounds that the managers or those members in control of the company ... have acted ... in a manner that is oppressive and was, is, or will be directly harmful to the applicant." *See id.* Eastbound sought no such relief here.

The New Jersey Superior Court has stated, "Given the lack of an oppressed member provision in the LLCA, our holding in *Denike*[32] and the Legislature's recent actions, we think it clear that the BCA's oppressed shareholder provisions have no application to an LLC." *See Tutunikov*, 2013 WL 3940889, at *9. Accordingly, to the extent Eastbound's "oppression" claim against Holistic and Nickelson purports to arise from the RULLCA, it fails as a matter of law. *Id.*

[32] *See Denike v. Cupo,* 394 N.J. Super. 357, 378 (App. Div. 2007), *rev'd on other grounds*, 196 N.J. 502 (2008).

To the extent Eastbound otherwise intended to assert a common law tort claim for "oppression," such a claim is barred by the economic loss doctrine. New Jersey courts have found that the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *See, e.g.*, *Namerow,* 461 N.J. Super. at 145; *see also Durr Mech. Constr*, 516 F. Supp. 3d 407, 418 (D.N.J. 2021) (quoting *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 159 (D.N.J. 2013)) ("The economic loss doctrine 'precludes tort claims where the allegedly tortious conduct is intrinsic to the contract—i.e., where the alleged tort consists of the breach of a contractual promise.'"). Eastbound's Count 7 in its Counterclaims is dismissed with prejudice.

### L. The License Agreement Is Unenforceable and All Parties' Breach Claims Fail As A Matter of Law.

An essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was the promissor undertook to do. *See Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank*, 163 N.J. Super. 463, 474, 395 A.2d 222, 227 (App. Div. 1978). "An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one." *Id.*, citing *Friedman v. Tappan Development Corp.*, 22 N.J. 523, 531, 126 A.2d 646 (1956). "A contract so vague in the description of the performance of each party thereto is incapable of remedy at law or in equity." *Id.*, citing *Caullett v. Stanley Stilwell & Sons, Inc.*, 67 N.J. Super. 111, 115, 170 A.2d 52 (App. Div. 1961).

The requirement of a meeting of the minds "is an essential element to the valid consummation of any contract." *Read v. Profeta*, 397 F. Supp. 3d 597, 626 (D.N.J. 2019). Here, an essential, material term of the License Agreement was never agreed upon. The parties

apparently intended to attach additional documentation to the License Agreement as exhibits and/or specify or describe what constituted the "Licensed Property," but they failed to do so. On the record presented, there was simply no meeting of the minds reached. "[I]t is not the function of the court to make a better contract for the parties, or to supply terms that have not been agreed upon." *Graziano v. Grant*, 326 N.J. Super. 328, 342 (App. Div. 1999) (citing *Schenck v. HJI Assoc.*, 295 N.J. Super. 445, 450 (App. Div.), *certif. denied*, 149 N.J. 35 (1996)). Because the contract is unenforceable, the breach of contract claims of Holistic, Nickelson and Eastbound under the License Agreement fail as a matter of law and are dismissed with prejudice.

**M. As Prevailing Parties, Holistic and Nickelson Are Entitled To Reasonable Attorneys' Fees and Certain Expenses.**

N.J.S.A §2A:23B-21(b) states, "An arbitrator may award reasonable attorney's fees and other reasonable expenses of arbitration if such an award is authorized by law in a civil action involving the same claim or by the agreement of the parties to the arbitration proceeding." *Id.*

**1. The Holistic OA and JAMS Rules**

Subject to Section 14.15 of the Holistic OA, I am required to "determine how the fees and expenses of the arbitration must be borne by the disputing parties. Those fees and expenses must include all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses, witness fees, and attorneys' fees." *See* Ex. C22, §14.12(d)(iv). Any award in this arbitration is also governed by JAMS Rule 24, Awards. Rules 24(f) and 24(g) provide as follows:

> (f) The Award of the Arbitrator may allocate Arbitration fees and Arbitrator compensation and expenses, unless such an allocation is expressly prohibited by the Parties' Agreement. (Such a prohibition may not limit the power of the Arbitrator to allocate Arbitration fees and Arbitrator compensation and expenses pursuant to Rule 31(c).)

> (g) The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

*See* JAMS Rules 24(f) and 24(g). Further, JAMS Rule 31(c) provides:

> The Parties are jointly and severally liable for the payment of JAMS Arbitration fees and Arbitrator compensation and expenses. In the event that one Party has paid more than its share of such fees, compensation and expenses, the Arbitrator may award against any other Party any such fees, compensation and expenses that such Party owes with respect to the Arbitration.

*See* JAMS Rule 31(c).

Separately, in the Holistic OA at Section 14.15 the parties agreed as follows:

> Attorneys' Fees. In the event that any party hereto institutes any legal suit, action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, <u>the prevailing party</u> in the suit, action, or proceeding <u>shall be entitled to receive</u>, in addition to all other damages to which it may be entitled, <u>the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses, and court costs</u>.

Ex. C22, §14.15 (emphasis added).

### 2. "Prevailing Party" Determination Under New Jersey Law

The threshold issue in determining whether an attorneys' fee award is reasonable is whether the party seeking the fee prevailed in the litigation. *See Singer v. State,* 95 N.J. 487, 494, 472 A.2d 138, *cert. denied,* 469 *U.S.* 832 (1984). "Because the focus should be on the ultimate results achieved through the litigation, a two-pronged test has been established to determine when a party seeking fee shifting has been a prevailing party." *N. Bergen Rex Transp., Inc. v. Trailer Leasing*

*Co., a Div. of Keller Sys.*, 158 N.J. 561, 570–71, 730 A.2d 843, 848–49 (1999). "The first part of the *Singer* test requires "a party to demonstrate that his lawsuit was causally related to securing the relief obtained; a fee award is justified if the party's efforts are a 'necessary and important' factor in obtaining the relief." *Id.* "The first prong requires a factual causal nexus between the pleading and the relief ultimately received." *Id.* The second part of the *Singer* test requires the party seeking attorneys' fees to show that "the relief granted had some basis in law." *Id.* The second prong requires both a factual and legal determination. *Id.* The party seeking attorneys' fees need not recover all relief sought, but rather, there must be "the settling of some dispute that affected the behavior of the party asked to pay attorneys' fees towards the party seeking attorneys' fees." *Id.* (quoting *Davidson v. Roselle Park Soccer Fed'n,* 304 N.J. Super. 352, 357, 700 *A.*2d 900 (Ch. Div. 1996)).

However, *Singer* also recognized that when a prevailing party has not been successful on all of its claims, an award of attorneys' fees based on an hourly rate multiplied by the total hours spent may result in an excessive fee. *See Singer,* 95 N.J. at 499–500, 472 A.2d 138. Before *Singer* was decided, the Appellate Division adopted a rule for measuring whether attorneys' fees are excessive in cases in which the prevailing party received less than a complete recovery. In *Cohen v. Fair Lawn Dairies, Inc.,* the court stated:

> "[W]here the merit or necessity of the creditor's claim or defense is successfully challenged, courts may decline to enforce attorney's fee provisions. When contractual provisions for payment by a debtor of his creditor's attorney's fees and costs are invoked, such payment should not be enforced in the full amount of the creditor's legal expenses (even though actually incurred, and reasonable in amount) where his claims or defenses giving rise to such expenses lack substantial merit. In no event should the sum allowed be so large as to amount to an undue penalty for taking one's grievance to the courts. And if the creditor has benefitted (sic) by having a doubtful question of law resolved, thus reducing the area of potential future dispute, the debtor should bear only a fair portion of the burden."

86 N.J. Super. 206, 216–17, 206 A.2d 585 (App. Div. 1965), *aff'd,* 44 N.J. 450, 210 A.2d 73 (1965) (quoting *Manchester Gardens, Inc. v. Great West Life Assurance Co.,* 205 *F.*2d 872, 878 (D.C. Cir. 1953)).

Although the New Jersey Supreme Court did "not establish a *per se* requirement that there be a close relationship between recovery and fees awarded for services rendered," it held that "when a substantial portion of a claim sought is ultimately rejected, that circumstance should be considered along with other factors, including those contained in RPC 1.5(a), to determine a reasonable award of attorneys' fees." *N. Bergen Rex Transp.*, 158 N.J. at 573-74, 730 A.2d at 850-51. Thus, "if a successful plaintiff has achieved only limited relief in comparison to all of the relief sought, the court must determine whether the expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained and, if not, reduce the award proportionately." *Singer,* 95 N.J. at 500, 472 A.2d 138 (internal citation omitted).

**a. Holistic Prevailed on the Majority of Its Affirmative Claims Against Respondents and Defeated All of the Counterclaims Asserted by Eastbound Against Holistic.**

In this matter, Holistic has satisfied the *Singer* test. It prevailed on the central issues in this arbitration, namely whether the non-disclosure of the Cliffside Deal created a "Regulatory Problem" under the Holistic OA, whether Eastbound's removal as a member was proper, and whether Eastbound breached the Holistic OA by, *inter alia*, entering into the Cliffside Deal without Holistic's consent, failing to provide information required by the NJ Marijuana laws, and/or creating a "Regulatory Problem." Further, Holistic prevailed on its declaratory judgment claims seeking confirmation that the removal of Eastbound was lawful and proper, that Eastbound forfeited its interests for no compensation, and that, to the extent Eastbound attempted to convey any membership interest in Holistic to Cliffside via the Cliffside Deal, the conveyance was null

and void. The factual findings confirmed Holistic's claims and the legal conclusions settled a dispute that affected the behavior of Eastbound towards Holistic. *See N. Bergen Rex Transp.*, 158 N.J. at 570–71. Holistic also successfully defeated ten separate counterclaims asserted by Eastbound.

However, Holistic did not prevail on its fraud claim, its piercing the corporate veil claim, or its claim for breach of fiduciary duty. It also did not prevail on its breach claim associated with the License Agreement, but no party did due to the contract being unenforceable. Part of the *Singer* test requires that I consider Holistic's failure to prevail on these claims and make any necessary adjustments to the fee award, which I will do below.[33]

**b. Nickelson Prevailed on Her Declaratory Judgment Claim and Defeated All Ten of Eastbound's Third-Party Claims Against Her Individually.**

Eastbound asserted ten separate causes of action against Nickelson, individually, and failed to prove any of them. Due to the fraud allegations in particular, Nickelson was required to obtain separate legal counsel from Holistic to represent her in this matter. The results that Nickelson obtained, as well as the factual and legal findings in her favor, confirm that she satisfies both parts of the *Singer* test. She is entitled to reasonable attorneys' fees and expenses under the Holistic OA

[33] To the extent Jonsson and Sciarrone have argued that they should separately be entitled to attorneys' fees as "prevailing parties," I find that they do not satisfy the *Singer* test. Because the focus of the Singer test is "on the ultimate results achieved through the litigation," and the first part of the *Singer* test requires "a party to demonstrate that his lawsuit was causally related to securing the relief obtained," Jonsson and Sciarrone fail to satisfy the first prong of the Singer test. *See N. Bergen Rex Transp.,* 158 N.J. at 570–71, 730 A.2d at 848–49. First, Sciarrone and Jonsson did not separately assert affirmative counterclaims against Holistic and Nickelson. *See* Eastbound's 6/17/2025 Amended Counterclaims. Second, Sciarrone and Jonsson were the individuals acting on behalf of their companies, Cliffside and Eastbound, respectively, and the results of the litigation were heavily in favor of Holistic. Jonsson and Sciarrone did not prevail on the ultimate results achieved through the litigation and they are therefore not entitled to a separate fee award. *See N. Bergen Rex Transp.,* 158 N.J. at 570–71, 730 A.2d at 848–49. However, in determining the amount of the fee award to Holistic, I have considered the fact that Holistic did not prevail on all of its claims and will reduce its award accordingly.

as a prevailing party. The fee award is justified because counsel's efforts were a 'necessary and important' factor in obtaining the relief. *See id.* There is factual causal nexus between her affirmative defenses and the relief ultimately received. *Id.* The dismissal of the claims against Nickelson was factually and legally supported by the record. *Id.*

### 3. New Jersey Law Governing Fee Awards

Any award of attorneys' fees and costs "must start from the proposition that New Jersey has a strong public policy against the shifting of costs and that [the New Jersey Supreme] Court has embraced that policy by adopting the 'American Rule,' which prohibits recovery of counsel fees by the prevailing party against the losing party." *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 439–40 (N.J. 2009) (quoting *In re Est. of Vayda*, 184 N.J. 115, 120 (2005)). "The [American Rule] promotes three goals: (1) unrestricted access to the courts for all persons; (2) ensuring equity by not penalizing persons for exercising their right to litigate a dispute, even if they should lose; and (3) administrative convenience." *Boyle v. Huff*, 314 A.3d 793, 799 n.1 (N.J. 2024) (quoting *In re Niles Tr.*, 823 A.2d 1, 8 (N.J. 2003)). "Under the American Rule, which is the law of [New Jersey], a prevailing party may not be granted attorney's fees unless authorized by the parties' contract, court rule, or statute." *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d at 439–40 (internal quotation marks omitted) (quoting *Rock Work, Inc. v. Pulaski Const. Co., Inc.*, 933 A.2d 988, 991 (App. Div. 2007)).

New Jersey law recognizes "a party may agree by contract to pay attorneys' fees." *Id.* (quoting *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 848 (N.J. 1999)); *see also Magnet Res., Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275, 293 n.6 (App. Div. 1998) (finding that contract provisions that a party injured by a breach can recover attorneys' fees and court costs as part of its damages is generally enforceable); *King Transcription Servs., LLC v. Phoenix Transcription, LLC*, No. A-5034-15T1, 2019 WL 1283894 at *15 (N.J. Super. Ct. App.

Div. Mar. 19, 2019) (enforcing an operating agreement's attorneys' fees provision). However, "even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorneys' fees." *Boyle*, 314 A.3d at 799 n.5 (internal quotation marks omitted).

**4. Holistic and Nickelson Are Entitled to a Monetary Award Under the Holistic OA.**

Subject to Section 14.15 of the Holistic OA, I have discretion to determine how to allocate among the parties the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses, witness fees, and attorneys' fees. *Id.*, §14.12(d)(iv). The parties expressly agreed that any prevailing party in the suit, action, or proceeding "shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses, and court costs." Ex. C22, §14.15.

**5. Assessment of the Requested Amounts.**

The amount of an attorneys' fees award "rests within the sound discretion" of the trial court. *See Empower Our Neighborhoods v. Guadagno*, 453 N.J. Super. 565, 579 (App. Div. 2018). When attorneys' fees are authorized by a contract, a reasonableness test used in awarding attorneys' fees is applied. *See Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 386 (2009); *see also N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 569 (1999).

"The starting point in awarding attorneys' fees is the determination of the 'lodestar,' which equals the 'number of hours reasonably expended multiplied by a reasonable hourly rate.'" *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 21 (2004) (quoting *Rendine v. Pantzer*, 141 N.J. 292, 335 (1995)). The United States Supreme Court has consistently upheld the lodestar calculation as the 'guiding light of [its] fee-shifting jurisprudence.'" *Bywaters v. U.S.*, 670 F.3d 1221, 1228-29 (Fed.

Cir. 2012)(citations omitted), quoting *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1672 (2010). I should satisfy myself "that the assigned hourly rates are fair, realistic, and accurate," or make appropriate adjustments. *Rendine*, 141 N.J. at 337. I have followed these principles in determining the monetary awards here.

In assessing a request for fees under New Jersey law, I am also required to consider the factors laid out in RPC 1.5(a). A party seeking attorneys' fees is required to submit an affidavit of services addressing the RPC 1.5(a) factors. R. 4:42-9(b). I required the parties to do so here. *See* February 23 Costs Order. I also gave all parties the opportunity to object to any costs sought by another party.

The New Jersey Supreme Court, in *Furst v. Einstein Moomjy, Inc.* 182 N.J. 1, 21 (2004), outlined the factors that must be considered in deciding the amount of an attorneys' fee award. Among other things, the *Furst* factors, require that I consider the time and labor required, the complexity of the matter and the legal issues involved, the skills required to perform the legal services and the credentials of the attorneys performing the work, the customary hourly rates, and the results the attorneys obtained for the client.

I have carefully scrutinized the affidavits and supporting materials submitted by the parties, as well as any objections thereto. As set forth in the following sections, I have adjusted the amounts requested by the prevailing parties as necessary.

**a. Findings Related to the Holistic Award**

Holistic requested a total award of $1,462,206.60 for legal fees, costs, and expenses it incurred throughout this Arbitration as of March 11, 2026; this amount is broken down as follows:

a. Attorneys' Fees
   1. A.Y. Strauss, LLC: $818,868.43

2. Vicente LLP: $63,333.31

b. Costs

1. MCS Group: $42,904.94
2. Veritext: $40,265.43
3. Arbitrator (Blank Rome LLP): $487,871.26
4. Disbursements/Advancements by A.Y. Strauss, LLC: $8,963.23

*See* 3/11/26 Affidavit of Robert J. Donaher, Counsel for Holistic ("Donaher Aff.") at ¶ 3. By comparison, Respondents were seeking to recover $2,055,808.49 in attorneys' fees and $565,585.29 in costs, for a total amount of $2,621,393.78. *See* 3/11/2026 Declaration of Jeffrey J. Greenbaum ("Greenbaum Decl.") in support of Respondents' Fee, Exhibit A. Additional Arbitrator fees were incurred by both parties after March 11, 2026, and have been accounted for in this Opinion.

**i. Time, Labor and Skill Required**

I find that the novelty and complexity of the applicable law and underlying legal issues, the competing interests of the parties at stake, and the highly contentious nature of the proceedings, significant time, labor, effort and considerable skill were required to effectively represent Holistic in this Arbitration. A.Y. Strauss, LLC ("AYS") timekeepers spent approximately 1,602 billable hours on the matter. *See* Donaher Aff. at ¶4. Subject to the adjustments required below, I find the number of hours billed by AYS to be reasonable given the complexity of the matter. By comparison, Respondents were seeking to recover for approximately 3,465 hours of billable time for its timekeepers in the case. *See* Greenbaum Decl., Exhibit B.

**ii. Other Employment**

The time commitment required for the effective representation of Holistic in this Arbitration affected the ability of the two primary AYS attorneys involved in the case to take on other work.

### iii. Reasonableness of Hourly Rates

I find that the hourly rates charged by AYS are competitive with the fees charged in the New Jersey and northern New Jersey market for representation in litigation of this nature. Lead counsel for Holistic, Mr. Donaher, billed at the discounted hourly rate of $600, whereas his standard hourly rate is $715. *See* Donaher Aff. at ¶ 4. By comparison, the hourly rates charged by Respondents' two lead attorneys at the hearing were $1,025 per hour and $850 per hour, respectively. *See* Greenbaum Decl., Exhibit B. At all times relevant to the arbitration, the hourly rates charged by Respondents' lead lawyers exceeded that of Holistic's lead counsel. Mr. Donaher has over three decades of litigation experience in complex litigation, arbitrations, white-collar criminal defense and appeals. *See* Donaher Aff. at ¶ 7. The $600 per hour rate that he charged is competitive with the rates charged by New Jersey firms for partners of similar background and experience, including counsel for Respondents. I find his hourly rate for representation of Holistic this matter to be reasonable.

Ms. Sjolund is a first-year associate at AYS and she provided primary attorney support prior to, during and after the hearing. She was billed at $350 per hour. *See* Donaher Aff. at ¶5. For comparison, the paralegal rates charged by Respondents' counsel were at or above this $350 per hour rate. *See* Greenbaum Decl. and supporting Exhibits. Mr. Camperson, who served in a similar role to Ms. Sjolund at the hearing, was billed at $525 per hour. *Id.* I find Ms. Sjolund's hourly rate to be reasonable and competitive with the rates charged by New Jersey firms for associates of similar background and experience.

As noted below, certain of Ms. Cabrera's time billed by AYS will be allowable as part of the cost-shifting. As to her time entries related to the arbitration, I find that her billable rate of $600 per hour for this matter is reasonable given her credentials, experience, and practice focus. *See* Donaher Aff. ¶ 7. Her hourly rate is competitive with the rates charged by New Jersey firms

for partners of similar experience, including similar counsel for Respondents. For the remaining AYS timekeepers identified, *see* Donaher Aff. at ¶¶ 5 and 7, I likewise find their rates to be reasonable and competitive with the rates for comparable timekeepers at New Jersey firms.

**iv. Results Obtained and Time Limitations**

Although the Arbitration spanned more than a year, the most significant activity in the case occurred over a three-month time period that was time intensive. Both sides described the matter as a "bet-the-company" type arbitration and much was at stake for both sides. Holistic's counsel diligently represented Holistic's interests throughout the arbitration and obtained a positive result.

**v. Adjustments to the Amounts Requested**

As noted above, in accordance with the *Singer* test, I am required to determine "whether the expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained ... and, if not, reduce the award proportionately." *Singer, supra,* 95 *N.J.* at 500, 472 *A.*2d 138. I have carefully analyzed the claims asserted by all parties and conclude that Holistic prevailed on approximately eighty-five percent (85%) of the claims it asserted and counterclaims it defended in this proceeding. Accordingly, to reflect the claims on which Holistic did not prevail and to ensure the award is reasonable in relation to the actual relief obtained, the attorneys' fees requested by Holistic for services provided by AYS will be reduced by 15%, or the equivalent of $122,830.26. *See id.*

In addition, with regard to time that Cabrera billed while serving as a fact witness in this matter, I find that these fees are not recoverable as attorneys' fees. Holistic will be responsible for Cabrera's time as a fact witness in this arbitration. As such, any time billed by AYS for services provided by Cabrera either in preparation for testimony or while testifying has been removed from the award. Reductions have also been made for Cabrera's time entries that are either not

sufficiently clear as to be considered an expense of the arbitration, or related to matters before the NJ-CRC, or reflective of other corporate or regulatory advice she provided to Holistic. Accordingly, Cabrera's billable hours will be reduced by 29.8 hours. This amounts to an additional reduction of $17,880 from the requested amount. In sum, Holistic will be awarded $678,158.17 as a reasonable attorneys' fee for the services of AYS.

With respect to the fees requested in Category a.2., the fees related to legal services provided by Vicente, LLC will also be reduced. First, as to the Vicente invoices from February 2024 through July 2024, the services and amounts billed relate to the time period prior to the filing of the arbitration and the time entries are clearly not "expenses of the arbitration." Any monetary amounts for services not compensable as "expenses of the arbitration" have been removed from the award. *See* Ex. C22, §14.12(d)(iv).

However, with respect to Respondents' argument that Holistic is not entitled to *any* of the Vicente attorney time because Vicente was not counsel to Holistic for this arbitration, I disagree. Respondents' argument is factually incorrect. The Vicente firm clearly had a role in the preparation of Holistic's initial arbitration demand and its filing, as well as the initial strategy, communications with the client, and arbitrator selection. The Invoices from August 2024 (for time in July) through January 2025 (for time in December 2024), reflect time entries to this effect from several Vicente attorneys, with reasonable rates ranging from $325 per hour to $600 per hour. The Vicente law firm specializes in the area of cannabis law, and the rates charged by the Vicente attorneys are competitive with the rates charged in New Jersey for legal services in matters of this nature and for the level of expertise required in this matter.

I have determined that the majority of the time entries in the Vicente invoices from August 2024 through January 2025 are expenses related to the arbitration and will be recoverable.

However, there are several time entries during this time period that appear to relate to regulatory advice and/or dealings with the NJ-CRC that I do not consider to be "expenses of the arbitration." I have made downward adjustments to the award accordingly. The amount awarded to Holistic for attorneys' fees of Vicente LLP as expenses of the arbitration shall be reduced from the requested amount of $63,333.31 to an awarded amount of $12,183.00.

Separately, as provided in the Holistic OA, it is within my discretion to determine how to allocate expenses like travel expenses and out-of-pocket expenses among the parties. *See* Holistic OA, §14.12(d)(iv). I find that certain cost amounts billed by AYS for meals, travel or parking shall be Holistic's responsibility and they will not be assessed against Eastbound. The amount awarded to Holistic for disbursements or advancements by AYS will therefore be reduced by $1,357.48. Holistic will be awarded $7,605.75 for disbursements or advancements by AYS.

As to the remaining costs requested by Holistic, I find that Holistic is entitled to recover the full amount of its portion of the Arbitrator's fees incurred as of the date of this Award. This amounts to $596,160.26 and will be included as part of the monetary award.[34] I have reviewed in detail the invoices for the costs Holistic seeks for the services of MCS Group (for litigation support: imaging, forensics, Relativity hosting, etc.) amounting to $42,904.94, and for Veritext (stenographic services) amounting to $40,265.43. I find all such amounts to be a reasonable and recoverable expense of the arbitration. As such, these amounts will be included in the monetary award to Holistic.

**b. Findings Related to the Nickelson Award**

Third-Party Respondent Suzan Nickelson requests a total award of $690,190.94. *See* 3/11/2026 Affidavit of Ethan Hougah, Counsel for Nickelson ("Hougah Aff.") at ¶ 10. The total

[34] This amount includes Holistic's portion of the Arbitrator's fees, $108,289.00, invoiced on April 2, 2026, which occurred subsequent to the parties' submission of their affidavits seeking costs.

request consists of $620,632.00 in attorneys' fees charged to Ms. Nickelson, $62,540 in additional attorneys' fees that were not charged by her attorneys due to Ms. Nickelson's inability to timely keep up with outstanding invoices, and $7,018.94 in costs. Hougah Aff. at ¶ 80.

**i. Time, Labor and Skill Required**

As noted above, Nickelson was required to obtain her own counsel due to the fraud allegations levied against her by Eastbound. Nickelson retained Ethan Hougah, a partner in the Cherry Hill, New Jersey office of Montgomery McCracken Walker & Rhoads LLP ("MMWR"). Hougah Aff. at ¶ 3. Mr. Hougah has been admitted to practice law for sixteen years and his practice focuses on white collar criminal defense, government investigations, and complex commercial litigation. Hougah Aff. at ¶ 3. Mr. Hougah was assisted with briefing and other materials related to the arbitration by his colleagues, Grace Wagner and Jacqualyn Gillen. Hougah Aff. at ¶ 6. Mr. Hougah also relied upon discrete, targeted assistance from three of his partners and one other associate, who performed legal research, assisted with drafting written submissions, and provided legal advice regarding complex corporate and other specialized legal issues. *Id.* Additionally, MMWR support staff provided additional research assistance and document review support. *Id.*

I find that the novelty and complexity of the applicable law and underlying legal issues, the competing interests of the parties at stake, and the highly contentious nature of the proceedings, significant time, labor, effort and considerable skill were required of MMWR timekeepers to effectively represent Nickelson in this Arbitration.

**ii. Other Employment**

Due to the time and attention necessary for the effective representation of Nickelson in this Arbitration affected Mr. Hougah's ability to take on other work, and to a lesser extent, that of his colleagues.

**iii. Reasonableness of Hourly Rates**

The hourly rates charged by Mr. Hougah and his colleagues are at or below the fees charged in the New Jersey and northern New Jersey market for representation in litigation of this nature. Mr. Hougah billed at an hourly rate of $590 for this matter. Hougah Aff. at ¶ 4. Ms. Wagner was billed at between $350 and $365 per hour over the duration of the matter. Hougah Aff. at ¶ 14. Ms. Gillen was billed at $360 per hour over the duration of the matter. Hougah Aff. at ¶ 15. At all times relevant to the arbitration, the hourly rates charged by Respondents' lead attorneys exceeded that of Nickelson's lead attorney.[35] For the remaining MMWR timekeepers identified, *see* Hougah Aff. at ¶¶ 16-22, I likewise find their rates to be competitive with or below the rates for timekeepers with comparable backgrounds, credentials and/or experience at comparable New Jersey firms.

**iv. Reasonableness of Hours Charged**

MMWR spent 1,273.4 hours of attorney time and 6.9 hours of supporting legal staff time on this case. Hougah Aff. at ¶ 12. Of this time, MMWR "no charged" 106.0 hours of attorney time to accommodate Ms. Nickelson. *Id.* By comparison, Respondents were seeking to recover for approximately 3,465 hours billed by Sills Cummis timekeepers in the case. *See* Greenbaum Decl., Exhibit B. Given the foregoing and considering the complexity of the matter, I find that the number of hours spent by MMWR timekeepers to be reasonable.

With respect to the analysis required by *Singer*, Nickelson defeated all ten causes of action asserted against her by Eastbound and she prevailed on her declaratory judgment claim. The only claim she did not prevail on was her affirmative claim for malicious abuse of process. However, I do not find this requires any separate downward adjustment to the monetary amount awarded to

[35] Over the course of the arbitration, Mr. Greenbaum's hourly rate ranged from $895 to $1,025, and Mr. Shumofsky's hourly rate ranged from $775 to $850. *See* Respondents' 3/18/2026 Opposition Letter Brief at 4.

Nickelson because the abuse of process claim was not materially different from the time MMWR otherwise spent in defending Nickelson or pursuing the declaratory judgment, and the "expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained." *Singer,* 95 N.J. at 500, 472 *A.*2d 138.

**v. Results Obtained and Time Limitations**

Although the Arbitration spanned more than a year, significant activity in the case occurred over a three-month time period. Due to the nature of the claims asserted against Nickelson, individually, this matter had significant implications to Nickelson personally. The attorneys of MMWR worked diligently in support of a positive result for their client.

**vi. Adjustment to Amounts Requested**

As a prevailing party, Nickelson is entitled to reasonable attorneys' fees, expenses and costs. However, the Holistic OA permits only amounts "incurred" as "expenses of the arbitration" to be considered as part of any award. *See* Ex. C22, §14.12(d)(iv). As such, the amounts that MMWR chose not to charge Nickelson cannot be considered expenses of the arbitration, as they were not expenses that Nickelson actually incurred. Accordingly, the amount awarded to Nickelson will not include the additional $62,540 for attorneys' fees.

I have carefully reviewed the MMWR invoices and find that all other fees and costs reflected in those invoices are reasonable expenses of the arbitration. Nickelson will be awarded $620,632.00 for reasonable attorneys' fees to MMWR and $7,018.94 in costs advanced by MMWR.

**6. Interest on the Monetary Awards.**

No part of the monetary awards requires an award of pre-judgment interest since, pursuant to JAMS Rule 31, the parties agreed that they were jointly and severally liable for all arbitration

fees and costs until any award was entered by the Arbitrator to the contrary. *See* JAMS Rule 31; *see also N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., a Div. of Keller Sys.*, 158 N.J. 561, 576, 730 A.2d 843, 852 (1999) (no prejudgment interest is permitted on award of reasonable attorneys' fees).

Finally, I am required by Section 14.12 of the Holistic OA to specify the statutory post-judgment interest due on any monetary award. *See* Ex. C22, §14.12. Pursuant to Rule 4:42-11(a)(iii), for judgments exceeding the monetary limit of the Special Civil Part at the time of entry for calendar year 2026 (commencing January 1, 2026), the post-judgment annual rate of interest is set at 6.5%. See https://www.njcourts.gov/notices/notice-post-judgment-interest-rate-calendar-year-2026-rule-442-11 (site last visited April 1, 2026). The monetary limit of the Special Civil Part is currently $20,000. *See* https://www.njcourts.gov/sites/default/files/courts/civil/postprejudgmentrates.pdf (site last visited April 1, 2026). Here, each of the monetary awards exceed the monetary limit of the Special Civil Part. Accordingly, post-judgment interest will continue to accrue on each of the awards at 6.5% annually until paid in full.

A Final Judgment and Award is issued herewith.

IT IS SO ORDERED.

Dated: April 16, 2026

STEPHEN M. ORLOFSKY
Arbitrator